No. 24-40065

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AHMED ABDALLA ALLAM,

*Defendant-Appellant.*

On Direct Appeal from the United States District Court
for the Eastern District of Texas
Beaumont Division

## INITIAL BRIEF FOR APPELLANT

**Elizabeth Emanuel**
3300 Oak Lawn Ave. Suite 700
Dallas, Texas 75219
(214) 253-9153
State Bar of Texas No. 24126180

**Attorney for Appellant**

CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Appellant:** | **Ahmed Abdalla Allam** |
| Represented by: | Elizabeth Emanuel (Appeal) |
| | Kevin B. Ross (Appeal) |
| | Ryan Withington Gertz (Trial) |
| | Thomas William Kelley (Trial) |
| | Gary R. Bonneaux, |
| | *Assistant Federal Public Defender,* |
| | *Eastern District of Texas* (Trial) |
| **Appellee:** | **The United States of America** |
| Represented by: | *United States Attorney for the* |
| | *Eastern District of Texas* (Trial and Appeal) |
| | Stephan Edward Oestreicher, Jr. (Appeal) |
| | Bradley Elliot Visosky (Appeal) |
| | John Bulkley Ross (Trial and Appeal) |
| | Joseph Robert Batte (Trial) |
| **Magistrate Judge:** | Hon. Zack Hawthorn |
| **District Judge:** | Hon. Marcia A. Crone |

/s/ Elizabeth Emanuel
ELIZABETH EMANUEL

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Allam requests oral argument. This appeal asks whether Mr. Allam's conviction under 18 U.S.C. § 922(q)(2)(A) unconstitutionally infringes on his rights under the Second Amendment. Counsel submits that oral argument would assist the Court in applying *Bruen*'s test to the facts of Mr. Allam's case in light of the new Supreme Court precedent in *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................2

STATEMENT REGARDING ORAL ARGUMENT..................................................3

TABLE OF CONTENTS ...............................................................................4

TABLE OF AUTHORITIES ..........................................................................5

JURISDICTIONAL STATEMENT ..................................................................10

ISSUES PRESENTED FOR REVIEW ............................................................11

STATEMENT OF THE CASE.......................................................................12

SUMMARY OF THE ARGUMENT ................................................................19

ARGUMENT AND AUTHORITIES................................................................22

CONCLUSION .........................................................................................64

CERTIFICATE OF SERVICE .......................................................................65

CERTIFICATE OF COMPLIANCE ...............................................................66

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Chiumento*,
  89 F.4th 271 (2d. Cir. 2023), *cert. granted, judgment vacated*
  *sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671
  (U.S. July  2, 2024) ............................................................... 46

*Class v. United States* (*Class I*),
  539 U.S. 174 (2018) .......................................................... 22

*Descamps v. United States*,
  570 U.S. 254 (2013) .......................................................... 30

*DiGiacinto v. Rector & Visitors of George Mason Univ.*,
  704 S.E.2d 365 (Va. 2011) .................................................. 39

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................. *passim*

*Ezell v. City of Chicago*,
  846 F.3d 888 (7th Cir. 2017) .............................................. 38

*GeorgiaCarry.Org, Inc. v. Georgia*,
  764 F. Supp. 2d 1306 (M.D. Ga. 2011) ................................. 38

*Heller v. District of Columbia* (*Heller II*),
  670 F.3d 1244 (D.C. Cir. 2011)............................................ 31

*Koons v. Platkin*,
  673 F. Supp. 3d 515 (D.N.J. May 16, 2023) ......................... 46

*Maryland Shall Issue, Inc. v. Montgomery County*,
  680 F. Supp. 3d 567 (D. Md. 2023)...................................... 46

*May v. Bonta*,
__ F. Supp. __, 2023 WL 8946212 (C.D. Cal. 2023) ............................ 46

*McDonald v. Chicago*,
561 U.S. 742 (2010) ............................................................................ 23

*McRorey v. Garland*,
99 F.4th 831 (5th Cir. 2024) ............................................................... 45

*Miller v. Smith*,
No. 18-cv-3085, 2022 WL 782735 (C.D. Ill. Mar. 14, 2022),
*vacated and remanded*, No. 22-1482, 2023 WL 334788
(7th Cir. Jan. 20, 2023) ........................................................................ 39

*Muscarello v. United States*,
524 U.S. 125 (1998) ............................................................................ 55

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("NRA"),
700 F.3d 185, 194-95 (5th Cir. 2012) ............................................ 35, 36

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022). ....................................................................... *passim*

*People v. Chairez*,
104 N.E.3d 1158 (Ill. 2018) ................................................................ 38

*United States v. Class* (*Class II*),
930 F.3d 460 (D.C. Cir. 2019) ....................................................... 41, 42

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) *cert. granted, judgment vacated*,
No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) ................. 30, 39, 50

*United States v. Dorosan*,
350 Fed. App'x. 874 (5th Cir. Oct. 14, 2009) ...................................... 40

*United States v. Emerson,*
   270 F.3d 203 (5th Cir. 2001) .............................................................. 34

*United States v. Gil,*
   No. 23-50525, 2024 WL 2186916, (5th Cir. May 15, 2024) ................ 30

*United States v. Lopez* (*Lopez I*),
   2 F.3d 1342 (5th Cir. 1993) ................................................................ 52

*United States v. Lopez* (*Lopez II*),
   514 U.S. 549 (1995) ...................................................................... 52, 53

*United States v. Masciandaro,*
   648 F. Supp. 2d 779 (E.D.Va. 2009) ................................................... 47

*United States v. Masciandaro,*
   638 F.3d 458 (4th Cir. 2011) .............................................................. 37

*United States v. Metcalf,*
   No. CR 23-103-BLG-SPW, 2024 WL 358154
   (D. Mont. Jan. 31, 2024) .............................................................. 53, 57

*United States v. Miller,*
   307 U.S. 174 (1939) ............................................................................ 34

*United States v. Perez-Macias,*
   335 F.3d 421 (5th Cir. 2003) ........................................................ 22, 23

*United States v. Power,*
   No. 20-po-331-GLS, 2023 WL 131050 (D. Md. Jan. 9, 2023).............. 46

*United States v. Rahimi,*
   144 S. Ct. 1889 (2024) .............................................................. *passim*

*Wolford v. Lopez,*
   686 F. Supp. 3d 1034 (D. Haw. 2023) ................................................ 47

## Constitutional Provisions

1776 Del. Const. art. 28................................................................ 62, 63

U.S. Const. amend. II ................................................................ 32, 33

## Federal Statutes

18 U.S.C. § 921(a)(26)(B)................................................................ *passim*

18 U.S.C. § 922(g)(1)-(4) ................................................................ 53

18 U.S.C. § 922(g)(8)................................................................ 22, 53

18 U.S.C. § 922(q)(2)(A)................................................................ *passim*

18 U.S.C. § 922(q)(2)(B)(ii) ................................................................ 54

18 U.S.C. § 922(q)(2)(B)(iii) ................................................................ 55

## State Statutes

1878 Miss. Laws 176 ................................................................ 60

1883 Mo. Laws 76................................................................ 60

Tex. Penal Code § 46.02-04 ................................................................ 55

Tex. Transp. Code § 504.945(a)(7)(B) ................................................................ 14

## Session Laws

Gun-Free School Zones Act of 1990,
   Pub. L. No. 101-647, 104 Stat. 4844 ................................................................ 52

**Law Review Articles**

Amy Hetzner,
    *Where Angels Tread: Gun-Free School Zone Laws and an Individual*
    *Right to Bear Arms,*95 Marquette L. Rev. 359 (2011) ......................... 54

D. Kopel & J. Greenlee,
    *The "Sensitive Places" Doctrine,*
    13 Charleston L. Rev. 205, 229-36, 244-47 (2018) ................... 50, 52, 61

**Other References**

K. Alexander Adams,
    *Research Highlights the Impact of Permitless Carry Laws on Crime*
    *and Violence,* University of Wyoming College of Law Firearms
    Research Center (May 29, 2024) ......................................................... 55

## JURISDICTIONAL STATEMENT

**Subject Matter Jurisdiction in the District Court:** This case arose from the prosecution of an offense against the laws of the United States of America. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**Jurisdiction in the Court of Appeals:** This is a direct appeal from a final decision of the U.S. District Court for the Eastern District of Texas, Beaumont Division, entering judgment of conviction and imposing a criminal sentence. This court has jurisdiction of the appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court entered written judgment imposing a 60-month term of imprisonment on January 30, 2024. ROA.435-41. Appellant filed a timely notice of appeal on February 1, 2024. ROA.442-43. Fed. R. App. P. 4(b).

## ISSUE PRESENTED FOR REVIEW

The Second Amendment "presumptively guarantees" individuals a right to "bear arms in public for self-defense," but the Supreme Court has indicated that "longstanding" laws prohibiting carrying of firearms *in* "sensitive places" are permissible. Mr. Allam was sentenced to five years' imprisonment for having a firearm in his car on a public road because he was parked within a 1,000-foot "gun-free" zone *around* a parochial school's property. Does Mr. Allam's conviction under 18 U.S.C. § 922(q)(2)(A) violate his Second Amendment right to keep and bear arms?

## STATEMENT OF THE CASE

This case is about whether the Constitution authorizes the federal government to convict a law-abiding, adult citizen of a felony for keeping a legally-owned firearm in his legally-parked vehicle on a public street simply because his vehicle was within 1,000 feet of a parochial school's property line and because the gun, at some point, crossed state lines.

Appellant Ahmed Allam was convicted on one count of violating the Gun Free School Zones Act ("the Act"), which prohibits possession of a firearm "that has moved in or that otherwise affects interstate commerce" in "a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). Mr. Allam did not bring a gun *into* a school. Nor did he ever set foot on school *property*. But the Act extends its reach to any public area "within a distance of 1,000 feet from the grounds of a public, parochial, or private school." *Id.* § 921(a)(26)(B). Because Mr. Allam had a gun in his car and was parked across the street from a school—albeit on a Sunday night, when no school activity was taking place—his conduct violated the Act. He was convicted of the offense and is now serving a five-year prison term.

12

Before pleading guilty, Mr. Allam challenged the constitutionality of the Act's 1,000-foot gun-free zone under the Second Amendment, which guarantees a general right to "bear arms in public for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 34 (2022). Criminalizing his possession of a firearm on a public street, Mr. Allam argued, burdened his Second Amendment rights in a way that was not consistent with our nation's "historical tradition of firearm regulation." *Bruen*, 597 U.S. at  17. The Government argued that the Second Amendment did not apply to Mr. Allam's conduct, and—even if it did— nineteenth-century university student conduct codes and post-Reconstruction state laws were sufficient to justify the 1,000-foot perimeter around every primary or secondary school in the United States. The district court agreed that the Second Amendment covered Mr. Allam's conduct and found the Government's proffered analogues insufficient under *Bruen*, but upheld the statute anyway after doing its own historical research and finding equally-belated election laws in some Southern states that prohibited carrying firearms around polling places on election days. Mr. Allam now challenges that decision by the lower court.

## A.    Factual Background

The factual basis for the conviction proffered by the Government and agreed to by Mr. Allam provides the following:

In January 2023, local police learned that Mr. Allam was sitting in his SUV "for extended periods of time" "next to" St. Anthony Cathedral Basilica School in Beaumont, Texas. ROA.390. This caused "fear and concern" at the school. ROA.390. The police were called nine times between January 5 and January 28 to address "Allam's presence near the school." ROA.390. When police encountered Mr. Allam on January 25, they warned him that the plastic frame around his rear license plate was obscuring the name of the state of registration—New York—in violation of Tex. Transp. Code § 504.945(a)(7)(B). ROA.390-91.

On Sunday evening, January 29, Mr. Allam was inside his SUV, which was parked "under a school-zone sign approximately forty feet across from the property line, adjacent to the school's playground." ROA.390. Mr. Allam stayed there from 4:00 P.M. to approximately 9:05 P.M., when he began driving away from the school. ROA.391. A police officer followed him and initiated a traffic stop after observing that Mr.

Allam failed to properly signal a turn. ROA.391. Mr. Allam pulled over in an area that was "still within 1,000 feet of the school." ROA.391.

Mr. Allam refused to speak with the officer who pulled him over or to lower his driver's side window. ROA.391. A Sergeant with Beaumont Police then arrived and explained to Mr. Allam that he was being placed under arrest for failing to correct the license plate violation. ROA.391. Mr. Allam then exited the vehicle and was placed into custody. ROA.391.

The police called a tow-truck to take Mr. Allam's SUV. ROA.391. While performing an inventory of the vehicle, an officer observed a small, partially-unzipped backpack on the center of the rear-passenger floorboard. ROA.391-92. Through the backpack's opening, the officer saw what he believed to be a "plastic marihuana grinder with marihuana residue on it." ROA.392. Inside the backpack, officers found an AR-15 style 30-round magazine, two 50-count boxes of rifle ammunition, and less than two ounces of "suspected synthetic marihuana." ROA.392. A Diamondback Firearms, Model DB15, multi-caliber rifle was recovered from the rear-passenger floorboard, as well as another 50-count box of ammunition. ROA.393. Phones, computers, a digital camera, and currency were also inventoried. ROA.393.

An ATF firearm and nexus expert examined the rifle and "determined that it was manufactured outside the State of Texas and, therefore, affected interstate commerce." ROA.393.

## B.    Procedural History

In a single-count indictment, a grand jury charged Allam with violating 18 U.S.C. § 922(q)(2)(A) by "knowingly" possessing—"on or about January 29, 2023," a Sunday—the DB15 rifle "that had moved in interstate and foreign commerce, within a distance of 1,000 feet of the grounds of St. Anthony Cathedral Basilica School, a place that the defendant knew and had reasonable cause to believe was a school zone." ROA.22. The Government successfully moved to detain Mr. Allam pending trial. ROA.14-15, 193-95.

Mr. Allam moved to dismiss the indictment, raising a limited facial and as-applied challenge to § 922(q)(2)(A) under the Second Amendment. ROA.45-62. Specifically, Appellant argued that § 922(q)(2)(A) runs afoul of the Second Amendment only when read or applied in conjunction with § 921(a)(26)(B), which provides that a school zone includes a radius of 1,000 feet beyond a school's property. ROA.49-53. The Government responded that the Second Amendment's plain text did not apply to

Allam's conduct. ROA.216-24. In doing so, it claimed that the area around a school is a "sensitive place," and that sensitive places are exempt from *Bruen*'s historical analysis. ROA.216-24. In the alternative, the Government proffered a handful of historical analogues to attempt to prove the constitutionality of the 1,000-foot radius. ROA.228-33.

Without holding a hearing, the district court denied Mr. Allam's motion and issued an extensive written opinion accompanying its order. ROA.332-86. The court dismissed Appellant's as-applied challenge in a footnote and proceeded to only address what it considered to be his facial challenge to the statute. ROA.343-44 n.15. The court held that Mr. Allam's conduct was presumptively protected under the Second Amendment, ROA.343-45, and that the 1,000-foot "buffer zone" is not a "sensitive place," ROA.346-56. Applying *Bruen*'s "more nuanced approach," Judge Crone concluded that none of the Government's proffered analogues justified the Act's buffer zone. ROA.364-79. But the court then decided to "conduct its own historical inquiry," and held that a handful of late nineteenth-century state election laws adequately demonstrated the Act's adherence to the Second Amendment. ROA.379-86.

Following the district court's decision, Mr. Allam pled guilty to the indictment's sole count without a plea agreement. ROA.1030, 1041. The court adjudicated him guilty based on the factual basis signed by both parties and proffered by the Government. ROA.1030-33, 1041. A sentencing hearing was held on January 30, 2024, where the Government presented additional evidence and asked that Mr. Allam be given the statutory maximum penalty. ROA.1044-1144. The court sentenced Mr. Allam to 60 months' imprisonment followed by a three-year term of supervised release. ROA.435-41.

Mr. Allam timely appealed. ROA.442-43.

## SUMMARY OF THE ARGUMENT

Every day, millions of ordinary Americans who walk or drive within a few blocks of a school face a false choice: Go unarmed for self-defense, or face up to five years in federal prison. The law that forces that choice cannot "comport with the principles underlying the Second Amendment." *See United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

While the Supreme Court has stated that the Government can presumptively ban weapons *in* "sensitive places such as schools," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), the Court has never recognized that such bans can extend to the public areas, sidewalks, and streets that happen to be *near* schools. That is because the Second Amendment guarantees the right to carry weapons "in case of confrontation," *id.* at 592, and confrontation is *certainly* no less likely on a city block close to a school than on a rural highway miles away from one. Indeed, the Court has cautioned that interpreting "sensitive places" too broadly risks "eviscerat[ing] the general right to publicly carry arms for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31 (2022).

19

The Gun Free School Zones Act ("the Act") makes it a felony for anyone like Mr. Allam—a law-abiding adult traveling out-of-state—to carry a firearm in public for self-defense at any time within 1,000 feet of a school's property line. *Bruen* makes clear that this conduct is presumptively protected under the Second Amendment. The Government's arguments to the contrary represent a misreading of Supreme Court precedent and recent decisions of this Court. Mr. Allam's challenge thus clears *Bruen*'s initial hurdle, and the burden shifts to the Government to prove that the Act's 1,000-foot restriction comports with "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

The Government failed to meet its *Bruen* burden below, and cannot meet its burden now. The Supreme Court emphasized once again in *Rahimi* that courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* The Government need not produce a "historical twin," but it must nonetheless produce founding era regulations that are similar to the Act in both *why* and *how* they burden the individual right to keep and bear arms. *Id.* No such regulations existed. The laws proffered by the Government and

identified by the district court—even when taken together—do not support a ban of the scope and consequence of the challenged portion of the Act. Because the application of § 922(q)(2)(A) to Mr. Allam infringes upon his constitutional rights in a way that is unmoored from "the principles underlying the Second Amendment," his conviction cannot stand. *Id.*

**ARGUMENT**

**18 U.S.C. § 922(q)(2)(A) is unconstitutional as applied to Mr. Allam because it violates his rights under the Second Amendment.**

## STANDARD OF REVIEW

This Court reviews *de novo* all questions regarding the constitutionality of a federal statute. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

An as-applied challenge to a statute's constitutionality remains subject to this Court's *de novo* review despite a guilty plea. *See Class v. United States* (*Class I*), 539 U.S. 174, 178-82 (2018); *United States v. Rahimi*, 144 S.Ct. 1889, 1898-1903 (2024) (reviewing constitutionality of 18 U.S.C. § 922(g)(8) on its face and as applied to defendant, who pled guilty).

## PRESERVATION OF ERROR

Before pleading guilty, Mr. Allam moved to dismiss the indictment, claiming that 18 U.S.C. § 922(q)(2)(A) is unconstitutional when read in conjunction with § 921(a)(26)(B) and as applied to him. ROA.45-62. He

therefore preserved his claim, which is now ripe for this Court's *de novo* review. *See Perez-Macias*, 335 F.3d at 425; *Rahimi*, 144 S. Ct. at 1896-97.

DISCUSSION

"The right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 144 S.Ct. at 1897 (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)). The right secures for Americans a means of self-defense, both in the home and in public. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 8-10 (2022). The "general right to public carry" is not boundless, but it is limited only by the "historical understanding" of the Second Amendment. *Id.* at 21. And history reveals only "*exceptional* circumstances under which one could not carry arms." *Id.* at 38 (emphasis added).

The Supreme Court has indicated that governments may ban firearms in certain locations without running afoul of the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *Bruen*, 597 U.S. at 30. But place-based prohibitions that reach "too broadly" or effectively "exempt cities from the Second Amendment" are not constitutionally permissible. *Bruen*, 597 U.S. at 31.

Mr. Allam asserts that the Government reached "too broadly" here when it prosecuted him for possessing a gun "within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 U.S.C. § 921(26)(B). To determine whether Mr. Allam's conviction is constitutional, this Court must first ask whether the Second Amendment's plain text covers his conduct. *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct," and the Government "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* "Only then" may the Court conclude that Mr. Allam's conduct fell outside the Second Amendment's "unqualified command." *Id.*

## A. The Second Amendment applies to Mr. Allam and presumptively protects his course of conduct.

The Supreme Court advised in *Bruen* that a Second Amendment claim like Mr. Allam's must pass a threshold inquiry: whether the involved individual is part of "the people" that the Amendment protects, and whether the "Amendment's plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 24, 31-32. This is not a difficult qualification to meet. The majority opinion in *Rahimi* failed to even address it. *See*

*Rahimi*, 144 S. Ct. at 1894-1903; *id.* at *14 (Gorsuch, J., concurring) ("In this case, no one questions that the law . . . addresses individual conduct covered by the text of the Second Amendment.").

Nonetheless, the Government argued below that Mr. Allam failed *Bruen*'s first step. *See* ROA.216-24. The district court correctly rejected that contention, holding that Mr. Allam and his conduct "clearly fall[] within the scope of the Second Amendment's plain text." ROA.345. For the reasons below, this Court should do the same.

### 1. Mr. Allam is one of "the people" guaranteed the rights under the Second Amendment.

It is undisputed that Mr. Allam is one of "the people" protected by the Second Amendment. *See Bruen*, 597 U.S. at 31-32; ROA.339-43. *Heller* explained that the term "the people," as it is used in the Second Amendment, "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. There is, therefore, a "strong presumption that the Second Amendment right . . . belongs to all Americans." *Id.* at 581.

The Supreme Court recently rejected the Government's argument that the Second Amendment only applies to "responsible" persons.

*Rahimi*, 144 S. Ct. at 1903. In doing so, the Court never even questioned whether Rahimi—dangerous as he was deemed to be—was one of "the people" protected by the Amendment's plain text. *See id.* at 1894-1903. Any renewed attempt by the Government in *this* case to disqualify Mr. Allam from the Second Amendment's protections based on amorphous standards like his "responsibleness" or "dangerousness" would therefore be severely misguided. *See id.* at 1903 (deeming "responsible" a "vague term" that does not "derive from our case law"); *id.* at 1944 (Thomas, J., dissenting) ("Not a single Member of the Court adopts the Government's theory. . . [which] lacks any basis in our precedents and would eviscerate the Second Amendment altogether."); *id.* at 1910 (Gorsuch, J., concurring) (clarifying that *Rahimi* does not mean legislatures can deny firearms "on a categorical basis to any group . . . deem[ed] . . . not responsible." (internal quotation marks omitted)).

Because Mr. Allam is an individual American—and an "ordinary, law-abiding adult citizen"—he is undoubtedly among "the people" whose arms-bearing conduct is presumptively lawful under the Second Amendment. *See Bruen*, 597 U.S. at 31-32; *Rahimi*, 144 S. Ct. at 1903.

### 2. *Mr. Allam's conduct—possession of a firearm in a school zone in violation of § 922(q)(2)—is presumptively protected by the Second Amendment.*

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. In *Bruen*, the Supreme Court explained that the text clearly covers "possess[ing] [or] carry[ing] weapons in case of confrontation." *Id.* at 32. This encompasses both possession in the home and public carry. *Id.* In fact, *Rahimi* seems to suggest that *any* "arms-bearing conduct" falls within the Second Amendment's wide ambit. *See Rahimi*, 144 S. Ct. at 1897 ("[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to justify its regulation." (internal quotation marks omitted)). The conduct regulated by § 922(q)(2) that Mr. Allam engaged in—possessing a firearm in public while in a personal vehicle—is therefore undoubtedly covered by the Second Amendment's plain text. *See Bruen*, 597 U.S. at 33.

Even so, the Government argued below that the Amendment's text did not protect Mr. Allam's conduct. ROA.219-20. But the Government could not have meant what it said, given the clear holding in *Bruen* that

the text applies to the bearing of arms in public for protection. *See Bruen*, 597 U.S. at 33. In fact, the Government did not even argue in *Rahimi* that the defendant's conduct—possession of two guns while under a domestic violence restraining order—was outside the Second Amendment's text. *Rahimi*, 144 S. Ct. 1907 (Gorsuch, J., concurring). The Government's contention at this stage can only be understood as an attempt to paint Mr. Allam as someone who just simply *had* to be disarmed.

According to the Government, in order to even bring his Second Amendment challenge, Mr. Allam had to first somehow affirmatively prove he possessed his firearm only for self-defense, and—in doing so— disprove that he harbored a malicious intent. *See* ROA.219-20, 340 n. 14. In the Government's view, the judge should have presumed that— because he sat in his vehicle for long periods of time outside the school— Mr. Allam was a "potential shooter casing the scene." ROA.220. After imputing this uncharged, irrelevant, and unfounded *mens rea* to Mr. Allam, the Government would then have the court require Mr. Allam to somehow prove his subjective motivation for having the gun was to aid in self-defense rather than some malicious other purpose. ROA.219-20;

ROA.340-41 n.14. The district court was right to reject such a far-fetched theory of constitutional law.

Judge Crone explained why the Government's contention is exceptionally "problematic":

> For example, when an individual is charged with attempting conduct that would constitute a criminal offense if it were completed, requiring the Government to prove an overt act (some *actus reus*) ensures that mere thought crimes (penalizing a *mens rea* alone) are not prosecuted. Depriving an individual of a constitutional right for his or her intent alone is troubling for the same reasons. While Allam's conduct (sitting in his car on a public roadway just outside school grounds for hours and days at a time) may be disturbing, that conduct is not unlawful *per se*, nor is any intent that may be imputed to Allam based on that conduct unlawful on its own. The Government's theory would effectively deprive individuals of their Second Amendment right by alleging only that such individuals had some malicious intent. This is a much different situation than the Government's charging an individual with a criminal violation containing an intent requirement (after a conviction of which the individual could be deprived of certain rights). The Government's theory would divest the right with no process at all. Moreover, the Second Amendment right should not be readily divested, such that a person could be in one day and out the next.

ROA.341 n.14 (internal quotation marks and citations omitted). This Court should likewise reject the Government's invitation below to delve into the minds and hearts of "the people" before recognizing their Second

Amendment right.[1] *Bruen* itself expressly struck down a scheme that required individuals to prove a "proper cause" before they could exercise the right to public carry. *Bruen*, 597 U.S. at 70-71.

Simply put, because § 922(q)(2)(A) regulates "arms-bearing conduct," including possessing a firearm in public near a school, the

---

[1] The Government may now very well abandon this argument on appeal given its clear constitutional infirmities and inconsistency with *Rahimi* and *Daniels*. *See Rahimi*, 144 S. Ct. at 1894-1903 (declining to even address whether Rahimi's conduct was outside the Second Amendment's text, let alone whether he showed his gun was possessed for self-defense rather than for use in one or multiple of the shootings underlying his state charges); *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) (disposing of the "course of conduct" question by simply stating that marihuana user had "a presumptive right to bear arms," and "[b]y infringing on that right, § 922(g)(3) contradicts the plain text of the Second Amendment"), *cert. granted, judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) (remanding for further consideration in light of *Rahimi*).

Even so, Mr. Allam anticipates the Government may nonetheless invoke unproven, uncontested, or disputed details and circumstances that have no bearing on the legal issue before the Court. Mr. Allam was charged only with possessing a firearm in a school zone. *See* § 922(q)(2)(A). The Government proffered facts proving each element of that charged offense was met. ROA.390-93. The Government never alleged anything more (and neither did the State of Texas). *C.f. Rahimi*, 144 S. Ct. at 1894-95; *see Descamps v. United States*, 570 U.S. 254, 270 (2013) ("A defendant, after all, often has little incentive to contest facts that are not elements of the charged offense—and may have good reason not to."). The question before the Court is whether § 922(q)(2)(A) is constitutional *as applied*—meaning whether the Government had the power to regulate the conduct that *formed the basis of his conviction. See United States v. Gil*, No. 23-50525, 2024 WL 2186916, at *4 (5th Cir. May 15, 2024) (not designated for publication) (declining to consider Government's assertion on appeal that Gil carried a firearm while dealing marihuana because "the government did not charge Gil with dealing marihuana or carrying a gun while doing so[, i]t charged him with being an unlawful user in possession of a firearm").

Government bears the burden to justify the statute and its application to Mr. Allam. *Rahimi*, 144 S. Ct. at 1897.

## B. "Sensitive place" restrictions—like every regulation of arms-bearing conduct—are subject to *Bruen*'s historical analysis.

The district court correctly concluded that the plain text of the Second Amendment presumptively protected Mr. Allam, his firearm,[2] and his conduct. At that point, *Bruen*'s "first step" or threshold inquiry was complete, and the burden shifted to the Government to justify the regulation. *See Bruen*, 597 U.S. at 24; *Rahimi*, 144 S. Ct. at 1897. Yet, the district court offered the Government an early out: If the 1,000-foot perimeter around a school is a "sensitive place," the court reasoned, then it is "not protected by the right" and the Government need not justify the Act at all. ROA.345. That erroneous decision by the court represents a

---

[2] "[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). The district court correctly recognized—without any dispute from the Government—that the "AR-15 platform rifle" Mr. Allam possessed was in "common use" such that its keeping or bearing falls within the scope of the Amendment. ROA.345. *See Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("Semi-automatic rifles remain in common use today. . . . [and] the AR-15 is the most popular semi-automatic rifle . . . .").

blatant misreading of *Heller*, *Bruen*, *Rahimi*, and the plain text of the Second Amendment.

### 1. The Second Amendment's plain text does not limit its protections to certain places.

The Government can only avoid its burden under *Bruen* if an individual's conduct falls outside the "plain text" of the Second Amendment. *Bruen*, 597 U.S. at 17. The Government thus argued that the text of the Second Amendment does not protect "carrying a firearm in a sensitive place." ROA.221. But in making its case, the Government did not reference the "plain text" of the Amendment at all; rather, it cited a handful of post-*Heller*, pre-*Bruen* cases that sought to define which places are sensitive. ROA.221-24. For its part, the district court treated Mr. Allam as passing the "plain text" inquiry, but then puzzlingly stated nonetheless that certain locations are exempt from the Second Amendment altogether. ROA.345. The attempts to read a location restriction into the text of the Second Amendment are seriously misguided.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep

and bear Arms, shall not be infringed." U.S. Const. amend. II. It says nothing of "place" or "location." In fact, in *Bruen*, the Court clarified that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. The Court, therefore, resoundingly clarified that place is wholly irrelevant to the question of whether an individual's conduct is presumptively protected under the Second Amendment.

The district court framed the issue as follows: "Allam may avail himself of the protections of the Second Amendment unless the area within 1,000 feet of school property is a "sensitive place," *such that the location is not protected by the right.*" ROA.345 (emphasis added). But **locations** are not protected by the Second Amendment, **people** are. *See Heller*, 554 U.S. at 581 ("[T]he Second Amendment right is exercised individually and belongs to all Americans."). And, as the individual holder of that right, Mr. Allam enjoys the presumption that his conduct was constitutionally protected. *See Bruen*, 597 U.S. at 32.

## 2. The Pre-Bruen *"sensitive places doctrine" developed under a now-defunct means-end test.*

The Government also argued below that it was not required to justify Mr. Allam's statute of conviction with reference to historical laws because—in its view—pre-*Bruen* case law suggests the public areas near a school are "sensitive places." ROA.220-24. The district court correctly disagreed with the Government's ultimate conclusion, but "assume[d] that *Bruen* did not alter or modify the sensitive places analysis." ROA.348 n.19. This assumption was error. To better explain why, a brief examination of the so-called "sensitive places doctrine" is in order.

### a. *Heller*'s Holding and the Resulting Two-Step Test

For most of the twentieth century, the prevailing view of the Second Amendment was that it protected only a *collective* right to bear arms. *See United States v. Miller*, 307 U.S. 174, 178 (1939) ("With obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view.") This Court was the first of the circuits to recognize that the Amendment protects an *individual*'s right to bear arms. *See United States v. Emerson*,

34

270 F.3d 203, 260 (5th Cir. 2001). The Supreme Court affirmed that view in 2008. *See Heller*, 554 U.S. at 591.

In *Heller*, the Supreme Court held unconstitutional a Washington, D.C. ordinance that effectively prohibited the possession of firearms in a readily-operable condition in the home. *Id.* The Court recognized that the Second Amendment guarantees an individual's right to keep and bear arms for self-defense, but failed to actually define the scope of the Amendment or set forth a standard of review to be used by the courts in evaluating the constitutionality of firearm restrictions. *See id.* at 629, 635.

Without a clear prescription from the Supreme Court, the Courts of Appeals eventually coalesced around a two-step inquiry to determine the constitutionality of firearms regulations. *See Bruen*, 597 U.S. at 17. At step one, this Court asked whether "the conduct at issue falls within the scope of the Second Amendment right" by looking to "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("NRA"), 700 F.3d 185, 194-95 (5th Cir. 2012), *abrogated by Bruen*, 597 U.S. 1 (2022); *see also Bruen*,

35

597 U.S. at 18 (noting that courts generally used history to determine whether the regulated activity was "categorically unprotected"). If the challenged law burdened conduct that falls within the Second Amendment's scope, then this Court "proceed[ed] to apply the appropriate level of means-end scrutiny." *NRA*, 700 F.3d at 195. Strict scrutiny applied if the law's burden on the Second Amendment was severe, while intermediate scrutiny applied if the regulation did not "encroach on the core of the Second Amendment." *Id.*

### b. *Heller*'s *Dicta* Listing "Presumptively Lawful" Regulations

Perhaps trying to stave off a slew of new constitutional challenges, the Court proffered in *Heller*'s *dicta* a non-exhaustive list of laws that it deemed "presumptively lawful." *See Heller*, 554 U.S. at 626-27 & n.26; *id.* at 635 (recognizing that its holding casts doubt on "so many applications" of the Second Amendment). The Court wrote,

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or **laws forbidding the firearms in sensitive places such as schools and government buildings**, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27 (emphasis added). But the Court declined to provide a rationale for its choice of presumptively permissible regulations or to further define what it meant by "sensitive places." *Id.* at 626-27, 635. Instead, it stated that "there will be time enough to expound upon the historical justifications" for the regulations in its list. *Id.* at 635. Lower courts were thus left to sort out which locations were "sensitive" enough such that guns could be banned from them without violating the Second Amendment. *See id.*

### c.  Post-*Heller* "Sensitive Places"

The lack of clear guidance from the Supreme Court in *Heller* resulted in a patchwork of sensitive-place analyses in lower courts. Courts repeatedly struggled to understand where *Heller*'s mention of sensitive places fit into the two-step framework for analyzing Second Amendment claims. For example, the Fourth Circuit noted that place-based restrictions *may* fall outside the scope of the Second Amendment, but also observed that the Supreme Court's use of the phrase "*presumptively* lawful" suggests only a limitation "on the analysis to be conducted with respect to the burden on that right." *United States v. Masciandaro*, 638 F.3d 458, 472 (4th Cir. 2011) (emphasis added)

(quoting *Heller*, 554 U.S. at 627 n.26); *see also Ezell v. City of Chicago*, 846 F.3d 888, 894-95 (7th Cir. 2017) ("The judge apparently thought [*Heller's dicta*] effectively immunized the buffer-zone rule from constitutional review. We're not sure that's the correct way to understand the Court's 'sensitive places' passage . . . .").

Many courts therefore avoided the sensitive places analysis altogether. *See, e.g.*, *Masciandaro*, 638 F.3d at 473 (upholding prohibition of firearms from national park parking area under intermediate scrutiny after declining to decide whether the park or its parking lots were sensitive places); *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1316-17 (M.D. Ga. 2011) ("Given the indeterminacy of what the Supreme Court intended to capture with the term 'sensitive places,' the Court finds that the better analytical approach is to lay aside the *Heller* list [and apply a means-end analysis].."); *Ezell*, 846 F.3d at 895 (striking down Chicago's firing range "buffer zones" as unconstitutional under intermediate scrutiny after deciding "we don't need to resolve the [sensitive places] matter in order to decide this case"); *People v. Chairez*, 104 N.E.3d 1158, 1169-70 (Ill. 2018) ("We, however, need not address whether the 1000-foot firearm restriction falls outside the ambit of the

[S]econd [A]mendment because we agree with the approach taken by other courts that assume some level of scrutiny must apply to *Heller*'s "presumptively lawful" regulations.").

Some courts, on the other hand, attempted to fit a sensitive places analysis *within* the two-step inquiry. *See, e.g.*, *Miller v. Smith*, No. 18-cv-3085, 2022 WL 782735, at *8 (C.D. Ill. Mar. 14, 2022) (not designated for publication) ("[T]he Court will not substitute 'sensitive places' analysis for the two-step inquiry . . . [but] a determination as to whether day care homes are 'sensitive places' will inform the Court's means-end analysis under step two . . . ."), *vacated and remanded*, No. 22-1482, 2023 WL 334788 (7th Cir. Jan. 20, 2023) (remanding to district court in light of *Bruen*); *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (determining that public university's buildings were sensitive places before holding that the regulation was constitutional because it was "narrowly tailored" such that "individuals may still carry or possess weapons on the open grounds" of the university).

This Court was asked to address a Second Amendment challenge to a place-based regulation just once in the period between *Heller* and

*Bruen. See United States v. Dorosan*, 350 Fed. App'x. 874 (5th Cir. Oct. 14, 2009) (not designated for publication). The appellant in *Dorosan* was a Postal Service employee who violated a federal regulation when he brought his handgun in his personal vehicle to work and parked in the post office's parking lot. *Id.* at 875. In a brief, unpublished opinion, the panel upheld the regulation against the employee's Second Amendment challenge under three separate rationales. *Id.* First and foremost, the panel recognized that the Postal Service had "constitutional authority as the property owner" to restrict handguns from its own property. *Id.* The court then addressed the sensitive-places issue in just two sentences:

> Moreover, the Postal Service used the parking lot for loading mail and staging its mail trucks. Given this usage of the parking lot by the Postal Service as a place of regular government business, it falls under the "sensitive places" exception recognized by *Heller*.

*Id.* (citing *Heller*, 554 U.S. at 626-27). Finally, the panel explained that the ban did not significantly burden the employee's exercise of his Second Amendment right because he could have kept the gun in his car while at work if he parked off site—upholding the regulation's constitutionality "under any applicable level of scrutiny." *Id.* at 876. Notably, *Dorosan* did not suggest that arms-bearing within the parking lot was conduct outside

40

the scope of the Second Amendment or "categorically unprotected." *See id.* at 875-76.

The D.C. Circuit took an altogether different approach when it heard a Second Amendment challenge to a D.C. law banning guns from Capitol Building grounds. *See United States v. Class* (*Class II*), 930 F.3d 460 (D.C. Cir. 2019). Appellant Rodney Class was convicted of a felony after authorities discovered firearms in his vehicle, which was parked in a lot north of the Botanical Gardens, within the Capitol Grounds. *Id.* at 462. Class claimed that the statute violated his right to keep and bear arms. *Id.* 462-63. The D.C. Circuit asked at the outset whether the parking lot where the guns were located was a sensitive place. *Id.* 463-64. After answering that question in the affirmative, the court ended its Second Amendment analysis. *Id.* at 463.

The D.C. Circuit interpreted *Heller*'s *dicta* to endorse a presumption that *any* sensitive place law—however "sensitive" may be defined—does not even "impinge" on an individual's right to keep and bear arms. *Id.* at 463-65. Under that now-abrogated test, a challenger had to affirmatively prove that a place-based restriction had "more than a de minimus effect" upon his right to public carry. *Id.* If he could simply

just *not go* to those places, then the Constitution apparently had nothing to say. *See id.* Given this astonishingly narrow interpretation of the Second Amendment, the Government's attempt to keep *Class II* alive comes as no surprise; the Government wishes to avoid the burden that *Bruen* clarifies it now bears.

> **3. Bruen *established a new test and rejected the Second Amendment analysis used by every court that previously considered the "sensitive places" question.***

In *Bruen*, the Supreme Court expressly rejected the two-part framework adopted by the appellate courts after *Heller*. *Bruen*, 597 U.S. at 19-24. In its place, the Court prescribed an entirely new methodology:

> The standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The [G]overnment must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. ***Only then*** may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* at 24 (emphasis added). This makes pellucidly clear that when the Second Amendment's "plain text" covers the conduct at issue, the "***only***" way a regulation of that conduct can be upheld is if the Government justifies it by showing that it is "consistent with the Nation's historical

tradition of firearm regulation." *Id.* "**Only if** [the Government] carr[ies]

that burden can they show that the pre-existing right codified in the

Second Amendment . . . does not protect [an individual's] course of

conduct." *Id.* at 34 (emphasis added).

The Supreme Court clarified in *Rahimi* that *Bruen*'s test is the only

test:

> [W]hen the Government regulates arms-bearing conduct . . .
> it bears the burden to justify its regulation. . . . As we
> explained in *Bruen*, the appropriate analysis involves
> considering whether the challenged regulation is consistent
> with the principles that underpin our regulatory tradition. A
> court must ascertain whether the new law is "relevantly
> similar" to laws that our tradition is understood to permit,
> applying faithfully the balance struck by the founding
> generation to modern circumstances.

*Rahimi*, 144 S. Ct. at 1897-88 (internal quotation marks and citations

omitted); *see also id.* at 1903 (rejecting Government's proffered rule that

persons who are "not responsible" may be disarmed). There is no

intermediate step, and there is no other inquiry whereby a regulation can

be upheld by this Court. The district court therefore erred in assuming

that place-based regulations need not be justified by historical laws so

long as the places fit the definition of "sensitive" that some judges have

given that term since *Heller*. *Bruen* explicitly rejected that kind of means-end approach. *See Bruen*, 597 U.S. at 19-24.

### 4. Bruen *itself explains that modern "sensitive place" laws must be justified by historical analogues.*

At the outset, it appears the Supreme Court has set forth two competing presumptions: Banning guns from certain locations is presumptively unconstitutional, *see Bruen*, 597 U.S. at 24, and is also "presumptively lawful" in "sensitive places," *Heller*, 554 U.S. at 626-27 & n.26. But the Court was well aware of its prior language in *Heller* when it fashioned the analytical framework in *Bruen*, and it deliberately did not immunize sensitive places from its prescribed analysis. *See, e.g.*, *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring) (directly quoting relevant portion of *Heller*).

On the contrary, the Court actually used the idea of sensitive places to demonstrate the required historical analysis. *See id.* at 30. When a court is asked to assess the constitutionality of a modern place-based regulation, it must determine whether the challenged law is analogous to the historical laws prohibiting weapons in "legislative assemblies, polling places, and courthouses." *Id.* Only by "us[ing] analogies to those

historical regulations" may the "new and analogous" law be upheld. *Id.*
at 30-31. The *Bruen* respondents attempted to argue that guns could be
banned from public in New York because the city is crowded and
protected by police. *Id.* Manhattan is not a sensitive place, the Court at
last explained, because "there is no historical basis" for such a conclusion.
*See id.* at 31.

### 5. *The consensus is that "sensitive place" laws are subject to* Bruen's *historical analysis.*

This Court has not yet been asked to apply *Bruen* to a firearm
regulation involving a location-based restriction. But it recently observed
in *McRorey v. Garland* that *Bruen* "applied the historical test to 'sensitive
place' restrictions." 99 F.4th 831, 838 (5th Cir. 2024) (denying
preliminary injunction against statute expanding background checks for
18-to-20-year-olds). Because sensitive-place laws "directly impact the
right to bear . . . they are likely subject to *Bruen*'s historical analysis." *Id.*
Moreover, this Court speculated (but did not hold) that "*Bruen* displaced
*Heller*'s statement about the presumptive lawfulness of sensitive-place
restrictions." *Id.* at 838 n.16 (distinguishing *Bruen*'s treatment of
sensitive-place laws from its discussion of shall-issue licensing schemes).

45

This Court has thus already recognized in *dicta* what many other courts have squarely held—that sensitive-place laws like § 922(q)(2) must be justified under *Bruen*'s historical test.

The handful of courts that have heard challenges to location-based restrictions have correctly required the regulating entity to justify the law using historical analogues. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 355-64 (2d. Cir. 2023) (applying full *Bruen* historical inquiry to New York's prohibitions on firearms in zoos and parks), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) (remanding for further consideration in light of *Rahimi*); *Koons v. Platkin*, 673 F. Supp. 3d 515, 627-57 (D.N.J. May 16, 2023) (applying *Bruen* historical inquiry to each "sensitive place" challenged), *appeal filed*, No. 23-2043 (3d. Cir. June 9, 2023); *May v. Bonta*, __ F. Supp. __, 2023 WL 8946212, at *6-17 (C.D. Cal. 2023) (same), *appeal filed*, No. 23-4356 (9th Cir. Dec. 22, 2023); *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 581-93 (D. Md. 2023) (same), *appeal filed*, No. 23-1719 (4th Cir. July 10, 2023). *But see United States v. Power*, No. 20-po-331-GLS, 2023 WL 131050, at *3-11 & n.7 (D. Md. Jan. 9, 2023) (using "textual analysis" to determine NIH campus is

a "government building" where *Bruen* already deemed it "settled" that guns could be prohibited).

Accordingly, courts have refused to uphold place-based restrictions where the government's attempted justification was limited to pre-*Bruen* case law. In *Wolford v. Lopez*, for example, Hawaii did not provide any historical analogues in support of its ban on firearms in the parking lots around government buildings. 686 F. Supp. 3d 1034, 1055 (D. Haw. 2023). Hawaii instead argued that parking lots are sensitive places because they are used by many people, including children, citing *United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D.Va. 2009). *Id.* at 1056. The court explained that earlier sensitive-place cases are "no longer good law" after *Bruen* and are entirely inapposite if they failed to assess historical analogues. *Id.* at 1056 (noting that Hawaii conceded as much at oral argument); *see also id.* at 1062 (rejecting Hawaii's argument, based on pre-*Bruen* case law, that it need not justify any gun restrictions in places where it has a proprietary interest). This Court should follow suit and resist the urge to stray from the Supreme Court's clear directive in *Bruen* and *Rahimi*. As it must with *any* regulation of Second Amendment conduct, this Court "must ascertain" whether the Act, as

47

applied to Mr. Allam, is "'relevantly similar' to laws that our tradition is understood to permit.'" *Rahimi*, 144 S. Ct. 1889, 1898.

**C.    The Government has not, and *cannot*, meet its burden to prove that Mr. Allam's conviction under § 922(q)(2)(A) fits within the nation's historical tradition of firearm regulation.**

The Gun-Free School Zones Act ("the Act"), first enacted in 1990, broadly criminalizes carrying firearms in public for self-defense within 1,000 feet of every K-12 school. *See* 18 U.S.C. §§ 921(a)(26), 922(q)(2). The Government bears the burden of justifying this substantial intrusion on the right to public carry by showing that the Act is "relevantly similar" to historical laws "that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898; *see Bruen*, 597 U.S. at 22-23. The Government must "*affirmatively prove*" that the Act is "part of the historical tradition that delimits" the Second Amendment right. *Bruen*, 597 U.S. at 19 (emphasis added). "Only then" may this Court uphold Mr. Allam's conviction. *See id.* at 24.

The historical inquiry required by *Bruen* involves analogical reasoning: courts must ascertain whether the challenged statute is "relevantly similar" to the historical precursors proffered by the Government. *Rahimi*, 144 S. Ct. at 1898. "Why and how the regulation

burdens the right are central to this inquiry." *Id.* (citing *Bruen*, 597 U.S. at 29). Modern laws that "impose similar restrictions" as founding-era laws "for similar reasons" are more likely to be constitutional. *See id.* But "even when a law regulates arms-bearing for a permissible reason," the law "may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* Thus, while the Government need not produce a "dead ringer" or "historical twin," it must show that its current regulation "impose[s] a comparable burden on the right of armed self-defense" to that imposed by a historically recognized regulation and that the burden imposed is "comparably justified." *Bruen*, 597 U.S. at 29-30.

Moreover, the Supreme Court cautioned that "not all history is created equal," and that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Id.* at 28, 34. Laws from the late nineteenth-century thus "cannot provide much insight into the meaning of the Second Amendment when [they] contradict[] earlier evidence." *Id.* at 66; *see also United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) ("A tradition cannot inform the meaning of the Bill of Rights if it emerges one hundred years later."), *cert. granted*,

*judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) (remanding for further consideration in light of Rahimi). Though the Supreme Court has yet to settle the "ongoing scholarly debate" about whether courts should primarily rely on the public's understanding of the right to bear arms when the Fourteenth Amendment was ratified, *Rahimi*, 144 S. Ct. 1898 n.1, *this* Court has rejected that proposition when—as here—a federal statute is challenged. *See Daniels*, 77 F.4th at 348 ("[T]he instant case involves a federal statute and therefore implicates the Second Amendment, not the Fourteenth. Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791).

The historical analysis is a bit more nuanced when it comes to location-based restrictions. *Bruen* elaborated that there were "relatively few" (three) sensitive places where weapons were altogether prohibited: "legislative assemblies, polling places, and courthouses." *Bruen*, 597 U.S. at 30 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). Because there were "no disputes regarding the lawfulness of such prohibitions," the Court

"assume[d] it settled" that bans in those three places were constitutional. *Id*. Therefore, this Court need not second-guess whether *those specific* restrictions are "well-established and representative" of the Second Amendment's meaning. *Id*. We have the green light to analogize to "*those historical regulations*" to determine whether a modern location-based restriction is "analogous enough to pass constitutional muster." *Id; Rahimi*, 144 S. Ct. at 1898. But the Court notably did not "settle[]" the score on whether any *other* historical place-based regulations were constitutional. *Bruen*, 597 U.S. at 30; *see id*. at 114 (Breyer, J., dissenting) (noting that there are "many locations in a modern city with no obvious 18th- or 19th-century analogue").

The upshot is unchanged: Unless the Government can show the Act (as applied) is "relevantly similar" to "laws that our tradition is understood to permit" in "why and how" it burdens the Second Amendment, Mr. Allam's conviction cannot stand. *Rahimi*, 144 S. Ct. at 1898.

1.    *The Gun-Free School Zones Act is a relatively new provision that sweeps far broader than most state laws.*

For most of our nation's history, there were no broad bans on carrying guns in schools. *See* Kopel & Greenlee, *supra*, at 289. Some states began banning guns from schools in the late nineteenth and early twentieth centuries, but "[b]road laws against guns in schools come mainly from the late twentieth century." *Id.* Most states passed a range of laws outlawing the possession of firearms on school grounds in the 1980's and 1990's. *See United States v. Lopez* (*Lopez II*), 514 U.S. 549 (1995). The federal government first did so in 1990. *See* Gun-Free School Zones Act of 1990, Pub. L. No. 101-647, 104 Stat. 4844.

Three years later, this Court struck down the Act as unconstitutional because it exceeded Congress's power under the Commerce Clause. *United States v. Lopez* (*Lopez I*), 2 F.3d 1342 (5th Cir. 1993). When it did so, this Court also recognized that "some applications of Section 922(q) might raise Second Amendment concerns." *Id.* at 1364 n.46). And when the Supreme Court affirmed this Court's judgment, it agreed that the Act "plows thoroughly new ground and represents a

sharp break with the long-standing pattern of federal firearms legislation." *Lopez II*, 514 U.S. at 563.

The Act's 1,000-foot buffer zone significantly burdens the general right to public carry. Under the statute, it is "unlawful for *any* individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is" within 1,000 feet of the grounds of any elementary, middle, or high school. 18 U.S.C. § 922(q)(2)(A) (emphasis added). Unlike the other provisions of § 922, the Act does not disarm only those individuals generally considered "dangerous," like felons, fugitives, drug addicts, mentally ill persons, or "persons who present a credible threat to the physical safety of others. *Rahimi*, 144 S. Ct. at 1902; *see* 18 U.S.C. § 922(g)(1)-(4), (8). Rather, the Act disarms "ordinary, law-abiding citizens" like Mr. Allam who wish to carry firearms "in case of confrontation" near a school.

The Act's buffer zones "cover[] almost the entirety of every urban location in the United States, including places that have nothing to do with the closest school." *United States v. Metcalf*, No. CR 23-103-BLG-SPW, 2024 WL 358154, at *8 (D. Mont. Jan. 31, 2024). In more developed

areas, it is thus virtually impossible for an individual to travel *any* distance without entering a gun-free zone. *See* Amy Hetzner, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 Marquette L. Rev. 359, 389 (2011) (noting that 1,000-foot school zones in Milwaukee covered "the majority of the city"). The zone that Mr. Allam was in, for example, covers more than forty-five city blocks and encompasses main thoroughfares. ROA.53.

The Act has no time component; it does not only prohibit guns from the buffer zone when school is in session or when some school activity is taking place. *See* § 922(q)(2). It applies twenty-four hours a day. It applies in the summer and on holidays. And it applies on Sunday nights at 9:00 PM, when there are no children present and the need for self-defense is heightened.

The Act does have exceptions, but the exceptions for "ordinary, law-abiding citizens" who wish to publicly carry firearms for self-defense are limited. Such citizens are exempt if they (1) have a state gun permit (2) that is obtainable only after verification by state law enforcement and (3) are *within that state* at the time they enter the buffer zone. *See id.* § 922(q)(2)(B)(ii). That does not apply to persons like Mr. Allam who are

traveling out of state. Nor does it apply to persons—again, like Mr. Allam—who are unlicensed but lawfully carrying in one of the twenty-nine states[3] that allow for permitless carry. *See* Tex. Penal Code § 46.02-04.

The Act *does* allow for such persons to have a firearm in a school zone if it is "not loaded" and is either "in a locked container" or on a "locked firearms rack that is on a motor vehicle." § 922(q)(2)(B)(iii). But the Second Amendment does not just sanctify possessing weapons in whatever form; it guarantees that an individual may be "armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). Requiring guns to be unloaded and locked away "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional" *Id.* at 630. For those "extended periods of time" where Mr. Allam was lawfully parked in his vehicle near a school, ROA.390, he could not have

---

[3] K. Alexander Adams, *Research Highlights the Impact of Permitless Carry Laws on Crime and Violence*, University of Wyoming College of Law Firearms Research Center (May 29, 2024), https://firearmsresearchcenter.org/forum/research-highlights-the-impact-of-permitless-carry-laws-on-crime-and-violence/.

a firearm "for the purpose of immediate self-defense," *Heller*, 554 U.S. at
635, without committing a felony. Such an intrusion on an individual's
right to armed self-defense simply cannot "comport with the principles
underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898.

> ### 2. The Government's proffered historical analogues do not justify the Act's burden on Mr. Allam's right to public carry.

The Government offered two sets of historical regulations in an
attempt to justify the Act—three university student conduct policies from
1810 to 1838, and seven state and territory laws from 1871 to 1903.
ROA.229-30. The district court correctly found these analogues entirely
unconvincing on the matter of the buffer zone's constitutionality.

First, the Government pointed to three public universities that
restricted  guns for students. ROA.229. The University of Georgia, in
1810, prohibited students from—at all times—"swearing," "loud[ly]
talking or singing during the time of study," leaving Athens without
permission, possessing a gun, and a host of other actions. ROA.368.
Fourteen years later, the University of Virginia, banned students from
keeping guns, liquor, gunpowder, servants, dogs, and horses on its
grounds.  ROA.369-70.  After  another  fourteen-year  interval,  the

University of North Carolina joined in by prohibiting students from keeping dogs, guns, and liquor; mandating chapel attendance; and banning gambling. ROA.371.

As the district court noted, the policies that applied to the student body of just three universities clearly "cannot be said to be representative of our Nation's tradition of firearms regulation." ROA.373. If they evince any "tradition" at all, it is that some state-funded higher-education institutions broadly restricted their students' behavior and moral conduct. Moreover, the bans notably did not apply to any non-students such as faculty members, parents of students, or members of the public who visited campus. *See* ROA.372. And the student bans were either limited to the campus itself (Virginia and North Carolina) or imposed without regard to place at all (Georgia). ROA.368-73.

The Government then cited several late nineteenth or early twentieth century restrictions on carrying weapons *inside* schools. *See* ROA.229-30. But Mr. Allam does not challenge a ban on guns in schools. He contests only the constitutionality of prohibiting armed self-defense on the nearby sidewalks, streets, and public areas "that have nothing to do with the closest school." *Metcalf*, 2024 WL 358154, at *8. And, as the

57

district court noted, the laws proffered by the Government simply "do not lend support for a protected zone around school property." ROA.378.

While the Government need not produce a "historical twin," it still must show that the Act's buffer zone is "relevantly similar" to permissible historical precursors. *Rahimi*, 144 S. Ct. at 1898. Though *Rahimi* cautioned against an overly myopic analysis, it did not dispose of the need to prove a comparable "tradition" of regulation. *See id.* For example, the Court acknowledged that surety laws were "well entrenched in the common law" and that ten states used them to restrict the misuse of firearms in public. *Id.* at 1900. And the affray laws the Court recognized were "incorporated into American jurisprudence through the common law" and codified by at least four states. *Id.*

The laws proffered by the Government here do not even pass that initial hurdle. For example, the 1871 Texas statute cited by the Government was simply a penalty provision part of a larger scheme that prohibited the public carrying of arms altogether unless the individual had "reasonable grounds for fearing an unlawful attack." ROA.373-74. The Supreme Court has already said that this Texas statute is an

58

"outlier" that "provide[s] little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen*, 597 U.S. at 65.

The Western Territory laws cited by the Government suffer from largely the same defects. The Supreme Court expressly warned that the firearm laws in these territories were often "legal improvisations which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect the origins and continuing significance of the Second Amendment and we do not consider them instructive." *Bruen*, 597 U.S. at 67 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 614). *Bruen* specifically denounced Oklahoma's regulation, which "completely prohibited public carry of pistols *everywhere*, but allowed the carry of 'shot-guns or rifles' for certain purposes." *Id.* at 597 U.S. at 66-67. Arizona's territorial law "prohibited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns everywhere." *Id.* at 66. And *Bruen* entirely dismissed any evidence from the twentieth century, which includes the Montana law cited by the Government. *Id.* at 66 n.28.

Left with just two statutes—from Mississippi in 1878 and Missouri in 1883—the Government's attempt to prove a "comparable tradition of

regulation" falls woefully short of what the Constitution requires. *Bruen*, 597 U.S. at 27. Mississippi's law only barred students from carrying concealed weapons. ROA.375; *see* 1878 Miss. Laws 176. It did not ban students from openly carrying, and it did not place *any* restrictions on faculty or other law-abiding adults. ROA.375; *see* 1878 Miss. Laws 176). And while Missouri's statute applied to all persons, it applied only to concealed firearms and therefore allowed individuals to carry openly without restriction. ROA.375; *see* 1883 Mo. Laws 76. Finally, Missouri's statute prohibiting the *discharge* of firearms within 600 feet of schools does not even implicate the Second Amendment conduct restricted by § 922(q)(2). Even when taken together, these statutes certainly do not evince a regulatory tradition comparable with the Act's application to Mr. Allam.

### 3. Reconstruction Era election laws likewise do not help the Government meet its burden.

After correctly deciding that the Government failed to meet its *Bruen* burden, the district court went digging for some other justification. *See* ROA.379. Though the Act's "buffer zones" are not *themselves* sensitive, the court reasoned, they are constitutional because they

"provide an additional layer of protection around a sensitive place." ROA.380 n.51, 383. But that interpretation suffers from the same defects as the respondents' reasoning in *Bruen*. *See Bruen*, 597 U.S. at 30-31 (assailing the idea of defining sensitive places broadly). How thick can that "layer" be? Would not an *additional* layer make it *even safer*?[4] If the Second Amendment has a line at all—and the Court has said it undoubtedly does—history does not support the one chosen by the Act.

The Supreme Court explained that governments cannot disarm law-abiding citizens in public places "where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id.* Any location-based gun restriction that "in effect exempts cities from the Second Amendment" is flatly impermissible. *Id.* at 31. "Put simply, there is no historical basis" for the court's reasoning or for the Act's broad reach. *Id.* at 31. *See* Kopel & Greenlee, *supra*, at 290 ("Given the thin historical record, one can only guess about what factors make places 'sensitive.' . . . The answer cannot

---

[4] *See, e.g., U.S. Rep. Ritchie Torres Announces Federal Legislation Banning Ghost Guns, Expanding Gun Free School Zones*, ritchietorres.house.gov (June 30, 2023), https://ritchietorres.house.gov/posts/u-s-rep-ritchie-torres-announces-federal-legislation-banning-ghost-guns-expanding-gun-free-school-zones (announcing legislation to expand the Act's zones to 5,000 feet beyond all schools and early childhood education centers).

be that the places are crowded. Sometimes they are, but no more so than a busy downtown sidewalk, and sidewalks are not sensitive places. . . . Accordingly, buffer zones are not sensitive places.").

The district court first draws support for its theory from the Delaware Constitution of 1776. Read in full, that provision states:

> To prevent any violence or force being used at the said elections, no person shall come armed to any of them, and no muster of the militia shall be made on that day; nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter, who offers to vote, objects thereto; nor shall any battalion or company, in the pay of the continent, or of this or any other State, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively, for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed, so as in any manner to impede the freely and conveniently carrying on the said election: Provided always, That every elector may, in a peaceable and orderly manner, give in his vote on the said day of election.

1776 Del. Const. art. 28. The "buffer zone" part of this restriction applied only to a "battalion or company"—not to *individuals* who were carrying firearms near the polling place for self-defense. The restriction was on militia assemblage alone, and it applied only within 24 hours of elections—not at all times like § 922(q)(2). *Bruen* and *Rahimi* do not permit such an incomparable burden. Moreover, this is seemingly the

only regulation from within eighty years of the Second Amendment's ratification cited by the court. There is no evidence that such a law comported with the understanding of a right later codified in 1791. This Court should not "stake [its] interpretation of the Second Amendment upon a single law, in effect in a single State, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public." *Bruen*, 597 U.S. at 65-66.

The late nineteenth-century election laws are likewise too little and too late. *See* ROA.380-82. These laws undoubtedly show that some states and localities severely restricted gun bearing on election days to prevent violence and voter intimidation in the wake of the Fourteenth Amendment and Reconstruction. *See* ROA.380-82. But these belated statutes, again, differ greatly from the Act in "how" they burden the general right to public carry. The prohibitions were limited in time and addressed the unique threats of voter intimidation which do not occur just *in* polling places, but on the sidewalks and streets outside elections. Unlike the postbellum citizens of certain Southern states, Mr. Allam was disarmed at a time when there was no one was even present at the school and the need for self-defense was more acute.

Ultimately, the district court searched for a historical justification and strayed too far into the type of means-end approach *Bruen* and *Rahimi* rejected. The Constitution demands more diligence from this Court.

## CONCLUSION

For the foregoing reasons, this Court should vacate Mr. Allam's conviction.

Respectfully submitted,

/s/ *Elizabeth Emanuel*
ELIZABETH EMANUEL
3300 Oak Lawn Ave., Suite 700
Dallas, Texas 75219
(214) 253-9153
liz@lizbrewerlaw.com

**Attorney for Appellant**

# CERTIFICATE OF SERVICE

The undersigned certifies that on July 17, 2024, the foregoing was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

> Stephan Oestreicher, stephan.oestreicher@usdoj.gov,
> Bradley Visosky, bradley.visosky@usdoj.gov, and
> John Ross, john.ross5@usdoj.gov,
>      Assistant United States Attorneys.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5th Cir. R. 25.2.5.


*s/ Elizabeth Emanuel*
ELIZABETH EMANUEL

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(a)(7)(A), this document contains 10,703 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared with the current version of Microsoft Word software, Microsoft Office 365 edition, using the proportionally spaced Century Schoolbook typeface in both the text (14-point) and footnotes (12-point).

s/ *Elizabeth Emanuel*
ELIZABETH EMANUEL
Dated: July 17, 2024