No. 24-40065

In the United States Court of Appeals
for the Fifth Circuit

_____

UNITED STATES OF AMERICA,
*Plaintiffs-Appellees,*

v.

AHMED ADBALLA ALLAM,
*Defendant-Appellant.*

_____

On Appeal from the
United States District Court for the Eastern District of Texas
Case No. 1:23-CR-10
Honorable Marcia A. Crone

_____

**BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INC., SECOND AMENDMENT LAW CENTER, INC.,
AND SECOND AMENDMENT FOUNDATION IN SUPPORT OF
APPELLANT AND REVERSAL**

_____

C. D. Michel
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for Amici Curiae*

July 19, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., and the Second Amendment Foundation are nonprofit organizations and thus have no parent corporations and no stock.

Date: July 19, 2024

**MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel

C.D. Michel

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement ........................................................................ i

Table of Contents ............................................................................................ ii

Table of Authorities ....................................................................................... iii

Interest of Amici Curiae ................................................................................. 1

Introduction .................................................................................................... 2

Argument ....................................................................................................... 4

I.     The Proper Application of *Bruen* in the Sensitive Places Context. ....................... 4

     A.    Historical analysis under the Second Amendment .................................. 4

     B.    Sensitive places are narrowly defined under Bruen .................................. 7

II.    The District Court's Three Critical Analytical Errors. ................................ 9

III.   How §922(q)(2)(A) Can Harm Law-Abiding Americans. ................................ 15

IV.   The Second Circuit's Recent "Sensitive Places" Ruling Defies Bruen and Should be Disregarded. ........................................................................... 20

Conclusion ..................................................................................................... 24

Certificate of Compliance ............................................................................... 25

Certificate of Service ...................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Antonyuk v. Chiumento,*
  89 F.4th 271 (2d Cir. 2023).......................................................................passim

*Antonyuk v. Hochul,*
  639 F. Supp. 3d 232 (N.D.N.Y. 2023)............................................................ 11

*Antonyuk v. James,*
  2024 WL 3259671 (U.S. July 2, 2024).....................................................11, 20

*Bonidy v. United States Postal Serv.,*
  790 F.3d 1121 (10th Cir. 2015)........................................................................ 9

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)..........................................................................4, 12, 14

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021)............................................................................... 5

*Ezell v. City of Chicago,*
  846 F.3d 888 (7th Cir. 2017)......................................................................... 18

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ...................................................................... 6

*Kipke v. Moore,*
  No. GLR-23-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ................ 20

*Koons v. Platkin,*
  673 F. Supp. 3d 515 (D.N.J. 2023) ............................................................3, 20

*May v. Bonta,*
  No. SACV2301696-CJC(ADSx), 2023 WL 8946212 (C.D. Cal. Dec. 20,
  2023) .....................................................................................................2, 3, 9, 20

*Nat'l Ass'n for Gun Rts. v. Grisham,*
  No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940 (D.N.M. Sept. 13, 2023)............. 20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022)........................................................................................passim

*Springer v. Grisham*,
  No. 1:23-cv-00781-KWR/LF, 2023 WL 8436312 (D.N.M. Dec. 5, 2023) .............. 20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ...................................................................................... 21

*United States v. Allam*,
  677 F. Supp. 3d 545 (E.D. Tex. 2023) ....................................................passim

*United States v. Ayala*,
  No. 22-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) ........................... 20

*United States v. Rahimi*,
  602 U.S. --, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024)......................passim

*Wolford v. Lopez*,
  686 F. Supp. 3d 1034 (D. Haw. 2023) .................................................. 3, 20

**Statutes**

1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Walker
  Hening ed., 1809) ...................................................................................... 12

18 U.S.C. § 922.............................................................................................passim

ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist.
  Soc'y 1885) ................................................................................................ 12

Del. Const. of 1776, art. XXVIII ................................................................ 12

**Other Authorities**

19 Colonial Records of the State of Georgia (A. Candler ed.1911) .............................. 12

Barondes, Royce de R.,
  *Federalism Implications of Non-Recognition of Licensure Reciprocity Under the Gun-Free School
  Zones Act*, 32 J.L. & Pol'y 139 (2017) ............................................................ 18

Bernabei, Leo,
  *Taking Aim at New York's Concealed Carry Improvement Act*, Duke Center for Firearms
  Law Blog (Aug. 7, 2023), https://firearmslaw.duke.edu/2023/08/taking-aim-at-
  new-yorks-concealed-carry-improvement-act/ ............................................................ 18

Charles, Jacob D.,
  *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*,
  73 Duke L.J. 67 (2023) ................................................................................ 21

Kopel, David & Joseph Greenlee,
*The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ............................... 7, 8

SB 2 Press Conference, YouTube.com (Feb. 1, 2023), https://www.youtube.
com/watch?v=Kpxpj6yvFIo (last visited June 7, 2024) ............................................. 20

Smith, Mark W.,
*Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24
Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) .......................................................... 6

## INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle and Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle and Pistol Association regularly participates as a party or amicus in firearm-related litigation.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

The Second Amendment Foundation is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every state of the union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms.

Together, Amici California Rifle & Pistol Association and the Second Amendment Foundation are also associational plaintiffs in a case challenging California's new "*Bruen* response" law which declared every public place, save for

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

some streets and sidewalks, "sensitive" and thus off-limits to carry, even for those with a concealed handgun license. Amici prevailed in the district court and won an injunction against most of the law, but the case is now awaiting a ruling from the Ninth Circuit following California's appeal. *See May v. Bonta*, No. SACV2301696-CJC(ADSx), 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023). Due to their extensive prior litigation and briefing on this topic, Amici believe their perspective on the application of the sensitive places doctrine may be useful to this Court as it considers this appeal.

## INTRODUCTION

Amici are Second Amendment advocacy groups that focus on civil litigation to advance the rights of their members who are peaceable citizens. Their advocacy in criminal matters like this one is sparing. Yet criminal cases can make precedential law as readily as civil cases, and that case law often affects not just one criminal defendant in his or her prosecution, but millions of peaceable citizens. Of late, the aphorism "bad facts make bad law" often applies in the Second Amendment context. Amici seek to persuade this Court to not allow the bad facts present here to lead to the adoption of bad law.[2]

The district court is correct that school shootings are horrific crimes that

---

[2] Amici take no position on whether the Appellant is *himself* legally allowed to possess firearms or whether he was acting otherwise lawfully on January 29, 2023, when he was arrested. For example, while it was not part of his indictment, cocaine was said to be found in his vehicle. *United States v. Allam*, 677 F. Supp. 3d 545, 549 n. 3 (E.D. Tex. 2023). If Mr. Allam was using that drug while in possession of a firearm, that would itself be illegal under 18 U.S.C. § 922(g)(3). But, as the district court concluded, what is at issue here is a *facial* challenge to § 922(q)(2)(A), and Mr. Allam's individualized conduct is not relevant to that question. Like the district court, Amici will "focus on the text of the statute at issue and not the particular set of circumstances in this case." *Id.* at 554.

"instill fear in parents' hearts and have now become a recurring nightmare." *Allam*, 677 F. Supp. 3d at 568. Where Amici part ways with the district court and the drafters of 18 U.S.C. § 922(q)(2)(A) is the belief that "gun-free zones" are a solution to this recurring nightmare. Such laws only disarm the honest citizen,[3] and certainly do not affect monstrous individuals bent on mass murder. In other words, laws like § 922(q)(2)(A) make the areas they ostensibly protect enticing "soft targets" for would-be mass killers, while disarming the very people who may have otherwise been able to stop them. If the government wants to deem a place "sensitive" and off-limits to those lawfully carrying firearms, then it should offer comprehensive security at those places, as it does at courthouses, airports, and legislative chambers.

But this is not a policy brief, and the district court's analysis did not err because of policy disagreements. It erred because it made several errors in the *Bruen* analysis. First, it relied on the looser standard of the "more nuanced approach" even though there is nothing new about schools and nothing new about people carrying firearms.

Second, the district relied on an insufficient number of historical polling place "buffer zone" laws in concluding these laws are a representative analogue of

---

[3] Acting as plaintiffs in their own litigation against California's expansive new "sensitive places" law, Amici presented data from several states (including Texas) demonstrating that Americans with CCW permits are overwhelmingly more law-abiding than the population as a whole. The District Court for the Central District of California relied on that data as part of the reason for issuing a preliminary injunction against the law. *See May*, 2023 WL 8946212, at *19 ("Simply put, CCW permitholders are not the gun wielders legislators should fear"). Other courts have reached the same conclusion. *See Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1076 (D. Haw. 2023) ("the vast majority of conceal carry permit holders are law abiding"); and *Koons v. Platkin*, 673 F. Supp. 3d 515, 669 (D.N.J. 2023) ("despite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence").

3

§ 922(q)(2)(A), elevating "outliers" to analogue status in contravention of *Bruen*. Finally, the reliance on polling place buffer zone laws was flawed; even if polling place buffer zone laws were not outliers, they are not relevantly similar to § 922(q)(2)(A) given the dramatically lesser comparative burden they imposed. Amici will also discuss how § 922(q)(2)(A) can harm peaceable Americans, and will conclude with a demonstration of why the very first circuit court ruling on "sensitive places," *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), should not be relied upon by this Court.

## ARGUMENT

### I.   THE PROPER APPLICATION OF *BRUEN* IN THE SENSITIVE PLACES CONTEXT.

#### A. Historical analysis under the Second Amendment.

In 2022, the Supreme Court reaffirmed the "original public meaning test" of *District of Columbia v. Heller*, 554 U.S. 570 (2008), for analyzing Second Amendment challenges. Applying it, the Court found that the Second Amendment protects the right to armed self-defense in public. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 19, 31-33 (2022). *Bruen* reiterated that courts may not engage in any form of "intermediate scrutiny" or "strict scrutiny" in Second Amendment cases. *Id.* at 23. The proper test is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24. The burden that the Second Amendment imposes is "the

*government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17 (emphasis added); *see also id.* at 19, 24, 58 n.25, 59 & 70.

Moreover, the government cannot simply proffer just any historical law that references firearms. Rather, when challenged laws regulate conduct or circumstances that already existed at the time of the Founding, the absence of widespread historical laws restricting that same conduct or circumstances suggests that the Founders understood the Second Amendment to preclude such regulation. *Id.* at 27. In contrast, uniquely modern circumstances that did not exist at the time of the Founding call for an analogical analysis, based on the government's proffered historical record. *Id.* at 28-29.

Outlier statutes do not satisfy the requirement. A law must be a "well-established and representative historical analogue." *Id.* at 30. Courts may not uphold a modern law just because a few similar laws may be found from the past. *Id.* Doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).

For example, in *Bruen*, New York presented three laws from the Colonial Era, three turn-of-the-18th-century laws, three 19th-century laws, and five late-19th-century regulations from the Western Territories. *Bruen*, 597 U.S. at 37-70. The Court found them to be outliers insufficient to uphold New York's law, and emphasized, as it had in *Heller*, that it would not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id.* at 65.

This emphasis on sufficient numerosity returned in the Court's latest Second Amendment case, *United States v. Rahimi*, where it decided that a modern federal statute that prohibits an individual subject to a domestic violence restraining order from possessing a firearm is constitutional. In its historical analysis, the Court relied on two categories of historical analogues rooted in the Founding Era and earlier which continued into the 19th century. For the first category it identified, historical surety laws, the Court referred to nine total Founding Era or later laws, not including the pre-Founding history of similar laws. *United States v. Rahimi*, 602 U.S. --, No. 22-915, 2024 WL 3074728, at *8 (U.S. June 21, 2024). The second category of laws was the historical "going armed in terror of the people" laws, which were also quite well-represented in Founding Era and earlier. The Court cited pre-Founding English history, colonial laws, and Founding Era laws supporting the tradition of "going armed" laws, as well as Blackstone. *Id.*, at *9.

Reconstruction Era evidence is relevant only if it provides confirmation of what had been established before, but "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (quoting *Heller v. District of Columbia,* 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).[4] 20th-century evidence was considered even less persuasive. *Bruen*, 597

---

[4] *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791").

U.S. at 66 n.28. While the Court in *Rahimi* declined to definitively rule out Reconstruction Era laws that had no Founding Era counterparts, it is quite clear that is the direction in which the Court is moving. "[E]vidence of 'tradition' unmoored from original meaning is not binding law . . . And scattered cases or regulations pulled from history may have little bearing on the meaning of the text." *Rahimi*, 2024 WL 3074728, at *29 (Barrett, J., concurring).

**B. Sensitive places are narrowly defined under *Bruen*.**

As to whether there are any special locations where the right to bear arms might be restricted without infringing Second Amendment rights, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597 U.S. at 30. And:

> expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly . . . [and] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id.* at 31. "[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.*

Indeed, sensitive places are intended to be the rare *exception* to the general right to public carry. Using the historical record, the Court acknowledged only three types of places where it suspected firearm carry might presumptively be foreclosed: legislative assemblies, polling places, and courthouses. *Id.* (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). Beyond that, the Court identified no other well-represented examples that

would obviously and facially meet *Bruen*'s test.

Government-provided security, while not dispositive of whether a place is actually sensitive, at least evidences the government's honest belief that it is. It also lessens the concern of the citizen who is temporarily giving up his right to armed self-defense, because some reasonable degree of security has been provided. By contrast, when the government declares a place a "gun-free zone" but provides no security of its own, it both effectively admits it does not truly consider that place sensitive but nonetheless removes the effective means of self-defense from law-abiding citizens in that space. As the Kopel & Greenlee article cited approvingly in *Bruen* explains:

> The government's behavior can demonstrate the true importance of the alleged government interest…when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive. . . . Conversely, when the government provides no security at all—such as in a Post Office or its parking lot—the government's behavior shows that the location is probably not sensitive…

Kopel & Greenlee, *supra*, at 290. So it is with § 922(q)(2)(A). It declares wide swaths of land around all schools—a thousand feet in every direction—completely off limits to the right of armed self-defense, but it does nothing to protect any of that area from criminals.

Moreover, it is unclear what historical or other basis there is for a blanket rule declaring off limits 1,000 feet, no more or less. As discussed below, this distance—like the more recent six-foot distancing requirement for pandemic mitigation based on science no more rigorous than speculation about public acceptance—seems to be grounded in little more than being a nice round number. To extend the curtilage of all schools this distance, regardless of whether a school is immediately surrounded by the

density of Brooklyn, New York, or the sparseness of Brookston, Texas, requires some history of regulation that such wide swaths of curtilage are sensitive regardless of location or density. Yet, none exists. *See, e.g., Allam*, 677 F. Supp. 3d at 562.

To be sure, some curtilage might be found to be genuinely sensitive after historical analysis. As one partial dissenting opinion that has been vindicated by *Bruen* explained, "[t]he White House lawn, although not a building, is just as sensitive as the White House itself" but, "[a]t the spectrum's other end[,] we might find a public park associated with no particular sensitive government interests–or a post office parking lot surrounding a run-of-the-mill post office." *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1137 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part); *see also May*, 2023 WL 8946212, at *17 ("[The] designation of parking areas as sensitive places is inconsistent with the Second Amendment. Both *Heller* and *McDonald* describe sensitive places where carry may be prohibited using the preposition 'in,' not 'near' or 'around.' ").

The school zones restricted by § 922(q)(2)(A) are clearly not like the White House lawn; they are so numerous and ubiquitous that the term "sensitive places" is meaningless if it is applied to them.

## II. THE DISTRICT COURT'S THREE CRITICAL ANALYTICAL ERRORS.

The district court upheld § 922(q)(2)(A) because it made three errors that doomed its analysis.

**First**, even though schools and the threat of violence in schools has existed for centuries, the district court inappropriately applied *Bruen*'s "more nuanced approach." While the Supreme Court said "unprecedented societal concerns or dramatic

technological changes may require a more nuanced approach," *Bruen*, 597 U.S. at 27, this is not such a case because § 922(q)(2)(A) purportedly "addresses a general societal problem that has persisted since the 18th century," *id.* at 26. The social concern of criminals committing crimes with weapons they carry in public is not a novel 21st-century challenge, and the Supreme Court made clear that the "lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added).

The district court conceded that while there have been attacks on schools in the past dating back to the French and Indian War, it argued that there are many more of them lately, beginning in the 1980s. *Allam*, 677 F. Supp. 3d at 567-69. The problem with this argument is that the same could be said for most public places. The scourge of mass shootings has inflicted parks, grocery stores, shopping malls, churches, hospitals, banks, bars, and even streets and sidewalks. If the district court were correct that the crime of mass shootings is justification for more general analogies, then every public place, even those that also existed in the 18th and 19th Centuries, would be subject to the "more nuanced approach." The government would never have to demonstrate that "distinctly similar" historical laws exist before deeming a place "sensitive," turning *Bruen's* detailed analogue discussion into surplussage.

What the district court did here is import the forbidden interest-balancing analysis into its ostensible *Bruen* analysis, i.e., "A 'nuanced approach' requires the court to 'broaden its conception of what constitutes an 'analogue' *and focus its attention on the justification for, and burden imposed by it*'." *Allam*, 677 F. Supp. 3d at 569 (emphasis added)

(quoting *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 296-97 (N.D.N.Y. 2023), *aff'd in part, vacated in part, and remanded sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *cert. granted and judgment vacated sub nom. Antonyuk v. James*, 2024 WL 3259671, (U.S. July 2, 2024)).

It determined that the reprehensible crime of school shootings was enough justification for the government to impose a substantial burden on the individual right to carry. *Allam*, 677 F. Supp. 3d at 566-69, 79. The Supreme Court warned against exactly this:

> [The analogical inquiry does] not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the "product of an interest balancing *by the people*," not the evolving product of federal judges.… It is not an invitation to revise that balance through means-end scrutiny.

*Bruen*, 597 U.S. at 29 n.7.

Moreover, the district court ignored another reason the more nuanced approach should not apply: "If earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26-27. In the Founding Era, churches were the frequent target of violent attacks, often by hostile Native American tribes. Did the Founders respond to this by foolishly declaring churches "gun-free zones" and disarming the adult congregants? No, they did the exact opposite. Founding Era and pre-Founding laws often required churchgoers to be armed to defend against such attacks. The Supreme Court even cited one example: "Many colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that 'for the security and *defence of this province* from internal dangers and insurrections'

11

required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.' " *Heller*, 554 U.S. at 601 (citing 19 Colonial Records of the State of Georgia 137-39 (A. Candler ed.1911)). Similarly, Maryland in 1642 and Virginia in 1631, 1642, and 1755 required able-bodied men to bear arms while at church. ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885); 1 THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Walker Hening ed., 1809).

Historical "sensitive places" in the Founding Era were largely limited to those places where the business of government was conducted; where it was feared that armed people could intimidate voters, courts, or elected officials to act according to their wishes. For example, the 1776 Delaware constitution provided that "[t]o prevent any violence or force *being used at the said elections*, no persons shall come armed to any of them; and no muster of the militia shall be made on that day. . . ." Del. Const. of 1776, art. XXVIII (emphasis added).

Faced with an increase in violent attacks at schools, the Founders would never have seen disarming peaceful adults as the solution. They would have allowed them— or even required them—to be armed to deal with any violent threats. The district court was wrong to engage in the "more nuanced approach."

**Second**, the district court was also wrong to conclude that there was any representative tradition of buffer zones around polling places (let alone schools).

The analogical analysis began well enough, with the district court rightfully rejecting the limited historical school restrictions the government presented as insufficient and not actually analogous, given they mostly only applied to students and

not adults, and they only applied on school property anyway, not areas around the schools.[5] *Allam*, 677 F. Supp. 3d at 572. As for the 19th-century laws and territorial restrictions the government presented, while they were far too few in number and late in time to be representative analogues, the district court again noted correctly that they only applied on the school premises themselves, not in zones around them. *See id.*

But then, after rejecting all of the government's proposed historical analogues, the district court put forward its own history in an effort to uphold § 922(q)(2)(A). In doing so, the district court presented two laws involving buffer zones around polling places (and not schools). One applied in Louisiana and banned carry entirely on election days, and within half a mile of registration locations on registration days. *Id.* at 577 (discussing various Reconstruction Era Louisiana carry laws). The district court also cited a similar 1873 Texas law, as well as 1874 and 1886 Maryland laws that applied in only two counties, not the entire state. *Id.*

Of course, by 1886, there were 38 states, and the vast majority of them had no similar buffer zone laws on the books. Two state laws, plus two more laws applying to just two counties in a state, are outliers, not the sort of "well-established and representative historical *analogue*" *Bruen* requires. 597 U.S. at 30. *Bruen* itself rejected two historical state laws as insufficient to uphold New York's carry law. *See Bruen*, 597 U.S. at 65 ("We acknowledge that the Texas cases support New York's proper-cause

---

[5] The district court could have also rejected them for another reason: *Bruen* looks for "an enduring American tradition of *state regulation*," not private school rules. *Bruen*, 597 U.S. at 69 (emphasis added).

requirement. . . . But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers. In fact, only one other State, West Virginia, adopted a similar public-carry statute before 1900."). Given that two statewide laws were insufficient in *Bruen*, there is absolutely no reason that same number should be sufficient here to save § 922(q)(2)(A).

Furthermore, these buffer zone laws have no Founding Era anchor, making them dubious analogues. "[W]e seek to honor the fact that the Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have when the people adopted' it. *Rahimi*, 2024 WL 3074728, at \*15 (Gorsuch, J., concurring) (citing *Heller*, 554 U.S. at 592).

**Third**, even if the exceedingly few 19th-century polling place buffer zone laws the district court cited were deemed sufficient in number to be valid historical analogues, they are not relevantly similar to the school zone restriction of § 922(q)(2)(A) in terms of the burden they impose. The polling place buffer zones would only apply on election days, totaling no more than two-to-three days in a given year depending on how many federal, state, local, and primary elections occurred. By contrast, the school zone laws apply all day long, every day of the year, regardless of the presence of children or staff, including when school is not in session and the school year is over.

The district court handwaved away this critical difference in scope, arguing that threats to schools are not temporally limited. *Allam*, 677 F. Supp. 3d at 579. But it ignored part of the *Bruen* analogical analysis in doing so. In addition to examining the

"how" and "why" metrics to determine the similarity of a modern law to proposed historical analogues, the Supreme Court also explained that "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (emphasis added). Here, the burdens imposed by the two types of laws are entirely different. Whereas the polling place restrictions only burdened the right of armed self-defense on the rare occasion of an election day, § 922(q)(2)(A) is in effect *every day*, making 1,000 feet around each school off-limits to a constitutional right on a permanent basis.

*Rahimi* further confirms the district court's error. There, the Supreme Court emphasized the similar burdens imposed by the historical laws as compared to the modern law at issue. "[L]ike surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi. Section 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Rahimi*, 2024 WL 3074728, at *10. Had the district court's logic been correct that temporal differences do not matter, then the Court's analysis would have been different. "[A] court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at *30 (Barrett, J., concurring).

The district court was wrong to ignore the critical differences in the temporal burden imposed by the historical and modern laws, and, for that reason as well, it should be reversed.

## III.    HOW § 922(Q)(2)(A) CAN HARM LAW-ABIDING AMERICANS.

Given the unsympathetic facts present in many criminal cases, courts can often

overlook how the challenged law detrimentally affects millions of peaceable citizens. Section 922(q)(2)(A) is such a law, as it makes carry difficult or impossible for people simply trying to peaceably exercise their right of armed self-defense.

While all overbearing "sensitive place" restrictions are an affront to the Second Amendment, buffer zone laws are in their own special category because they can lead to accidental violations. Someone legally carrying a firearm in an urban environment will not necessarily know exactly when they have entered into a school zone. 1,000 feet in every direction is quite a wide radius, as it is the length of approximately three football fields (or a total end-to-end diameter of over a third of a mile for each school zone). Given the sheer size of these zones, it can be very easy to go about one's day and stop for coffee, get gas, or even just drive near a school while otherwise lawfully carrying without realizing you have entered into a school zone. *See Fig. 1*, *infra*, excerpted from Google Maps (last visited July 8, 2024).

/ / /

/ / /

/ / /

/ / /

16



*Fig. 1: Brooklyn's famous James Madison High School contains numerous businesses, hundreds of residences, 17 streets, and a major thoroughfare within its 1,000-foot gun-free zone.*

The district court made much of the limited exceptions, most notably the allowance for an unloaded and locked firearm, *Allam*, 677 F. Supp. 3d at 566, but they are often of no help to someone who is exercising his right to armed self-defense and inadvertently crosses into a school zone while doing so. For instance, individuals licensed by the state they are carrying in are exempt, but as more and more states become "constitutional carry" states where no permit is required, this exemption puts more otherwise law-abiding citizens at risk if they opted to stop renewing their CCW permits and carry without one. And as for those with permits issued by the other states but honored via reciprocity, the district court noted that "[t]he ATF has taken the position that a nonresident who is licensed by a state through reciprocity alone,

17

giving recognition to a permit issued by another state, is not 'licensed to do so by the State in which the school zone is located'—licensure by that state through reciprocity is not, in their view, licensure by a state." *Allam*, 677 F. Supp. 3d at 567 n.31 (citing Royce de R. Barondes, *Federalism Implications of Non-Recognition of Licensure Reciprocity Under the Gun-Free School Zones Act*, 32 J.L. & Pol'y 139, 144 (2017)). As visitors from out of state are the least likely to know where schools are located, they are the most at risk of an inadvertent violation.

Given that many schools exist in urban areas, this Court should also consider whether school zones, "when considered in combination[,] . . . effectively exempt cities from the Amendment's protections." *See* Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act*, Duke Center for Firearms Law Blog (Aug. 7, 2023), https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-improvement-act/. This "aggregate-effect" analysis was adopted by the Seventh Circuit in barring the City of Chicago from zoning gun ranges out of existence, because the "combined effect" of the various zoning rules left very little of the City of Chicago available for ranges. *Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017). So too can the combined effect of dozens of school zones make the right to carry difficult or impossible.

For example, below is a map of schools in Dallas. For each school marked on the map, recall that a radius of 1,000 feet, about three football fields, extends out in every direction thanks to § 922(q)(2)(A). Cumulatively, that is quite a lot of land suddenly off limits to people otherwise lawfully carrying.

18



*See School Finder*, Choose Dallas ISD, https://dallasisd.schoolmint.net/school-finder/home (last visited July 8, 2024).

Even an informed individual who has memorized where each school is would have quite a difficult time traversing this maze of sometimes-overlapping school zones which render large swaths of the city off-limits to them if they are exercising their right to carry. Section 922(q)(2)(A) is even more of a problem to the uninformed individual, such as people visiting Dallas or just passing through, as they will not know where schools are. And while the law requires the individual to "knowingly" possess a gun somewhere they have reasonable cause to believe is a school zone, that is cold comfort to someone whose degree of knowledge is disputed by the government. Such an individual may be dragged through the criminal justice system, or more commonly, forced into a plea bargain that may cost them their Second Amendment rights permanently. Limitations on constitutional rights must have clearer boundaries than this. Section 922(q)(2)(A) is unconstitutional.

## IV.  THE SECOND CIRCUIT'S RECENT "SENSITIVE PLACES" RULING DEFIES *BRUEN* AND SHOULD BE DISREGARDED.

A number of district courts have already wholly or partially struck down over-expansive "sensitive places" laws, many of which were passed by states unfriendly to the Second Amendment to undermine *Bruen*.[6] One of these was Amici's own case, which challenged several aspects of California sensitive places law passed in response to *Bruen*; they were enjoined before they took effect. *See May*, 2023 WL 8946212, at *19 (granting preliminary injunction against California's new "sensitive places" restrictions). Several similar rulings have been issued.[7] And in one criminal case, a district court struck down a federal restriction on carrying in post offices. *United States v. Ayala*, No. 22-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) (invalidating ban on carrying in post offices because post offices have existed since the Founding, but the first restriction on carry within them was enacted in 1972).

Standing in sharp contrast to these generally faithful-to-*Bruen* rulings is the Second Circuit's deeply flawed decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ("*Antonyuk*"), recently vacated by the Supreme Court in light of *Rahimi*. *See Antonyuk v. James*, 2024 WL 3259671, (U.S. July 2, 2024). Amici examine *Antonyuk* here to demonstrate the flaws in the Second Circuit's analysis and why this Circuit

---

[6] For example, in announcing California's response law last year, Governor Newsom angrily criticized the Supreme Court for the *Bruen* ruling and mocked the notion of a right to carry. *See* SB 2 Press Conference, YouTube.com (Feb. 1, 2023), https://www.youtube.com/watch?v=Kpxpj6yvFIo (at 36:10) (last visited June 7, 2024).

[7] *See, e.g., Koons v. Platkin*, 673 F. Supp. 3d 515; *Wolford v. Lopez*, 686 F. Supp. 3d 1034; *Kipke v. Moore*, No. GLR-23-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023); *Nat'l Ass'n for Gun Rts. v. Grisham*, No. 1:23-cv-00771-DHU-LF, 2023 WL 5951940 (D.N.M. Sept. 13, 2023); *Springer v. Grisham*, No. 1:23-cv-00781-KWR/LF, 2023 WL 8436312 (D.N.M. Dec. 5, 2023).

should avoid them.

The problems with *Antonyuk* are evident from the start, as the Second Circuit cited with approval a law review article that was extremely critical of *Bruen*, and it ultimately followed the article's advice for narrowing the *Bruen* analysis to justify circumscribing the right to carry. *Antonyuk*, 89 F.4th at 301 n.10 (citing Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67, 153 (2023)). The Charles article expressly calls for lower courts to narrow the *Bruen* precedent from below rather than follow it faithfully. *Id. at 149*. The Second Circuit's reliance on that article to guide its analysis is similar to relying on a dissenting opinion for how to apply a rule, a practice the Supreme Court has rejected. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion.").

As one case study to demonstrate *Antonyuk*'s flaws, consider how it upheld New York's ban on carry in all places that serve alcohol. That prohibition applies even if the individual has no intention of drinking, such as when they are out to dinner with their family at a restaurant that happens to also offer beer and wine. It is undisputed that establishments that serve alcohol existed in the Founding Era and before, as did fears that armed drunks might become violent. Yet New York presented no historical state law showing that carrying in bars or pubs was banned in the 18th or 19th centuries, and instead offered only a few laws from pre-statehood territories and some 19th-century laws that prohibited *intoxicated* persons from possessing arms. But, as Professor Charles entreated, the Second Circuit abandoned its duty to faithfully apply

the *Bruen* historical methodology and, instead, it disregarded *Bruen* in at least four ways.

First, *Bruen* gave virtually no weight to territorial restrictions, reasoning that territorial "legislative improvisations" that conflict with the Nation's earlier approach to firearm regulation are unlikely to reflect our true historical tradition. *Bruen*, 597 U.S. at 67. The Second Circuit disregarded that guidance, saying that "the district court made too much of the fact that *Bruen* gave 'little weight' to territorial laws." *Antonyuk*, 89 F.4th at 366. To the contrary, the district court respected *Bruen*, while the Second Circuit did not.

Second, because bars and pubs existed in the Founding Era, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Analogical reasoning is thus not appropriate, and the government needs distinctly similar laws. The Second Circuit ignored this, fabricating an excuse that this guidance only applied to *Bruen's* particular facts "due to the exceptional nature of New York's proper-cause requirement, which conditioned the exercise of a federal constitutional right on the rightsholder's reasons for exercising the right." *Antonyuk*, 89 F.4th at 302.

Third, "if earlier generations addressed the societal problem, but did so through materially different means," that is evidence that the modern law is unconstitutional. *Bruen*, 597 U.S. at 26. As the Second Circuit acknowledged, the few historical laws that dealt with the problem of drunken armed people simply barred the intoxicated from

being armed, they did not disarm both the drunk and sober in bars and pubs. *Antonyuk*, 89 F.4th at 366. New York's modern prohibitions on restaurant carry are materially different ways of addressing this same age-old societal problem and are therefore impermissible.

Fourth, even if analogical reasoning were allowed in this circumstance, and assuming the very few laws cited could constitute a representative historical tradition as *Bruen* commands, the comparable factor cannot be as simple as "crowded places." *Bruen*, 597 U.S. at 30-31. The Second Circuit, however, ruled that "[w]hen paired with the crowded space analogues, even absent the historical statutes prohibiting carriage in liquor-serving establishments, the analogues prohibiting intoxicated persons from carrying or purchasing firearms justify [New York's law]." *Id.* This completely ignores the Supreme Court's rejection of New York's argument that it may ban carry in places where people typically congregate. *Bruen*, 597 U.S. at 30-31. There is no historical basis to restrict carry somewhere "simply because it is crowded and protected generally by the [police]." *Id.* Nor is there a basis to bundle completely unrelated historical prohibitions to manufacture an analogical tradition.[8]

These same errors, as well as others, repeat for every supposed "sensitive place" the Second Circuit upheld in *Antonyuk*. Its ruling should not be given any credence as this Court decides this appeal.

---

[8] While the Supreme Court in *Rahimi* did rely on two sets of analogues it paired together, it emphasized the similarity between what they intended to achieve. "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Rahimi*, 2024 WL 3074728, at *9. The Second Circuit in *Antonyuk* went much further, tying together completely dissimilar historical laws to create a Frankenstein-esque "tradition."

## CONCLUSION

For these reasons, Amici urge this Court to reverse the district court and rule

that § 922(q)(2)(A) is unconstitutional.

Dated: July 19, 2024                                     Respectfully submitted,

                                                        **MICHEL & ASSOCIATES, P.C.**

                                                        /s/ C.D. Michel
                                                        C.D. Michel
                                                        Konstadinos T. Moros
                                                        MICHEL & ASSOCIATES, P.C.
                                                        180 East Ocean Blvd., Suite 200
                                                        Long Beach, CA 90802
                                                        Telephone: (562) 216-4444
                                                        Email: cmichel@michellawyers.com
                                                        *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 6,471 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond.

Date: July 19, 2024                    MICHEL & ASSOCIATES, P.C.

                                       /s/ C.D. Michel
                                       C.D. Michel
                                       *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on June 19, 2024, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: July 19, 2024                    MICHEL & ASSOCIATES, P.C.

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*