No. 24-40065

# In the United States Court of Appeals for the Fifth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## AHMED ABDALLA ALLAM,

*Defendant-Appellant.*

On Direct Appeal from the United States District Court
for the Eastern District of Texas
Beaumont Division

**RECORD EXCERPTS**

**Elizabeth Emanuel**
3300 Oak Lawn Ave. Suite 700
Dallas, Texas 75219
(214) 253-9153
State Bar of Texas No. 24126180

**Attorney for Appellant**

# TABLE OF CONTENTS

1. DOCKET SHEET.............................................................................ROA.1-12

2. NOTICE OF APPEAL .................................................................ROA.442-43

3. INDICTMENT ..............................................................................ROA.22-24

4. JUDGMENT IMPOSING SENTENCE .......................................ROA.435-41

5. ORDER ON MOTION TO DISMISS...........................................ROA.332-86

1

# U.S. District Court
## Eastern District of TEXAS [LIVE] (Beaumont)
## CRIMINAL DOCKET FOR CASE #: 1:23-cr-00010-MAC-ZJH-1

Case title: USA v. Allam

Magistrate judge case number: 1:23-mj-00008-ZJH

Date Filed: 02/01/2023

Assigned to: District Judge Marcia
A. Crone
Referred to: Magistrate Judge Zack
Hawthorn
Appeals court case number:
24-40065 5CA

**Defendant (1)**

**Ahmed Abdalla Allam**      represented by      **Kevin Blake Ross**
Law Office of Kevin B. Ross, PC
8150 N. Central Expressway
Suite M2070
Dallas, TX 75206
214-731-3151
Fax: 214-594-8988
Email: kbr@rosscrimlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Ryan Withington Gertz**
Gertz Adair Law Firm
2630 Liberty
Beaumont, TX 77702
409/833-6400
Fax: 409-833-6401
Email: rgertz@gertzlawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Gary R Bonneaux**
Federal Defender's Office - Beaumont
510 Park Street
Suite 450

Beaumont, TX 77701
409/839-2608
Fax: 409-839-2610
Email: gary_bonneaux@fd.org
*TERMINATED: 02/02/2023*
*Designation: Public Defender or Community Defender*
*Appointment*

**John T Floyd , III**
John T. Floyd Law Firm
4900 Woodway Dr
Suite 725
Houston, TX 77056
713-224-0101
Fax: 713-237-1511
Email: jfloyd@johntfloyd.com
*TERMINATED: 02/08/2024*
*Designation: Retained*

**Thomas William Kelley**
The Gertz Law Firm
2630 Liberty Street
Beaumont, TX 77702
409-833-6400
Fax: 409-833-6401
Email: tkelley@gertzlawyers.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| POSSESSION OF A FIREARM IN A SCHOOL ZONE - CRIMINAL FORFEITURE (1) | 60 months imprisonment, 5 years supervised release, fine waived, $100 special assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| 18:922Q.F Possession of a firearm in a school zone | |

**Plaintiff**

**USA**                                         represented by   **John Bulkley Ross**
U S Attorney's Office - Beaumont
550 Fannin Street
Suite 1250
Beaumont, TX 77701
Jefferson
409/839-2538
Fax: 409/839-2550
Email: john.ross5@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Joseph Robert Batte**
US Attorney - Beaumont
550 Fannin Street
Suite 1250
Beaumont, TX 77701
Jefferson
409/839-2538
Fax: 14098392550
Email: joe.batte@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/30/2023 | 1 (p.13) | COMPLAINT as to Ahmed Abdalla Allam (1). (Attachments: # 1 (p.13) Affidavit) (ttp, ) [1:23-mj-00008-ZJH] (Entered: 01/30/2023) |
| 01/30/2023 | 3 | E-GOV SEALED Form AO 257 filed as to Ahmed Abdalla Allam (ttp, ) [1:23-mj-00008-ZJH] (Entered: 01/30/2023) |
| 01/30/2023 | | NOTICE OF HEARING as to Ahmed Abdalla Allam Initial Appearance set for 1/31/2023 02:00 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn. (ttp, ) [1:23-mj-00008-ZJH] (Entered: 01/30/2023) |
| 01/31/2023 | 4 (p.14) | MOTION for Detention by USA as to Ahmed Abdalla Allam. (Ross, John) [1:23-mj-00008-ZJH] (Entered: 01/31/2023) |
| 01/31/2023 | | Minute Entry for proceedings held before Magistrate Judge Zack Hawthorn: Initial Appearance as to Ahmed Abdalla Allam held on 1/31/2023 from 2:00pm - 2:06pm. Dft Location: Custody. Defendant appeared before the court without counsel. Defendant was sworn and advised of his rights, charges and penalties. Defendant requested court appointed counsel; financial affidavit waived. FPD Gary R Bonneaux appointed. ( Preliminary / Detention Hearing set for 2/2/2023 02:00 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn.) Attorney Appearances: AUSA - John Ross; Defense - None Present.No exhibits(Court Reporter Digital Recording.) (ttp, ) [1:23-mj-00008-ZJH] (Entered: 01/31/2023) |
| 01/31/2023 | | TEXT ONLY ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Ahmed Abdalla Allam. Issued by Magistrate Judge Zack Hawthorn on 1/31/2023. |

| | | |
|---|---|---|
| | | (ttp, ) [1:23-mj-00008-ZJH] (Entered: 01/31/2023) |
| 01/31/2023 | | NOTICE OF HEARING as to Ahmed Abdalla Allam Preliminary & Detention Hearing set for 2/2/2023 02:00 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn. (ttp, ) [1:23-mj-00008-ZJH] (Entered: 01/31/2023) |
| 02/01/2023 | 7 (p.16) | MOTION for Psychiatric Exam by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Text of Proposed Order)(Bonneaux, Gary) [1:23-mj-00008-ZJH] (Entered: 02/01/2023) |
| 02/01/2023 | 9 (p.22) | INDICTMENT (Merged MJ complaint case: 1:23mj8) as to Ahmed Abdalla Allam (1) count(s) 1. (bjc, ) (Entered: 02/01/2023) |
| 02/01/2023 | 10 | E-GOV SEALED Form AO 257 filed as to Ahmed Abdalla Allam (bjc, ) (Entered: 02/01/2023) |
| 02/01/2023 | | NOTICE OF HEARING as to Ahmed Abdalla Allam Arraignment/Detention Hearing set for 2/2/2023 02:00 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn. (bjc, ) (Entered: 02/01/2023) |
| 02/01/2023 | 11 (p.25) | NOTICE OF ATTORNEY APPEARANCE: Thomas William Kelley appearing for Ahmed Abdalla Allam (Kelley, Thomas) (Entered: 02/01/2023) |
| 02/01/2023 | 12 (p.27) | NOTICE OF ATTORNEY APPEARANCE: Ryan Withington Gertz appearing for Ahmed Abdalla Allam (Gertz, Ryan) (Entered: 02/01/2023) |
| 02/02/2023 | | Minute Entry for proceedings held before Magistrate Judge Zack Hawthorn: Arraignment as to Ahmed Abdalla Allam (1) held on 2/2/2023 from 2:12 pm - 2:17pm. Dft Location: Custody. Defendant appeared before the court with counsel. Defendant was sworn and advised of his rights, charges and penalties set forth in the Indictment. Defendant entered a plea of NOT GUILTY to Count 1 of the Indictment and consented to detention at that time. Attorney Appearances: AUSA - John Ross; Defense - Ryan Gertz.No exhibits(Court Reporter Digital Recording.) (ttp, ) (Entered: 02/02/2023) |
| 02/02/2023 | 13 (p.29) | PRE-TRIAL ORDER as to Ahmed Abdalla Allam Plea Agreement due by 2/17/2023. Pretrial Conference set for 3/13/2023 09:00 AM in Ctrm 3 (Beaumont) before District Judge Marcia A. Crone.. Signed by Magistrate Judge Zack Hawthorn on 2/2/2023. (ttp, ) (Entered: 02/02/2023) |
| 02/02/2023 | 14 (p.31) | ORDER - PRETRIAL DISCOVERY & INSPECTION as to Ahmed Abdalla Allam. Signed by Magistrate Judge Zack Hawthorn on 2/2/2023. (ttp, ) (Entered: 02/02/2023) |
| 02/02/2023 | 15 (p.36) | ORDER OF DETENTION as to Ahmed Abdalla Allam. Signed by Magistrate Judge Zack Hawthorn on 2/2/2023. (ttp, ) (Entered: 02/02/2023) |
| 02/02/2023 | | ORAL MOTION to Withdraw Document 7 (p.16) MOTION for Psychiatric Exam by Ahmed Abdalla Allam. (ttp, ) (Entered: 02/02/2023) |
| 02/02/2023 | | ORAL ORDER granting ORAL Motion to Withdraw MOTION for Psychiatric Exam as to Ahmed Abdalla Allam (1). Issued by Magistrate Judge Zack Hawthorn on 2/2/2023. (ttp, ) (Entered: 02/02/2023) |
| 02/06/2023 | 17 | ***FILED IN ERROR per attorney.*** MOTION to Dismiss *Indictment* by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Exhibit, # 2 Exhibit, # 3 Exhibit)(Gertz, Ryan) (Additional attachment(s) added on |

| | | |
|---|---|---|
| | | 2/6/2023: # 4 (p.14) Text of Proposed Order) (bjc, ). Modified on 2/7/2023 (bjc, ). (Entered: 02/06/2023) |
| 02/06/2023 | 18 (p.37) | MOTION for Detention *to Reopen Detention Hearing* by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Text of Proposed Order)(Gertz, Ryan) (Entered: 02/06/2023) |
| 02/06/2023 | 19 | TEXT ONLY: ORDER granting 18 (p.37) Motion to Reopen Detention Hearing as to Ahmed Abdalla Allam (1). It is ORDERED that a Detention hearing is scheduled for February 9, 2023 at 2:45 p.m., in Courtroom #4 (Beaumont) before the undersigned. Signed by Magistrate Judge Christine L. Stetson on 2/6/2023. (saw, ) (Entered: 02/06/2023) |
| 02/06/2023 | 20 | NOTICE OF HEARING as to Ahmed Abdalla Allam. Detention Hearing set for 2/9/2023 at 2:45 PM in Ctrm 4 (Beaumont) before Magistrate Judge Christine L. Stetson. (saw, ) (Entered: 02/06/2023) |
| 02/06/2023 | 21 (p.40) | MOTION to Suppress *Evidence* by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Text of Proposed Order)(Gertz, Ryan) (Entered: 02/06/2023) |
| 02/07/2023 | | ***FILED IN ERROR per attorney. Document # 17, motion to dismiss indictment.*** (bjc, ) (Entered: 02/07/2023) |
| 02/07/2023 | 22 (p.45) | MOTION to Dismiss *Indictment* by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 (p.14) Text of Proposed Order)(Gertz, Ryan) (Entered: 02/07/2023) |
| 02/09/2023 | 24 (p.188) | ORDER REFERRING 21 (p.40) MOTION to Suppress *Evidence* filed by Ahmed Abdalla Allam to US Magistrate Judge Zack Hawthorn. Signed by District Judge Marcia A. Crone on 2/9/2023. (bjc, ) (Entered: 02/09/2023) |
| 02/09/2023 | 25 (p.189) | Minute Entry for proceedings held before Magistrate Judge Christine L. Stetson: Detention Hearing as to Ahmed Abdalla Allam held on 2/9/2023 from 3:02-8:18 pm. Defendant appeared before the court with counsel, Ryan Gertz and Thomas Kelley. Court heard testimony and will ordered the defendant detained. Dft Location: Custody. Attorney Appearances: AUSA - Joe Batte/John Ross; Defense - Ryan Gertz/Thomas Kelley. Witness and Exhibits admitted: by the Government and Defendants. (Court Reporter Digital Recording.)(Courtroom Deputy: Sherre White) (saw) (Entered: 02/10/2023) |
| 02/09/2023 | 26 (p.1145) | GOVERNMENT ADMITTED EXHIBITS LIST from Detention Hearing held on 2/9/2023 before Judge Stetson as to Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Defendant Exhibit 1)(saw, ) # 2 Government Exhibit 1 BPD Hot sheet Email, # 3 Government Exhibit 2A- Screenshot from BPD Security Video, # 4 (p.14) Government Exhibit 2B - Screenshot from BPD Video, # 5 Government Exhibit 2C - Screenshot from BPD Security Video, # 6 Government Exhibit 3A - Aerial Map St. Anthonys School, # 7 (p.16) Government Exhibit 3B Aerial Map St. Anthony Schoo (wider view), # 8 Government Exhibits 4 A-H) # 9 (p.22) Government Exhibit 5 A Photo of Allam, # 10 Government Exhibit 5B Photo of Allam, # 11 (p.25) Government Exhibit 5C Photo of Allam, # 12 (p.27) Government Exhibit 8 ATF Photo - Gun, # 13 (p.29) Government Exhibit 8B ATF Photo Magazine, # 14 (p.31) Government Exhibit 8C ATF Photo Ammunition, # 15 (p.36) Government Exhibit 9 A-G FBI Photos of Items in Car and Travel Chart) # 16 Government Exhibits 9 H-L FBI Photos) # 17 Government Exhibit 10 Summary Chart of Domestic Travel, # 18 (p.37) Government Exhibit 11 Summary Chart of BPD Contact, # 19 Government Exhibit 12 Allam's Social Media, # 20 Government Exhibit 14 Scans of Notebook, # |

| | | |
|---|---|---|
| | | 21 (p.40) Government Exhibit 15 Scans from Journal, # 22 (p.45) Government Exhibit 16 NYU Article) Government Exhibit 6 & 7 Video/Audio Files (Chambers) Modified on 1/12/2024 to add exhibits. (saw, ). (Main Document 26 replaced on 1/12/2024 to attache correct document) (saw, ). Modified on 1/12/2024 (saw, ). (Entered: 02/10/2023) |
| 02/09/2023 | 27 (p.192) | GOVERNMENT ADMITTED WITNESS LIST from the Detention Hearing held on February 9,2023, before Judge Stetson as to Ahmed Abdalla Allam. (saw, ) (Entered: 02/10/2023) |
| 02/09/2023 | 28 (p.1210) | DEFENDANT ADMITTED WITNESS AND EXHIBITS LIST from the Detention hearing held on February 9, 2023, before Judge Stetson as to Ahmed Abdalla Allam (saw, ) (Main Document 28 replaced on 1/12/2024) (saw, ). Modified on 1/12/2024 to attach corrected document (saw, ). (Additional attachment(s) added on 1/12/2024: # 1 (p.13) Defendant Exhibit 1 Character Letters) (saw, ). (Entered: 02/10/2023) |
| 02/10/2023 | 29 (p.193) | ORDER OF DETENTION as to Ahmed Abdalla Allam. Signed by Magistrate Judge Christine L. Stetson on 2/10/2023. (saw, ) (Entered: 02/10/2023) |
| 02/17/2023 | 30 (p.196) | RESPONSE to Motion by USA as to Ahmed Abdalla Allam re 21 (p.40) MOTION to Suppress *Evidence* (Attachments: # 1 (p.13) Text of Proposed Order)(Ross, John) (Entered: 02/17/2023) |
| 02/21/2023 | | NOTICE OF HEARING ON MOTION in case as to Ahmed Abdalla Allam 21 (p.40) MOTION to Suppress Evidence: Motion Hearing set for 3/1/2023 01:30 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn. (mkm, ) (Entered: 02/21/2023) |
| 02/21/2023 | | NOTICE OF HEARING ON MOTION in case as to Ahmed Abdalla Allam 21 (p.40) MOTION to Suppress Evidence : Motion Hearing RESET TO 2/28/2023 01:30 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn. (mkm ) (Entered: 02/21/2023) |
| 02/21/2023 | 31 (p.211) | RESPONSE to Motion by USA as to Ahmed Abdalla Allam re 22 (p.45) MOTION to Dismiss *Indictment* (Attachments: # 1 (p.13) Text of Proposed Order, # 2 Exhibit 1, # 3 Exhibit 2, # 4 (p.14) Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 (p.16) Exhibit 6, # 8 Exhibit 7, # 9 (p.22) Exhibit 8, # 10 Exhibit 9, # 11 (p.25) Exhibit 10)(Ross, John) (Entered: 02/21/2023) |
| 02/23/2023 | 32 (p.278) | MOTION to Continue by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Text of Proposed Order)(Gertz, Ryan) (Entered: 02/23/2023) |
| 02/24/2023 | 33 (p.281) | ORDER granting the 32 (p.278) Unopposed Motion for Continuance as to Ahmed Abdalla Allam. Time excluded under the Speedy Trial Act is from 2/23/23 until 5/15/23. Final Pretrial Conference and Jury Trial reset for 5/15/23 at 09:00 AM in Ctrm 3 (Beaumont) before District Judge Marcia A. Crone. Signed by District Judge Marcia A. Crone on 2/24/23. (kcv, ) (Entered: 02/24/2023) |
| 02/24/2023 | 34 (p.282) | AMENDED PRETRIAL ORDER as to Ahmed Abdalla Allam. Plea Agreement due by 4:00 p.m. on 4/24/2023. Final Pretrial Conference reset for 5/15/2023 at 09:00 AM in Ctrm 3 (Beaumont) before District Judge Marcia A. Crone. Jury Selection and trial will begin immediately and continue thereafter until completion. Signed by District Judge Marcia A. Crone on 2/24/23. (kcv, ) (Entered: 02/24/2023) |
| 02/27/2023 | | NOTICE RESETTING HEARING ON MOTION in case as to Ahmed Abdalla Allam 21 (p.40) MOTION to Suppress *Evidence* : Motion Hearing set for 2/28/2023 |

| | | |
|---|---|---|
| | | 1:30PM has been RESET to 3/20/2023 01:30 PM in Ctrm 6 (Beaumont) before Magistrate Judge Zack Hawthorn. (ttp, ) (Entered: 02/27/2023) |
| 03/06/2023 | 35 (p.484) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Detention Hearing as to Ahmed Abdalla Allam held on 2-9-2023 before Magistrate Judge Christine Stetson. Court Reporter/Transcriber: Ruth Weese,Telephone number: 409 654-2833. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 3/27/2023. Release of Transcript Restriction set for 6/5/2023. (rcw, ) Modified **CORRECTED Transcript filed 84 (p.708)** due to clerical error on 3/11/2024 (bmf, ). (Entered: 03/06/2023) |
| 03/20/2023 | 36 (p.284) | EXHIBIT LIST by USA as to Ahmed Abdalla Allam (Ross, John) (Entered: 03/20/2023) |
| 03/20/2023 | 37 | WITNESS LIST by USA as to Ahmed Abdalla Allam (Ross, John) (Entered: 03/20/2023) |
| 03/20/2023 | | Minute Entry for proceedings held before Magistrate Judge Zack Hawthorn: Motion Hearing as to Ahmed Abdalla Allam held on 3/20/2023 re 21 (p.40) MOTION to Suppress *Evidence* filed by Ahmed Abdalla Allam from 1:56pm - 4:11pm. Dft Location: Custody. Government invoked the rule. Witnesses were sworn. Government's exhibit 1-5B admitted with no objections. Court to take under advisement and will enter a report and recommendation. Attorney Appearances: AUSA - John Ross & Joe Batte; Defense - Ryan Gertz.Exhibits admitted(Courtroom Deputy: Tonya Piper; Court Reporter Ruth Weese.) (ttp, ) (Entered: 03/21/2023) |
| 03/20/2023 | 38 (p.1219) | ADMITTED EXHIBITS LIST - Motion to Suppress Hearing as to Ahmed Abdalla Allam (ttp, ) (Additional attachment(s) added on 3/22/2023: # 1 (p.13) Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 (p.14) Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 (p.16) Exhibit) (ttp, ). (Entered: 03/21/2023) |
| 03/31/2023 | 39 (p.932) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Suppression Hearing as to Ahmed Abdalla Allam held on 3-20-2023 before Judge Zack Hawthorn. Court Reporter/Transcriber: Ruth Weese, Telephone number: 409 654-2833. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 4/21/2023. Release of Transcript Restriction set for 6/29/2023. (rcw, ) (Entered: 03/31/2023) |

| | | |
|---|---|---|
| 04/18/2023 | 40 (p.285) | MOTION to Continue by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Text of Proposed Order)(Gertz, Ryan) (Entered: 04/18/2023) |
| 04/19/2023 | 41 (p.288) | NOTICE OF ATTORNEY APPEARANCE Joseph Robert Batte appearing for USA. *(Co-Counsel)* (Batte, Joseph) (Entered: 04/19/2023) |
| 04/24/2023 | 42 (p.290) | REPORT AND RECOMMENDATION as to Ahmed Abdalla Allam. The undersigned recommends denying 21 (p.40) MOTION to Suppress *Evidence*. Signed by Magistrate Judge Zack Hawthorn on 4/24/2023. (bjc, ) (Entered: 04/24/2023) |
| 04/26/2023 | 43 (p.316) | ORDER granting the 40 (p.285) Unopposed Motion for Continuance as to Ahmed Abdalla Allam. Time excluded under the Speedy Trial Act is from 4/18/23 until 7/10/23. This case is reset for Final Pretrial Conference and Jury Trial on July 10, 2023, at 9:00 a.m. Signed by District Judge Marcia A. Crone on 4/26/23. (kcv, ) (Entered: 04/26/2023) |
| 04/26/2023 | 44 (p.317) | AMENDED PRETRIAL ORDER as to Ahmed Abdalla Allam. Plea Agreement due by 4:00 p.m. on 6/16/2023. Final Pretrial Conference, Jury Selection and Trial reset for 7/10/2023 09:00 AM in Ctrm 3 (Beaumont) before District Judge Marcia A. Crone.. Signed by District Judge Marcia A. Crone on 4/26/23. (kcv, ) (Entered: 04/26/2023) |
| 05/08/2023 | 45 (p.319) | OBJECTION TO REPORT AND RECOMMENDATIONS 42 (p.290) by Ahmed Abdalla Allam (Attachments: # 1 (p.13) Text of Proposed Order)(Gertz, Ryan) (Entered: 05/08/2023) |
| 05/10/2023 | 46 (p.324) | ORDER as to Ahmed Abdalla Allam adopting magistrate judge's 42 (p.290) Report and Recommendation. Defendant Ahmed Abdalla Allam's 21 (p.40) Motion to suppress evidence is denied. Signed by District Judge Marcia A. Crone on 5/10/2023. (bjc, ) (Entered: 05/11/2023) |
| 05/30/2023 | 47 (p.326) | MOTION to Continue by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Proposed Order)(Gertz, Ryan) (Entered: 05/30/2023) |
| 05/31/2023 | 48 (p.329) | ORDER TO CONTINUE - Ends of Justice as to Ahmed Abdalla Allam. Time excluded from 5/30/2023 until 9/11/2023. Order granting 47 (p.326) MOTION to Continue filed by Ahmed Abdalla Allam. This case is reset for Final Pretrial Conference and Jury Trial on September 11, 2023, at 9:00 a.m. Signed by District Judge Marcia A. Crone on 5/31/2023. (bjc, ) (Entered: 05/31/2023) |
| 05/31/2023 | 49 (p.330) | AMENDED PRE-TRIAL ORDER as to Ahmed Abdalla Allam. This case is reset for Final Pretrial Conference on September 11, 2023, at 9:00 a.m. in Courtroom #3, United States Courthouse, Beaumont, Texas. Jury Selection and trial will begin immediately and continue everyday thereafter until completion. Signed by District Judge Marcia A. Crone on 5/31/2023. (bjc, ) (Entered: 05/31/2023) |
| 06/14/2023 | 50 (p.332) | MEMORANDUM and ORDER denying 22 (p.45) Motion to Dismiss as to Ahmed Abdalla Allam (1). Signed by District Judge Marcia A. Crone on 6/14/2023. (bjc, ) (Entered: 06/14/2023) |
| 08/07/2023 | | NOTICE OF HEARING as to Ahmed Abdalla Allam. Change of Plea Hearing set for 8/10/2023 at 03:00 PM in Ctrm 3 (Beaumont) before District Judge Marcia A. Crone. (jc, ) (Entered: 08/07/2023) |
| 08/10/2023 | 51 (p.387) | ELEMENTS of the Offense by USA as to Ahmed Abdalla Allam (Ross, John) (Entered: 08/10/2023) |

| | | |
|---|---|---|
| 08/10/2023 | | Minute Entry for proceedings held before District Judge Marcia A. Crone: Change of Plea Hearing as to Ahmed Abdalla Allam held on 8/10/2023 from 3:12-3:45 pm. Dft Location: Custody. Defendant was present with attorney. Defendant was placed under oath. Court informed defendant of rights and consequences as a result of pleading guilty. Court informed defendant of the constitutional right to a trial. Defendant stated the plea was voluntary, and not the result of force, threats, or promises. *There was no written plea agreement.* Government summarized the factual basis in open court. Defendant described the actions that led to the charge. Court determined it was an appropriate Factual Basis. **Defendant pled guilty to Count 1 of the Indictment.** Attorney Appearances: AUSA - John Ross; Defense - Ryan Gertz. No exhibits(Court Reporter Ruth Weese.) (jc, ) (Entered: 08/10/2023) |
| 08/10/2023 | 52 (p.389) | Factual Basis by USA as to Ahmed Abdalla Allam. (jc, ) (Entered: 08/11/2023) |
| 10/03/2023 | 53 (p.395) | PAPER TRANSCRIPT REQUEST by USA as to Ahmed Abdalla Allam for proceedings held on 08/10/2023 Change of Plea before Judge Marcia Crone. (Forwarded to Ruth Weese on 10/3/23) (Ross, John) Modified on 10/3/2023 (bga). (Entered: 10/03/2023) |
| 10/05/2023 | 54 (p.1017) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Change of Plea Hearing as to Ahmed Abdalla Allam held on 8-10-23 before Judge Marica A. Crone. Court Reporter/Transcriber: Ruth Weese, Telephone number: 409 654-2833. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 10/26/2023. Release of Transcript Restriction set for 1/3/2024. (rcw, ) (Entered: 10/05/2023) |
| 11/03/2023 | 56 (p.396) | MOTION for Extension of Time to File *Objections to Pre-Sentence Investigation Report* by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Proposed Order)(Gertz, Ryan) (Entered: 11/03/2023) |
| 11/06/2023 | 57 (p.400) | ORDER granting 56 (p.396) Motion for Extension of Time to File as to Ahmed Abdalla Allam (1). The deadline to file objections to the Presentence Investigation Report is extended to November 20, 2023. Signed by District Judge Marcia A. Crone on 11/6/2023. (bjc, ) (Entered: 11/07/2023) |
| 11/20/2023 | 58 (p.1438) | SEALED OBJECTION TO PRESENCE INVESTIGATION REPORT by Ahmed Abdalla Allam (Gertz, Ryan) (Entered: 11/20/2023) |
| 12/01/2023 | 59 (p.401) | MOTION FOR UPWARD DEPARTURE OR VARIANCE by USA as to Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Proposed Order)(Ross, John) (Entered: 12/01/2023) |
| 12/20/2023 | 60 (p.1442) | FINAL PRESENCE INVESTIGATION REPORT (SEALED) (including addendum) as to Ahmed Abdalla Allam (Attachments: # 1 (p.13) Supplement Cover Letter)(McDorman, Tiffany) (Entered: 12/20/2023) |

| 01/05/2024 | | NOTICE OF HEARING as to Ahmed Abdalla Allam. Sentencing set for 1/30/2024 at 09:00 AM in Ctrm 3 (Beaumont) before District Judge Marcia A. Crone. All departure and variance motions, sentencing memoranda, and any other documents relating to the sentencing hearing must be filed at least five (5) business days prior to the date of sentencing in order to be considered. Character Letters should not be filed. They should be submitted by email as one PDF document to Julia_Colyer@txed.uscourts.gov. (jc, ) (Entered: 01/05/2024) |
| --- | --- | --- |
| 01/08/2024 | 62 (p.1474) | REVISED FINAL PRESENTENCE INVESTIGATION REPORT (SEALED) (including addendum) as to Ahmed Abdalla Allam (Attachments: # 1 (p.13) Supplement Cover Letter)(Champion, Judith) (Entered: 01/08/2024) |
| 01/30/2024 | 65 (p.432) | EXHIBIT LIST by USA as to Ahmed Abdalla Allam (Ross, John) (Entered: 01/30/2024) |
| 01/30/2024 | 66 | PROPOSED WITNESS LIST by USA as to Ahmed Abdalla Allam (Ross, John) (Entered: 01/30/2024) |
| 01/30/2024 | 67 (p.434) | Minute Entry for proceedings held before District Judge Marcia A. Crone: Sentencing held on 1/30/2024 for Ahmed Abdalla Allam from 9:20AM-12:00PM. **Defendant sentenced in Count 1 of the indictment to 60 months imprisonment, 3 years supervised release, fine waived, and $100 special assessment.** Dft Location: Custody. Attorney Appearances: AUSA - John Ross & Joe Batte; Defense - Ryan Gertz & Tom Kelley; USPO Clinton Derouen. Exhibits admitted.(Court Reporter Ruth Weese.) (jc, ). (Entered: 01/30/2024) |
| 01/30/2024 | | ORAL ORDER granting 59 (p.401) Government's Motion for Upward Departure or Variance as to Ahmed Abdalla Allam by District Judge Marcia A. Crone on 1/30/24. (jc, ) (Entered: 01/30/2024) |
| 01/30/2024 | 68 (p.1275) | GOVERNMENT'S ADMITTED EXHIBITS LIST re: Ahmed Abdalla Allam (jc, ) (Additional attachment(s) added on 2/1/2024: # 1 (p.13) Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 (p.14) Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 (p.16) Exhibit 7, # 8 Exhibit 8) (jc, ). (Entered: 01/30/2024) |
| 02/01/2024 | 69 (p.435) | JUDGMENT as to Ahmed Abdalla Allam (1), Count(s) 1, 60 months imprisonment, 3 years supervised release, fine waived, $100 special assessment. Signed by District Judge Marcia A. Crone on 2/1/2024. (bjc, ) (Entered: 02/01/2024) |
| 02/01/2024 | 71 (p.442) | NOTICE OF APPEAL re 69 (p.435) Judgment by Ahmed Abdalla Allam. (Gertz, Ryan) Modified on 2/1/2024 (bjc, ). (Entered: 02/01/2024) |
| 02/01/2024 | 72 (p.444) | MOTION for Leave to Appeal In Forma Pauperis by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Exhibit, # 2 Proposed Order)(Gertz, Ryan). Added MOTION to Appoint Counsel on 2/1/2024 (bjc, ). (Entered: 02/01/2024) |
| 02/05/2024 | 73 (p.449) | ORDER granting 72 (p.444) Motion for Leave to Appeal In Forma Pauperis and 72 (p.444) Motion to Appoint Counsel. Kevin Blake Ross appointed for Ahmed Abdalla Allam (1). Signed by Magistrate Judge Zack Hawthorn on 2/5/2024. (bjc, ) (Entered: 02/05/2024) |
| 02/05/2024 | 74 (p.450) | UNOPPOSED MOTION to Substitute Attorney by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Proposed Order)(Floyd, John) (Entered: 02/05/2024) |
| 02/06/2024 | 75 (p.454) | ORDER denying 74 (p.450) Motion to Substitute Attorney as to Ahmed Abdalla Allam (1). Signed by Magistrate Judge Zack Hawthorn on 2/6/2024. (bjc, ) (Entered: |

| | | 02/06/2024) |
|---|---|---|
| 02/07/2024 | 76 (p.456) | SECOND MOTION to Substitute Attorney by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Proposed Order)(Floyd, John) (Entered: 02/07/2024) |
| 02/08/2024 | 77 (p.460) | MOTION to Withdraw Document 76 (p.456) SECOND MOTION to Substitute Attorney by Ahmed Abdalla Allam. (Attachments: # 1 (p.13) Proposed Order)(Floyd, John) (Entered: 02/08/2024) |
| 02/08/2024 | | TEXT ONLY ORDER granting 77 (p.460) Motion to Withdraw Document and denying as moot 76 (p.456) Motion to Substitute Attorney as to Ahmed Abdalla Allam (1). Issued by Magistrate Judge Zack Hawthorn on 2/8/2024. (ttp, ) (Entered: 02/08/2024) |
| 03/04/2024 | 78 (p.464) | TRANSCRIPT REQUEST by Ahmed Abdalla Allam for proceedings held on 01/31/2023; 02/02/2023 before Judge Zack Hawthorn, (Forwarded to Gwen Reed on 3/5/24) (Ross, Kevin) Modified on 3/5/2024 (bga). (Entered: 03/04/2024) |
| 03/04/2024 | 79 (p.465) | TRANSCRIPT REQUEST by Ahmed Abdalla Allam for proceedings held on 02/09/2023 before Judge Christine L. Stetson, (Transcript already docketed by Ruth Weese) (Ross, Kevin) Modified on 3/4/2024 (bga). (Entered: 03/04/2024) |
| 03/04/2024 | 80 (p.466) | TRANSCRIPT REQUEST by Ahmed Abdalla Allam for proceedings held on 03/20/2023; 08/10/2023; 01/30/2024 before Judge Zack Hawthorn; Marcia A. Crone, (Forwarded to Ruth Weese on 3/4/24) (Ross, Kevin) Modified on 3/4/2024 (bga). (Entered: 03/04/2024) |
| 03/08/2024 | 81 (p.467) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Initial Appearance as to Ahmed Abdalla Allam held on 1/31/23 before Judge Zach Hawthorn. Court Reporter/Transcriber: GLR Transcribers,Telephone number: 409-330-1610. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 3/29/2024. Release of Transcript Restriction set for 6/6/2024. (bga) (Entered: 03/08/2024) |
| 03/08/2024 | 82 (p.476) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Arraignment as to Ahmed Abdalla Allam held on 2/2/23 before Judge Zach Hawthorn. Court Reporter/Transcriber: GLR Transcribers,Telephone number: 409-330-1610. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 3/29/2024. |

| | | |
|---|---|---|
| | | Release of Transcript Restriction set for 6/6/2024. (bga) (Entered: 03/08/2024) |
| 03/11/2024 | 83 (p.1044) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Sentencing Hearing as to Ahmed Abdalla Allam held on 1-30-2024 before Judge Marica A. Crone. Court Reporter/Transcriber: Ruth Weese, Telephone number: 409 654-2833. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Motion to Redact due 4/1/2024. Release of Transcript Restriction set for 6/10/2024. (rcw, ) (Entered: 03/11/2024) |
| 03/11/2024 | 84 (p.708) | NOTICE OF FILING OF OFFICIAL **CORRECTED** TRANSCRIPT of Detention Hearing as to Ahmed Abdalla Allam held on 02/09/2023 before Judge Magistrate Judge Christine Stetson. Court Reporter/Transcriber Ruth Weese. This transcript replaces 35 (p.484) transcript due to a clerical error on the date of the hearing on the transcript. (bmf, ) (Entered: 03/11/2024) |
| 03/11/2024 | | NOTICE of Docketing Notice of Appeal from USCA as to Ahmed Abdalla Allam re 71 (p.442) Notice of Appeal filed by Ahmed Abdalla Allam. USCA Case Number 24-40065 (bjc, ) (Entered: 03/11/2024) |
| 03/13/2024 | | Notice of certification of eROA provided to 5th Circuit Court of Appeals. (bjc, ) (Entered: 03/13/2024) |

2

# IN THE UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO.  1:23-CR-10 |
| | § | |
| AHMED ALLAM | § | |

## NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Ahmed Allam, Defendant, and files this his Notice of Appeal to the Fifth Circuit Court of Appeals from the judgment and sentence in the above styled and numbered cause as entered by the Court on January 30, 2024.

Respectfully submitted,

THE GERTZ KELLEY LAW FIRM
Attorneys at Law
2630 Liberty
Beaumont, Texas 77702
P: (409) 833-6400
F: (409) 833-6401
E: rgertz@gertzlawyers.com
E: tkelley@gertzlawyers.com

*/s/ Ryan W. Gertz*
_____
RYAN W. GERTZ
STATE BAR NUMBER:  24048489
Attorney for Ahmed Allam

*/s/ Thomas W. Kelley*
_____
THOMAS W. KELLEY
STATE BAR NUMBER: 24072891
Attorney for Ahmed Allam

**CERTIFICATE OF SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the 1st day of February, 2024.

*/s/ Ryan W. Gertz*

_____

RYAN W. GERTZ

*/s/ Thomas W. Kelley*

_____

THOMAS W. KELLEY

3

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

FEB - 1 2023

BY
DEPUTY_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:23-CR-_1D_ |
| | § | Judge _Crone – Hawthorn_ |
| AHMED ABDALLA ALLAM | § | |

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### Count One

Violation: <u>18 U.S.C. § 922(q)(2)(A)</u>
(Possession of a Firearm in a School Zone)

On or about the January 29, 2023, in the Eastern District of Texas, the defendant,

**Ahmed Abdalla Allam**, did knowingly possess a firearm, that is, one (1) Diamondback

Firearms, Model DB15, multi-caliber rifle bearing serial number DB2615207, that had

moved in interstate and foreign commerce, within a distance of 1,000 feet of the grounds

of St. Anthony Cathedral Basilica School, a place that the defendant knew and had

reasonable cause to believe was a school zone.

In violation of <u>18 U.S.C. § 922(q)(2)(A)</u>.

### NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

<u>Criminal Forfeiture Pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c)</u>

As the result of committing the felony offense in violation of <u>26 U.S.C. § 5861(d)</u>

alleged in Count One of this indictment, defendant **Ahmed Abdalla Allam** shall forfeit

to the United States, pursuant to <u>18 U.S.C. § 924(d)(1)</u>, <u>28 U.S.C. § 2461(c)</u>, <u>26 U.S.C. §</u>

5872, and 49 U.S.C. § 80303, all firearms and ammunition involved in the offense,

including but not limited to the following:

> one (1) Diamondback Firearms, Model DB15, multi-caliber rifle bearing serial number DB2615207; one (1) thirty-round magazine; and one-hundred and fifty (150) rounds of .556 caliber ammunition.

A TRUE BILL

_____
GRAND JURY FOREPERSON

BRIT FEATHERSTON
UNITED STATES ATTORNEY

_____
JOHN B. ROSS
Assistant United States Attorney

_____2-1-23_____
Date

24-40065.23

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 1:23-CR-_10_ |
| | § | Judge _Crone – Hawthorn_ |
| AHMED ABDALLA ALLAM | § | |

## NOTICE OF PENALTY

### Count One

Violation:     18 U.S.C. § 922(g)(2)(A) and 924(a)(4).

Penalty:     Imprisonment of not more than five (5) years, a fine not to exceed
$250,000, or twice the pecuniary gain to the defendant or loss to the
victim, whichever is greater, or both; a term of supervised release of
not more than three (3) years.

Special Assessment: $ 100.00

24-40065.24

4

# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS BEAUMONT DIVISION

| UNITED STATES OF AMERICA | § | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| | § | |
| v. | § | |
| | § | Case Number: **1:23-CR-00010-MAC-ZJH(1)** |
| **AHMED ABDALLA ALLAM** | § | USM Number: **42254-510** |
| | § | **Ryan Withington Gertz** |
| | § | Defendant's Attorney |

**THE DEFENDANT:**

| ☒ | pleaded guilty to count(s) | **Count 1 of the Indictment** |
|---|---|---|
| ☐ | pleaded guilty to count(s) before a U.S. Magistrate Judge, which was accepted by the court. | |
| ☐ | pleaded nolo contendere to count(s) which was accepted by the court | |
| ☐ | was found guilty on count(s) after a plea of not guilty | |

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18 U.S.C. § 922(q)(2)(A), 18 U.S.C. § 924(a)(1)(B) Possession of a Firearm in a School Zone | 01/29/2023 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ There are no counts remaining as to this defendant.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**January 30, 2024**

Date of Imposition of Judgment

*Marcia A. Crone*

Signature of Judge

**MARCIA A. CRONE**
**UNITED STATES DISTRICT JUDGE**

Name and Title of Judge

2/1/24

Date

DEFENDANT: AHMED ABDALLA ALLAM
CASE NUMBER: 1:23-CR-00010-MAC-ZJH(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**60 months**.

☒ The court makes the following recommendations to the Bureau of Prisons:

The court recommends the defendant serve the term of imprisonment at FCI Otisville or FCI Ray Brook, if eligible.

The court recommends the defendant undergo a mental health evaluation to determine if treatment is necessary. If deemed necessary, the Court recommends to the Bureau of Prisons that the defendant receive appropriate mental health treatment while imprisoned.

The court recommends the defendant receive appropriate drug treatment while imprisoned.

☒ The defendant is remanded to the custody of the United States Marshal.
☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ☐ a.m. ☐ p.m. on

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on
☐ as notified by the United States Marshal.
☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to

at _____, with a certified copy of this judgment.

UNITED STATES MARSHAL

By
DEPUTY UNITED STATES MARSHAL

24-40065.436

DEFENDANT:  AHMED ABDALLA ALLAM
CASE NUMBER:  1:23-CR-00010-MAC-ZJH(1)

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of:  **three (3) years.**

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. (*check if applicable*)

4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. (*check if applicable*)

5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable*)

6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. (*check if applicable*)

7. ☐ You must participate in an approved program for domestic violence. (*check if applicable*)

   You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

DEFENDANT:          AHMED ABDALLA ALLAM
CASE NUMBER:     1:23-CR-00010-MAC-ZJH(1)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

# U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____          Date  _____

24-40065.438

DEFENDANT:          AHMED ABDALLA ALLAM
CASE NUMBER:        1:23-CR-00010-MAC-ZJH(1)

# SPECIAL CONDITIONS OF SUPERVISION

You must provide the probation officer with access to any requested financial information for purposes of monitoring your efforts to obtain and maintain lawful employment.

You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption.

You must undergo a mental health evaluation, if not already completed, to determine if treatment is necessary.

You must participate in a program of testing and treatment for substance abuse and follow the rules and regulations of that program until discharged. The probation officer, in consultation with the treatment provider, will supervise your participation in the program. The defendant must pay any cost associated with treatment and testing.

You must participate in any combination of psychiatric, psychological, or mental health treatment programs, if deemed necessary, and follow the rules and regulations of that program, until discharged. This includes taking any mental health medication as prescribed by your treating physician. The probation officer, in consultation with the treatment provider, will supervise your participation in the program. You must pay any cost associated with treatment
and testing.

You must not have access to or loiter near school grounds, parks, arcades, playgrounds, amusement parks or other places where children may frequently congregate. You must neither seek nor maintain employment or volunteer work at any location and/or activity where persons under the age of 18 congregate, without prior permission of the probation officer.

DEFENDANT: AHMED ABDALLA ALLAM
CASE NUMBER: 1:23-CR-00010-MAC-ZJH(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $100.00 | $.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until     An *Amended Judgment in a Criminal Case (AO245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the schedule of payments page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the     ☐ fine     ☐ restitution

☐ the interest requirement for the     ☐ fine     ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

24-40065.440

DEFENDANT: AHMED ABDALLA ALLAM
CASE NUMBER: 1:23-CR-00010-MAC-ZJH(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☒  Lump sum payments of $ 100.00 due immediately, balance due

  ☐  not later than                              , or

  ☒  in accordance          ☐  C,          ☐  D,          ☐  E, or          ☒  F below; or

**B**  ☐  Payment to begin immediately (may be combined with          ☐  C,          ☐  D, or          ☐  F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal 20 *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☒  Special instructions regarding the payment of criminal monetary penalties:
  **It is ordered that the Defendant shall pay to the United States a special assessment of $100.00 for Count 1, which shall be due immediately. Said special assessment shall be paid to the Clerk, U.S. District Court.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
  See above for Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

  ☐  Defendant shall receive credit on his restitution obligation for recovery from other defendants who contributed to the same loss that gave rise to defendant's restitution obligation.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA Assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

24-40065.441

5

**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA          §
                                  §
*versus*                          §          CASE NO. 1:23-CR-10
                                  §
AHMED ADBALLA ALLAM               §

### MEMORANDUM AND ORDER

Pending before the court is Defendant Ahmed Adballa Allam's ("Allam") Motion to Dismiss the Indictment (#22). Allam is charged with one count of possession of a firearm in a school zone, in violation of 18 U.S.C. § 922(q)(2)(A). Allam contends that, in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, ___ U.S. ___, 142 S. Ct. 2111 (2022), and the United States Court of Appeals for the Fifth Circuit's recent decision in *United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023), *petition for cert. filed*, (U.S. Mar. 21, 2023) (No. 22-915),[1] 18 U.S.C. § 922(q)(2)(A) runs afoul of the Second Amendment to the United States Constitution. The Government filed a response in opposition (#31). Having considered the motion, the Government's response, the record, the applicable law, and the relevant history, the court is of the opinion that the motion should be denied.

I.          Background

Until July 2022, Allam lived with his family at their home in Brooklyn, New York. At that time, Allam left New York and headed toward the west coast. Allam left in his father's SUV, a black Toyota RAV4 ("SUV"), bearing a New York license plate. Early into Allam's trip, he stopped at a gun store in Pennsylvania. There, he purchased a Diamondback model DB15—an

---

[1] The Fifth Circuit originally filed its panel opinion, *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), on February 2, 2023. On March 2, 2023, however, the Fifth Circuit withdrew its February opinion and substituted it with the above-cited panel opinion.

AR-15-platform rifle.[2]  After Allam's firearm purchase, he proceeded to California, where he stayed for a few months until departing for Texas in December 2022.

Allam arrived in Beaumont, Texas, some time in early January 2023.  It appears that Allam had been living in the SUV since he left New York and continued to do so after coming to Beaumont.  The Beaumont Police Department ("BPD") became acutely aware of Allam's presence in Beaumont after receiving multiple complaints reporting that Allam would park for extended periods of time around St. Anthony Cathedral Basilica School ("School") and Temple Emanuel, a Jewish synagogue.  Between January 24, 2023, and Allam's arrest on January 29, 2023, he consistently parked on the south-east side of Forsythe Street directly across from School grounds for hours on end.  Allam's unusual activity concerned the School's principal, which motivated her to call BPD several times each day.  Various members of the School's community asked Allam to move the SUV, and BPD officers interacted with Allam upwards of nine times during his stay on Forsythe Street.  Allam usually parked the SUV approximately 50 feet from the School's playground.  Additionally, during Allam's time on Forsythe Street, School students would periodically cross Forsythe Street to attend mass at the Basilica, which is off School property.

On the night of January 29, 2023, a BPD officer was posted on Forsythe Street to monitor Allam.  Once Allam moved the SUV from its parked position, the BPD officer stopped him for

---

[2] "The ArmaLite Rifle, design 15 is [a] rifle platform commonly abbreviated AR–15, a registered trademark of Colt's Inc. AR–15, Registration No. 0,825,581."  *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 461 n.1 (5th Cir. 2016) (Jones, J., dissenting); *see Lucio-Vasquez v. City of Aurora*, No. 21-CV-2756-WJM-MDB, 2023 WL 2891009, at *3 n.5 (D. Colo. Apr. 11, 2023) ("The term 'AR-15' is a reference to the Colt ArmaLite Rifle-15.  Since the patent to the gas operating system that made Colt's AR-15 so successful expired in 1977, the term 'has become a catchall that includes a variety of weapons that look and operate similarly, including the Remington Bushmaster, the Smith & Wesson M&P15[,] and the Springfield Armory Saint.'" (quoting Ali Watkins, John Ismay & Thomas Gibbons-Neff, *Once Banned, Now Loved and Loathed:  How the AR-15 Became "America's Rifle,"* N.Y. TIMES (Mar. 3, 2018), https://www.nytimes.com/2018/03/03/us/politics/ar-15-americas-rifle.html.)).

a traffic violation, and additional BPD officers arrived as backup. Allam repeatedly failed to comply with many of the BPD officers' instructions, and he was eventually arrested. Upon conducting an inventory search, BPD officers found, among other things,[3] the DB15 rifle, 150 rounds of ammunition, and a loaded thirty-round magazine.[4] The location of the stop and Allam's subsequent arrest, as well as where he parked on Forsythe Street, was within 1,000 feet of the School's property.[5]

On February 1, 2023, a grand jury in the Eastern District of Texas returned a one-count Indictment charging Allam with possession of a firearm in a school zone, in violation of 18 U.S.C. § 922(q)(2)(A), which provides:

---

[3] Allam appeared before United States Magistrate Judge Christine L. Stetson on February 9, 2023, for a detention hearing. In Judge Stetson's Order of Detention (#29), she noted that in addition to the DB15 rifle, ammunition, and the magazine, there were various other items seized from Allam's vehicle "including children's clothing . . . questionable magazine articles regarding terrorist events, and journal entries related to gun violence that mention rape, murder, killing moms, the president is dead, taking the AR in, taking no hostage, and blow up the base." BPD officers also found a "plastic marijuana grinder" containing "marijuana residue," "approximately one ounce of suspected synthetic marijuana," and a "white powdery substance . . . wrapped up in a piece of loose leaf paper" that "field tested positive for cocaine" (#s 35, 42).

[4] The DB15 rifle was found under the SUV's rear passenger seat. The rifle was in its original, unlocked box. Additionally, the rifle was unloaded and the thirty-round magazine was found in a bag behind the driver's seat, along with the additional rounds of ammunition.

[5] On February 6, 2023, Allam filed a Motion to Suppress Evidence (#21), wherein he sought to suppress evidence found in the SUV as a result of an unlawful arrest and search. United States Magistrate Judge Zack Hawthorn held a hearing on Allam's motion on March 20, 2023. In Judge Hawthorn's Report and Recommendation (#42), signed on April 24, 2023, he found that:

[T]he BPD officers lawfully stopped and detained Allam's vehicle for violating several provisions of the Texas Transportation Code, lawfully arrested Allam for committing such traffic violations, satisfied their burden in showing they conducted a lawful inventory of Allam's vehicle, and accordingly, had probable cause to search the rest of his vehicle once they discovered illicit contraband.

As a consequence, Judge Hawthorn recommended that this court deny Allam's Motion to Suppress. By order (#46) signed on May 10, 2023, the court adopted Judge Hawthorn's Report and Recommendation.

(2)(A) It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.[6]

(B) Subparagraph (A) does not apply to the possession of a firearm--

(i) on private property not part of school[7] grounds;

(ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

(iii) that is--

(I) not loaded; and

(II) in a locked container, or a locked firearms rack that is on a motor vehicle;

(iv) by an individual for use in a program approved by a school in the school zone;

(v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

(vi) by a law enforcement officer acting in his or her official capacity; or

(vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

On February 7, 2023, Allam filed the pending motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B). Allam contends that 18 U.S.C. § 922(q)(2)(A), in conjunction with 18 U.S.C. § 921(a)(26)(B),[8] is facially unconstitutional because it violates the Second

---

[6] "The term 'school zone' means--(A) in, or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 U.S.C. § 921(a)(26).

[7] "The term 'school' means a school which provides elementary or secondary education, as determined under State law." 18 U.S.C. § 921(a)(27).

[8] Allam challenges 18 U.S.C. § 922(q)(2)(A) only to the extent that it prohibits the possession of a firearm within a distance of 1,000 feet from the school grounds. He does not contend that 18 U.S.C. § 922(q)(2)(A), in conjunction with 18 U.S.C. § 921(a)(26)(A), is unconstitutional.

4

Amendment, relying upon *Bruen* and *Rahimi*. The Government opposes Allam's motion, contending that 18 U.S.C. § 922(q)(2)(A) is constitutional despite both *Bruen* and *Rahimi*.

II.   Analysis

A.   Procedural Mechanism

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a court to dismiss a defective indictment. An indictment predicated on a statute that is unconstitutional is defective and, thus, must be dismissed. *United States v. Barber*, No. 4:20-CR-384-SDJ, 2023 WL 1073667, at *2 (E.D. Tex. Jan. 27, 2023) ("[A]n indictment premised on a statute that is unconstitutional must be dismissed."); *United States v. Brown*, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010); *see In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883) ("An indictment is defective if it alleges a violation of an unconstitutional statute.").

B.   Second Amendment Challenge

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller* and *McDonald v. Chicago*, the Supreme Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."[9] *Bruen*, 142 S.

---

[9] Prior to the Supreme Court's decision in *Heller*, in *United States v. Emerson*, the Fifth Circuit held that the Second Amendment "protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms." 270 F.3d 203, 260 (5th Cir. 2001), *cert. denied*, 536 U.S. 907 (2002); *see Rahimi*, 61 F.4th at 450 ("In *Emerson*, we held that the Second Amendment guarantees an individual right to keep and bear arms—the first circuit expressly to do so."). "However, *Emerson* recognized that the Second Amendment right was subject to 'limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country.'" *Barber*, 2023 WL 1073667, at *2 (quoting *Emerson*, 270 F.3d at 261).

5

Ct. at 2122 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010)). Recently, in *Bruen*, the Supreme Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

       1.   *Bruen*'s Framework

Before *Bruen*, and in response to the Supreme Court's decision in *Heller*, circuit courts "coalesced around a similar 'two-step inquiry for analyzing laws that might impact the Second Amendment.'" *Rahimi*, 61 F.4th at 450 (quoting *United States v. McGinnis*, 956 F.3d 747, 753 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021)). Courts would first "ask 'whether the conduct at issue falls within the scope of the Second Amendment right.' To make that determination, 'we look to whether the law harmonizes with the historical traditions associated with the Second Amendment.'" *McGinnis*, 956 F.3d at 754 (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012), *cert. denied*, 571 U.S. 1196 (2014)). "If the conduct fell outside the scope of the Second Amendment right, then the challenged law was constitutional." *Rahimi*, 61 F.4th at 450 (citing *McGinnis*, 956 F.3d at 754). "But if the conduct fell within the scope of the right, then we proceeded to the second step of the analysis, which applied either intermediate or strict scrutiny." *Id.*

*Bruen* altered the structure of the Second Amendment analysis and set out the framework that must be applied to Second Amendment challenges going forward. The Supreme Court

24-40065.337

rejected the circuit courts' two-step approach and held that "it is one step too many."[10] *Bruen*, 142 S. Ct. at 2127. Accordingly, *Bruen* articulated a new framework:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id*. at 2126 (internal quotation marks and citations omitted); *see Rahimi*, 61 F.4th at 450.

### 2. Step One: The Second Amendment's Plain Text

At the first step of *Bruen*'s framework, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. Before analyzing whether Allam's conduct falls within the scope of the Second Amendment,[11] the court

---

[10] In *Bruen*, Justice Thomas stated that while "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history . . . *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. Justice Thomas also noted that the Supreme Court "looked to history because 'it has always been widely understood that the Second Amendment . . . codified a pre-existing right.'" *Id*. (quoting *Heller*, 554 U.S. at 592). Justice Thomas further noted that although the Court mentioned in *Heller* that:

> [T]he ban "would fail constitutional muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," we did not engage in means-end scrutiny when resolving the constitutional question. Instead, we focused on the historically unprecedented nature of the District's ban, observing that "[f]ew laws in the history of our Nation have come close to [that] severe restriction."

*Id*. (citations omitted) (quoting *Heller*, 554 U.S. at 628-29).

[11] Or, rather, as discussed below, whether 18 U.S.C. § 922(g)(2)(A) prohibits conduct covered by the Second Amendment. *See United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022); *see also Barber*, 2023 WL 1073667, at *5 ("The burdened conduct at issue in this case is [the defendant's] possession of a type of AR-15 semi-automatic rifle in his home."); *United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *2 (N.D. Tex. Nov. 3, 2022) ("The Court first determines 'whether the plain text of the Second Amendment protects' the conduct

24-40065.338

must determine whether Allam "as an individual can claim protection under the Second Amendment." *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2023 WL 2806324, at *4 (W.D. Tex. Apr. 6, 2023).

        a.      <u>The Scope of "The People"</u>

In *Rahimi*, the Fifth Circuit noted "that the words 'the people' in the Second Amendment have been interpreted throughout the Constitution to 'unambiguously refer[ ] to all members of the political community, not an unspecified subset.'" *Rahimi*, 61 F.4th at 451 (quoting *Heller*, 554 U.S. at 580). *Rahimi* "rejected the argument that 'non-law-abiding' people could be excluded from the Second Amendment's scope, reasoning that such an interpretation of the Amendment 'admits to no true limiting principle.'" *Connelly*, 2023 WL 2806324, at *4 (quoting *Rahimi*, 61 F.4th at 453). Moreover, although *Heller* and *Bruen* "refer to 'law-abiding, responsible citizens' in discussing the amendment's scope (*Bruen* adds 'ordinary, law-abiding citizens')," and "there is some debate over the extent to which the Court's 'law-abiding' qualifier constricts the Second Amendment's reach," the Fifth Circuit held that "*Heller*'s reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, *i.e.*, groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated"—such as felons and the mentally ill.[12] *Rahimi*, 61 F.4th at

---

regulated by these statutes." (quoting *Bruen*, 142 S. Ct. at 2134)).

[12] The Fifth Circuit noted that "in context, *Heller* simply uses 'law-abiding, responsible citizens' as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Rahimi*, 61 F.4th at 451 (quoting *Heller*, 554 U.S. at 626-27). *Heller* mentioned longstanding prohibitions on possessing firearms in "sensitive places" in the same breath that it mentions felons and the mentally ill—those individuals who have been *stripped* of their Second Amendment right. Specifically, *Heller* notes:

24-40065.339

451-52 (quoting *Heller*, 554 U.S. at 626-27). Thus, *Rahimi* "suggests that if an individual belongs to a group that has long been prohibited from possessing firearms, the Second Amendment may not protect that individual at all, even if their conduct would otherwise fall within its scope." *Connelly*, 2023 WL 2806324, at *4.

Nevertheless, Allam, like Rahimi,[13] does not fall into any group that has "historically been stripped of their Second Amendment rights." Instead, the Government appears to contend that, because Allam was not possessing a firearm in his vehicle for the purpose of self-defense, his conduct is not protected by the Second Amendment.[14] The Government relies on language from

---

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on *longstanding prohibitions* on the possession of firearms by felons and the mentally ill, or *laws* forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626-27. Courts may be inclined to hold that individuals subject to all "longstanding prohibitions" (possession by felons and the mentally ill) and "longstanding" "laws" (forbidding the possession of firearms within sensitive places) regarding firearm possession may not be protected by the Second Amendment (or, in other words, may be excluded at step one), and, thus, may not be "law-abiding, responsible citizens." Accordingly, the court will conduct the sensitive-places analysis within step one of *Bruen*'s framework.

[13] Rahimi was far from a model citizen. In fact, he was involved in five separate shootings in little over a month where he needlessly discharged a firearm, both in the air and in the direction of other individuals. Moreover, "while he was suspected of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him," thus, Rahimi was able to avail himself of the Second Amendment's protection. *Rahimi*, 61 F.4th at 452 (quoting *Heller*, 554 U.S. at 626-27).

[14] A more narrow interpretation of the Government's contention would be that the Second Amendment does not apply to an individual who sits in his vehicle for long periods of time just outside a school's property or to an individual who maintains some mal-intent. The Government fails to elucidate its view. The Government contends that Allam's conduct was "consistent with that of a potential shooter casing the scene and gearing up," arguing that, from these actions, the court must presume that Allam had some malicious intent unless he can prove otherwise, *i.e.*, that he possessed a firearm for the purpose of self-defense. The Government's contention, however compelling on its face, is problematic. For example, when an individual is charged with attempting conduct that would constitute a criminal offense if it were completed, requiring the Government to prove an overt act (some *actus reus*) ensures that mere thought

24-40065.340

*Bruen* stating that the question before the Court at step one was "whether the plain text of the

Second Amendment protects [the petitioners'] proposed course of conduct—carrying handguns

---

crimes (penalizing a *mens rea* alone) are not prosecuted. Depriving an individual of a constitutional right for his or her intent alone is troubling for the same reasons. While Allam's conduct (sitting in his car on a public roadway just outside School grounds for hours and days at a time) may be disturbing, that conduct is not unlawful *per se*, nor is any intent that may be imputed to Allam based on that conduct unlawful on its own. The Government's theory would effectively deprive individuals of their Second Amendment right by alleging only that such individuals had some malicious intent. This is a much different situation than the Government's charging an individual with a criminal violation containing an intent requirement (after a conviction of which the individual could be deprived of certain rights). The Government's theory would divest the right with no process at all. Moreover, the Second Amendment right should not be "readily divested, such that 'a person could be in one day and out the next.'" *Rahimi*, 61 F.4th at 452-53 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).

In any event, to support its theory, the Government references Judge Ho's concurrence in *Rahimi*, asserting that *Rahimi* "does not suggest that, for the sake of 'security' and 'free[dom],'" U.S. Const. amend. II, the government must wait until after an attack to respond to conduct like Allam's." The Government is correct. "Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons." *Rahimi*, 61 F.4th at 464 (Ho, J., concurring); *State v. Buzzard*, 4 Ark. 18, 21 (1842) (Ringo, C.J.) ("Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned."). "In addition, the government can detain and disarm, based not just on acts of violence, but criminal threats of violence as well." *Rahimi*, 61 F.4th at 464 (Ho, J., concurring) (citing *United States v. Ackell*, 907 F.3d 67 (1st Cir. 2018) (upholding criminal stalking law)). If an individual engages in chargeable conduct that would indicate that he or she is likely to commit some act of violence, it is incumbent on the Government to charge and arrest that person for such conduct.

Specifically, the Government argues that "the Fifth Circuit did not say one way or the other whether the Second Amendment would have extended to Rahimi's conduct if, *e.g.*, he had stalked his ex-girlfriend with a rifle in hand." This assertion is not entirely consistent with *Rahimi*. The Fifth Circuit indicated that there are certain classes of individuals who may be stripped of their Second Amendment right (felons and the mentally ill), a class in which Rahimi did not fall, and Judge Ho indicated that the proper course of conduct when an individual poses a threat to another (when stalking, for example) is to detain and disarm that person if his or her conduct is criminally prohibited. *See id*. Neither Judge Wilson, who authored the majority opinion, nor Judge Ho seemed to indicate that an individual's Second Amendment right is stripped based on having a particular intent or engaging in certain conduct (arguably excluding conduct equating to a longstanding prohibition as discussed below). The court seemed to recognize that it is the Government's obligation to charge and detain individuals who pose a threat. At that point, the individual will lose certain liberties such as access to weapons. "[T]he [Second Amendment] right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 610). The Government may charge and convict an individual if he or she violates a criminal statute which may or may not necessitate some intent requirement. However, removing an individual's Second Amendment right based on the Government's assertion of some mal-intent alone is "more befitting the fictional movie 'Minority Report' than modern-day America." *See Andrews v. Marshall*, 845 F. App'x 849, 855 (11th Cir. 2021) (citing Minority Report (20th Century Fox 2002)).

24-40065.341

publicly for self-defense." *Bruen*, 142 S. Ct. at 2134. It further asserts that, because Allam "invokes the Second Amendment," at step one, he must satisfy the "initial burden of showing that it applies to his conduct." The Government's argument, however, is quickly deflated.

In *Bruen*, Brandon Koch and Robert Nash sued the New York State Police, the entity that oversees the enforcement of New York's firearms licensing laws, for declaratory and injunctive relief, "alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications on the basis that they had failed to show 'proper cause,' *i.e.*, had failed to demonstrate a unique need for self-defense." *Id.* at 2125. The petitioners alleged that carrying a handgun in public for the purpose of self-defense—their "proposed course of conduct" and the conduct which New York law prohibited in the absence of "proper cause"—was protected by the Second Amendment. *Id.* In Allam's case, the proper question at step one is whether the conduct prohibited by 18 U.S.C. § 922(q)(2)(A) falls within the Second Amendment's scope. *See Quiroz*, 2022 WL 4352482, at *3 ("*Bruen*'s first step, however, requires only that 'the Second Amendment's plain text cover the conduct.' And the prohibited conduct under § 922(n) is 'receipt' of a firearm—nothing more."); *see also Barber*, 2023 WL 1073667, at *5; *Holton*, 2022 WL 16701935, at *2 ("The Court first determines 'whether the plain text of the Second Amendment protects' the conduct regulated by these statutes." (quoting *Bruen*, 142 S. Ct. at 2134)).

Moreover, in this case, Allam mounts a facial challenge; thus, the court must focus on the text of the statute at issue and not the particular set of circumstances in this case.[15] *Field Day,*

---

[15] Although Allam labels his motion as both an as-applied and a facial challenge, his arguments do not clearly distinguish between the two and, in substance, primarily discuss the statute's facial validity. The only argument Allam seems to make in support of his as-applied challenge is his contention that he "was arrested on a Sunday evening" when "[n]o children were in school or present." Allam asserts that

11

*LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (noting that a court evaluating "[a] 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual"). Furthermore, construing *Heller*, the Supreme Court in *Bruen* "flatly rejected any means-end scrutiny as part of this analysis, [*Bruen*, 142 S. Ct.] at 2129, such that if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *Rahimi*, 61 F.4th at 453 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual.")). Thus, the question at step one becomes, because Allam is a part of "the people" whom the Second Amendment protects, does Allam's conduct—*i.e.*, the conduct prohibited by 18 U.S.C. § 922(q)(2)(A)—fall within the scope of the Second Amendment's "plain text." *Bruen*, 142 S. Ct. at 2126; *Rahimi*, 61 F.4th at 454.

> b.    The Second Amendment's "Plain Text"

The Second Amendment provides that the people's right "to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Allam is indicted under 18 U.S.C. § 922(q)(2)(A), which

---

"the imposition here is operable even when the school is not operating and children are not present." Allam, however, does not contend that he possessed a firearm within § 922(q)(2)(A)'s 1,000-foot zone only when the School was not "operating." Prior to his arrest, Allam had been observed within 1,000 feet of School property numerous times by School officials, parents, and law enforcement. Additionally, at the time Allam was arrested, he was living out of the SUV. He had purchased the DB15 months earlier, and the DB15 was found under the back seat of the SUV, in its original box, with other items on top of and scattered around it. Accordingly, although Allam was arrested on a Sunday night, it appears that he possessed the rifle within the school zone while school was in session, and he makes no assertion to the contrary. Thus, the court finds that, to the extent Allam mounts an as-applied challenge, it must fail. *See Rahimi*, 61 F.4th at 453; *United States v. Posada*, No. EP-22-CR-1944(1)-KC, 2023 WL 3027877, at *6 n.6 (W.D. Tex. Apr. 20, 2023).

24-40065.343

makes it "unlawful for any individual knowingly to *possess* a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A) (emphasis added).

*Bruen*'s first step requires only that the Second Amendment's plain text cover the conduct burdened by 18 U.S.C. § 922(q)(2)(A). *See Bruen*, 142 S. Ct. at 2126; *Rahimi*, 61 F.4th at 454; *Barber*, 2023 WL 1073667, at *5; *see also Connelly*, 2023 WL 2806324, at *5 ("Under *Bruen* and *Rahimi*, the Court must first decide whether § 922(g)(3) burdens conduct protected by the Second Amendment."); *Quiroz*, 2022 WL 4352482, at *3. The conduct burdened by 18 U.S.C. § 922(q)(2)(A) is the "possession" of a firearm while in a school zone. "[T]he 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).

"'[P]ossession' is included within the meaning of 'keep'" as used in the Second Amendment. *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2134-35); *Barber*, 2023 WL 1073667, at *5 ("In *Heller*, the Supreme Court made clear that the Second Amendment's right to 'keep and bear arms' includes possession of weapons, such as firearms, and 'extends, prima facie, to all instruments that constitute bearable arms.'"); *see Connelly*, 2023 WL 2806324, at *5. Moreover, *Bruen* clarified that the Second Amendment right to possess and carry firearms applies outside the home. *See Bruen*, 142 S. Ct. at 2135 ("After all, the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554 U.S. at 592, and confrontation can surely take place outside the home.").[16] Furthermore, "the Second

---

[16] "*Heller* further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready

13

Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, <u>142 S. Ct. at 2143</u> (quoting *Heller*, <u>554 U.S. at 627</u>).  The Government does not dispute that, in this case, the type of firearm possessed by Allam—an AR-15-platform rifle—is "in common use," such that it falls within the scope of the amendment.[17]  *See Barber*, <u>2023 WL 1073667</u>, at *5*; see also Rahimi*, <u>61 F.4th at 454</u> (quoting *Bruen*, <u>142 S. Ct. at 2134-35</u>).

Allam's conduct—possession of a firearm in a school zone in violation of <u>18 U.S.C. § 922(q)(2)(A)</u>—clearly falls within the scope of the Second Amendment's "plain text." Nevertheless, Allam, "like any other citizen, may have forfeited his Second Amendment rights if his conduct ran afoul of a 'lawful regulatory measure[ ]' 'prohibiting . . . the possession of firearms,' . . . that is consistent with 'the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Rahimi*, <u>61 F.4th at 453-54</u> (quoting *Heller*, <u>554 U.S. at 626-27</u> & 627 n.26; *Bruen*, <u>142 S. Ct. at 2127</u>).  Accordingly, Allam may avail himself of the protections of the Second Amendment unless the area within 1,000 feet of school property is a "sensitive place," such that the location is not protected by the right.

---

for offensive or defensive action in a case of conflict with another person.'" *Bruen*, <u>142 S. Ct. at 2134</u> (quoting *Heller*, <u>554 U.S. at 584</u>).

[17] "The AR-15, which has been described as America's 'most popular semi-automatic rifle,' is covered under the [Second] Amendment's text." *Barber*, <u>2023 WL 1073667</u>, at *5 (quoting *Heller v. District of Columbia (Heller II)*, <u>670 F.3d 1244, 1287</u> (D.C. Ci<u>r. 2011</u>) (Kavanaugh, J., dissenting)). "[C]ourts have repeatedly recognized that modern, semi-automatic rifles like the AR-15 are in common use by law-abiding citizens for self-defense." *Id*. "Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Heller II*, <u>670 F.3d at 1261</u> (Noting that "it [was] clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use.'").

24-40065.345

c.      The "Sensitive Places" Doctrine

The Supreme Court "gave a name—'sensitive places'—to the idea that certain locations (as do certain people, arms, and activities) fall outside the boundaries of the Second Amendment." Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller, *"A Map Is Not The Territory": The Theory and Future of Sensitive Places Doctrine*, N.Y.U. L. REV. ONLINE (forthcoming 2023) (manuscript at 3), https://papers.ssrn.com/sol3/ papers.cfm?abstract_id= 4325454 [hereinafter *"A Map Is Not The Territory"*].  When a location is deemed to be a sensitive place, statutes prohibiting the possession of a firearm, even by a licensed individual, are constitutional.  *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1122 (10th Cir. 2015), *cert. denied*, 577 U.S. 1216 (2016). In *Heller*, the Supreme Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 626-27.  The Court later restated this holding in *McDonald*.  561 U.S. at 786 (citing *Heller*, 554 U.S. at 626-27).

Last year, in *Bruen*, the Supreme Court reiterated its prior holdings regarding such "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626); *accord United States v. Power*, No. 20-PO-331-GLS, 2023 WL 131050, at *3 (D. Md. Jan. 9, 2023); *United States v. Robertson*, No. 22-PO-867-GLS, 2023 WL 131051, at *3 (D. Md. Jan. 9, 2023).  The Supreme Court noted that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative

15

assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133 (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 205, 229-36, 244-47 (2018); Brief for Independent Institute as Amicus Curiae, *United States v. Bruen* 142 S. Ct. 2111 (2022) (No. 20-843)). Thus, the Court "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment"—and, thus, found such prohibitions to be consistent with the Nation's historical tradition of firearm regulation. *Id*. Further, the Court determined that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*.

Although the Supreme Court did not provide a clear explanation of the exact definition of a "sensitive place," by stating that courts may reason by analogy, it clarified that new and analogous sensitive places will be similar to those which it determined to be longstanding. Accordingly, the reasons for firearms regulations in sensitive places—both old and new—"cannot be understood purely locationally." *"A Map Is Not The Territory"*, *supra*, at 18. Considering the *places* that the Supreme Court has recognized to be *sensitive*, "whether a place is sensitive depends on the people found there or the activities that take place there." *Id*. at 20 (internal quotation marks omitted); *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011), *aff'd*, 687 F.3d 1244 (11th Cir. 2012).

16

i.      <u>Post-*Heller*, But Pre-*Bruen* "Sensitive Places"</u>

The Government contends that the area within 1,000 feet of school grounds should be classified as a "sensitive place."[18] Prior to *Bruen*, courts were left to find their own answers as to what constitutes a "sensitive place." Kopel & Greenlee, *supra*, at 207. Accordingly, the Government relies on four post-*Heller*, but pre-*Bruen* cases to support its position.[19] First, the Government cites *United States v. Dorosan*, <u>350 F. App'x 874</u> (5th Ci<u>r. 2009)</u>, *cert. denied*, <u>559 U.S. 983</u> (2010). Dorosan was convicted "for bringing a handgun onto property belonging to the United States Postal Service [("Postal Service")]" in "violation of <u>39 C.F.R. § 232.1(l)</u>, which prohibits the storage and carriage of firearms on Postal Service property.[20] *Id*. at 875. Prior to discussing the sensitive place exception, the Fifth Circuit acknowledged that "the Postal Service owned the parking lot where Dorosan's handgun was found"; thus, "its restrictions on guns stemmed from its constitutional authority as the property owner." *Id*. (citing <span style="font-variant:small-caps">U.S. Const. art. IV, § 3</span>, cl. 2; *United States v. Gliatta*, <u>580 F.2d 156, 160</u> (5th Cir.), *cert. denied*, <u>439 U.S. 1048</u> (1978)). The Fifth Circuit then held that, because "the Postal Service used the parking lot for

---

[18] In its sensitive-places argument, the Government contends that *Bruen*'s "use of 'such as' indicates that a place outside the building may be just as sensitive for Second Amendment purposes." *Bruen*'s use of "such as" comes from its statement at the outset of the sensitive places framework. Specifically, the court stated, "[c]onsider, for example, *Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Bruen*, <u>142 S. Ct. at 2133</u> (quoting *Heller*, <u>554 U.S. at 626</u>). In context, the Court's statement seems to be referring to other places where longstanding laws have forbidden the possession of firearms. *See Robertson*, <u>2023 WL 131051</u>, at *5 ("The Supreme Court identified sensitive places as places 'such as' 'schools' and 'government buildings.'"). In any event, *Bruen* does account for the classification of "*new* and analogous sensitive places" based on analogies to historical regulations of sensitive places.

[19] For purposes of this analysis, the court assumes that *Bruen* did not alter or modify the sensitive places analysis conducted in the various cases upon which the Government relies.

[20] "Notwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes." <u>39 C.F.R. § 232.1(l)</u>.

loading mail and staging its mail trucks," *i.e.*, using the parking lot "as a place of regular government business," the Postal Service parking lot fell under the "sensitive places" exception recognized by *Heller*. *Id*. (quoting *Heller*, 554 U.S. at 626). The 1,000-foot zone in this case differs from the Postal Service parking lot. The area within 1,000 feet of school property is—by definition—not school property. Nor is all land within this zone government property such that the federal government's constitutional authority as a property owner would be implicated. Additionally, schools do not conduct the same "business" in this 1,000-foot zone as is conducted on school grounds, foreclosing the argument that the zone is a place of regular school business. *See Dorosan*, 350 F. App'x at 875.

Second, the Government relies on *Bonidy*. 790 F.3d at 1121. Bonidy, "a concealed-carry permit holder under Colorado law, sued the Postal Service," challenging the constitutionality of 39 C.F.R. § 232.1(l) by claiming that the regulation violated his right to bear arms for self-defense. *Id*. at 1122-23. In *Bonidy,* the Tenth Circuit concluded that the Postal Service parking lot was a sensitive place, just like the Postal Service building, and should be "considered as a single unit with the postal building." *Id*. at 1125. The Tenth Circuit's conclusion was based on the facts that "it is attached" to and "exclusively serves" the postal building—"[t]here is, in fact, a drop-off box for the post office in the parking lot, meaning that postal transactions take place in the parking lot as well as in the building." *Id*. The justifications that the Tenth Circuit found convincing are not applicable in this case. The 1,000-foot zone cannot be considered to be "a single unit" with a school building or its property. The 1,000-foot zone is not attached in the sense that a parking lot is attached to a building, and the area within this zone does not

24-40065.349

"exclusively serve" a school. The area within 1,000 feet of a school commonly serves the public at large, such that the area contains public roadways, private residences, and businesses.

Third, the Government contends that *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019)[21] is "[e]specially instructive." Class was convicted of possessing three firearms in his car while parked "in one of the many angled parking spots that line the 200 block of Maryland Avenue SW" ("Maryland Avenue parking lot") in violation of 40 U.S.C. § 5104(e)(1),[22] which "prohibits the possession of firearms on the grounds of the United States Capitol." *Id*. at 462. Class's parking place was "approximately 1,000 feet from the entrance to the Capital itself" and the street on which the parking spot was located was "accessible to the general public." *Id*. The parking place, however, was also "reserved on weekdays (like the Thursday he parked there) for employees of the House of Representatives" and "marked by a sign indicating a permit is required." *Id*. The D.C. Circuit concluded that the Maryland Avenue parking lot was "sufficiently integrated with the Capitol for *Heller*[ ]'s sensitive places exception to apply." *Id*. at 464.

---

[21] *Class*'s articulation of the post-*Heller* two-part analysis, which applied the "appropriate level of constitutional scrutiny," was clearly abrogated by *Bruen*. *Bruen*, 142 S. Ct. at 2127 n.4 (citing *Class*, 930 F.3d at 463). The court, however, does not read *Bruen* to abrogate the D.C. Circuit's sensitive places analysis, as it gives no indication that the appellate court's previous sensitive places holdings were incorrect. Thus, for the purposes of the sensitive places analysis, the court will consider *Class*'s holding to be undisturbed.

[22] 40 U.S.C. § 5104(e)(1) states, in relevant part, that:
(1) Firearms, dangerous weapons, explosives, or incendiary devices.--An individual or group of individuals--
    (A) except as authorized by regulations prescribed by the Capitol Police Board--
        (i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device.

24-40065.350

To reach its conclusion, the D.C. Circuit reasoned that "the Maryland Avenue parking lot may be used during working hours only by Capitol employees with a permit," which "makes the area a potential stalking ground for anyone wishing to attack congressional staff and disrupt the operations of Congress." *Id*. Next, the court found that the Maryland Avenue parking lot was within 1,000 feet of the "entrance to the Capitol, and a block away from the Rayburn House Office Building." *Id*. Finally, the D.C. Circuit relied on the fact that "the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property." *Id*. (citing *Adderley v. Florida*, 385 U.S. 39 (1966) (observing in the free-speech context that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *Bonidy*, 790 F.3d at 1126 (observing that when the U.S. Postal Service acts "as a proprietor rather than as a sovereign, [it] has broad discretion to govern its business operations according to the rules it deems appropriate")). For these three reasons, the D.C. Circuit found the Maryland Avenue parking lot to be "a single unit with the Capitol building," and, thus, "a 'sensitive' place where firearms prohibitions are presumptively lawful." *Id*.

The 1,000-foot zone at issue in this case is, once again, distinguishable from the Maryland Avenue parking lot involved in *Class*. The 1,000-foot zone around a school is not used exclusively by the school that it surrounds, nor is access to this area restricted to school students or employees. Additionally, the fact that a similar distance of "less than 1,000 feet" from the Capitol entrance was at issue in *Class* is not dispositive. The significance of the distance involved in *Class* cannot be separated from the fact that the government owned the property on which the Maryland Avenue parking lot was located.

20

The Government cites additional language from *Class*, stating that the court "ha[d] little trouble concluding that the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms on the *property* surrounding those buildings as well," and that "[a]lthough there is surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns, Congress has not exceeded it here." *Id*. While this reasoning would seem to be relevant here, the fundamental distinction between this case and *Class* is that the D.C. Circuit was extending the sensitive place prohibition from *inside* the Capitol building exclusively to *government property outside* the building. Thus, the D.C. Circuit seemed to limit this "outer bound" to property owned by the government, and used by government employees. In that context, the government's role as a property owner was in play. Unlike *Class*, because the land within 1,000 feet of school property, to which 18 U.S.C. § 922(q)(2)(A) applies, is not owned by the school, schools are not acting "as property owners" in this context—a fact that appeared central to the D.C. Circuit's determination that the Maryland Avenue parking lot was a sensitive place.

Finally, the Government briefly cites *United States v. Lewis*, 50 V.I. 995, 1000 (D.V.I. 2008) for its holding that it "need not decide [ ] what level of scrutiny should apply to *post-Heller* challenges to Section 922(q)(2)(A)," because "[i]t is beyond peradventure that a school zone, where Lewis is alleged to have possessed a firearm, is precisely the type of location of which *Heller* spoke." The court, however, conducts no analysis and provides no reasoning for reaching its conclusion that the area within 1,000 feet of school property is a sensitive place.

The District Court of the Virgin Islands recently reiterated this holding in *United States v. Walter*, No. 3:20-CR-0039, 2023 WL 3020321 (D.V.I. Apr. 20, 2023). In *Walter*,

21

"[r]easoning by analogy to the relevant historic tradition of prohibitions of firearms in the houses of legislatures, polling places, courthouses, or other areas near core government operations requiring security of their occupants and prevention of gun violence," the court held "that the area within 1,000 feet of the school grounds is within the scope of 'sensitive places' as contemplated by *Heller* and required to ensure security of the school's occupants and to prevent gun violence." *Id.* at *8 (citing *Class*, 930 F.3d at 464; *Lewis*, 50 V.I. at 1001). The *Walter* court then states that "[§] 922(q)(2)(A) is analogous to this Nation[']s historical tradition of lawfully disarming citizens in 'sensitive places' and is constitutionally sound." *Id.* (citing *United States v. Redwood*, No. 16 CR 00080, 2016 WL 4398082, at *5 (N.D. Ill. Aug. 18, 2016)). *Redwood*, however, upheld § 922(q)(2)(A) based on means-end scrutiny *without* finding the 1,000-foot zone to be a "sensitive place." *Redwood*, 2016 WL 4398082, at *5.

ii.   Sensitive Places and School Zones

Rather than labeling the 1,000-foot zone around school property the "school zone," because the § 921(a)(26) definition of "school zone" includes school grounds as well as the area around school property, such a zone can be more accurately characterized as a "buffer zone." The Government, relying on the above post-*Heller*-pre-*Bruen* cases, contends that this buffer zone should be classified as a sensitive place just like the school building. As noted above, factors that make places "sensitive" include circumstances such as "most persons therein are minors (K-12 schools), places that concentrate adversarial conflict and can generate passionately angry emotions (courthouses, legislatures, polling places), or buildings containing people at acute personal risk of being targets of assassination (many government buildings)." Kopel & Greenlee, *supra*, at 290.

It is of note that when articulating the sensitive places analysis, the Supreme Court "used the preposition 'in' when referring to schools as opposed to using 'around' or 'near'"—*i.e.*, "words that might have provided better constitutional protection to [a] 1000-foot perimeter." Amy Hetzner, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 MARQ. L. REV. 359, 392 (2011); *see* Kopel & Greenlee, *supra*, at 290 ("[B]uffer zones are not sensitive places."). That is not to say, however, that an "area immediately outside of a school," such as a school parking lot or some other school property, is not a sensitive place. Hetzner, *supra*, at 392. In fact, consistent with *Dorosan*, there appears to be no doubt as to the constitutionality of 18 U.S.C. § 922(q)(2)(A) in conjunction with 18 U.S.C. § 921(a)(26)(A).[23] 350 F. App'x at 874. The Supreme Court's use of "in" rather than "around" or "near" poses a more difficult question for 18 U.S.C. § 922(q)(2)(A)'s buffer zone in light of the fact that the zone exists only outside of school property.[24] Nevertheless, in determining whether a new location is a "sensitive place," "courts should look to how similar the location in question is with respect to its sensitivity, not just its proximity or lack thereof to a ['sensitive place']." Kopel & Greenlee, *supra*, at 281 (quoting *Bonidy*, 790 F.3d at 1140 n.10 (Tymkovich, J., concurring in part and dissenting in part) ("Proximity to a government building, without more, cannot be sufficient to exempt a location from the Second Amendment.")). Whether it be a buffer zone, open field, or

---

[23] Defining "school zone" in part as "in, or on the grounds of, a public, parochial or private school." 18 U.S.C. § 921(a)(26)(A).

[24] Additionally, "[w]hen it referred to schools as sensitive places, the Supreme Court was certainly cognizant of the federal Gun-Free School Zones Act, which imposes criminal penalties for possession of a firearm within 1000 feet of school grounds." *Hall v. Garcia*, No. C 10-03799 RS, 2011 WL 995933, at *4 (N.D. Cal. Mar. 17, 2011); *see* Hetzner, *supra*, at 392 ("[C]ertainly, the Court was aware of the existence of laws criminalizing the possession of firearms near schools."); *see also United States v. Lopez*, 514 U.S. 549 (1995) (finding the federal Gun-Free School Zones Act of 1990 was held unconstitutional as outside the scope of Congress's Commerce Clause power).

24-40065.354

another building, a location's proximity to a predetermined "sensitive place"—standing alone—cannot be enough also to designate that location a "sensitive place."

As noted above, this case is distinguishable from *Dorosan*, *Bonidy*, and *Class*. The 1,000-foot zone does not consist of school property, is not a place of regular school business (such that the same functions and activities take place in the zone as do on school grounds), and the zone does not exclusively serve the school which it surrounds. Moreover, the justification commonly attributed to schools' classification as "sensitive places" is based on the concentration of minors contained therein. This justification becomes less persuasive farther away from school grounds. Within 1,000 feet of school property, there are often major throughfares, private residences, and businesses of all sizes. In this "buffer zone," it cannot be said that "most persons" are minors. Thus, the core justifications present in *Dorosan*, *Bonidy*, and *Class* are absent in this case, and all that remains is the argument that "the buffer zone surrounds a sensitive place." The "sensitive places" doctrine is intended to encompass particular locations that are used for a specific purpose, and it is *not* intended to encompass vast areas of property that contain numerous locations used for a vast array of purposes. *See* Kopel & Greenlee, *supra*, at 265 ("The thousand-foot radius is large enough to encompass much unsensitive land in any urban area."). Hence, such a buffer zone, including the area within 1,000 feet of school property, simply cannot be deemed a "sensitive place." Therefore, the Government has failed to show that the 1,000-foot zone around a school should be included in the Supreme Court's identification of "schools" as sensitive places, or that it is analogous to the sensitive places previously identified by the Supreme Court, such that it should be considered a *new* sensitive place.

24-40065.355

Accordingly, 18 U.S.C. § 922(q)(2)(A)'s constitutionality turns on whether prohibiting individuals from possessing a firearm within 1,000 feet of school property is consistent with our Nation's historical tradition of firearm regulation.

3.  Step Two: This Nation's Historical Tradition

"To carry its burden, the Government must point to 'historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation.'" *Rahimi*, 61 F.4th at 454 (quoting *Bruen*, 142 S. Ct. at 2131-32). "[W]e are not obliged to sift the historical materials for evidence to sustain [§ 922(q)(2)(A)]. That is [the Government's] burden." *Id*. (quoting *Bruen*, 142 S. Ct. at 2150).[25]

"The Government need not identify a 'historical twin'; rather, a 'well-established and representative historical analogue' suffices." *Id*. (quoting *Bruen*, 142 S. Ct. at 2133). "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 142 S. Ct. at 2132 (citation omitted). "The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right." *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2133). "[W]hether modern and historical regulations impose a comparable *burden* on the right of armed self-defense and whether that burden is comparably *justified* are central considerations when engaging in an analogical inquiry." *Bruen*, 142 S. Ct. at 2133 (emphasis added); *Rahimi*, 61 F.4th at 454.

---

[25] *Bruen* notes that "[t]he job of judges is not to resolve historical questions in the abstract; it is to resolve legal questions presented in particular cases or controversies" and "[c]ourts are thus entitled to decide a case *based on the historical record compiled by the parties*." *Bruen*, 142 S. Ct. at 2130 n.6 (emphasis added).

25

"As to the degree of similarity required, 'analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.'" *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2133). "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Bruen*, 142 S. Ct. at 2133 (internal quotation marks, alterations, and citations omitted). "On the other hand, 'even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.' The core question is whether the challenged law and proffered analogue are 'relevantly similar.'" *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2132-33) (internal citations omitted).

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id*. In some cases, the historical analogies will be "relatively simple to draw"; however, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. "Fortunately, the Founders created a Constitution—and a Second Amendment—'intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.'" *Id*. (citation omitted). "Although its meaning is fixed according to the understandings of those who ratified

26

24-40065.357

it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*.

a.    <u>The Gun-Free School Zones Act of 1990</u>

The Gun-Free School Zones Act of 1990 ("Act") "was introduced in response to a 'shocking number' of incidents of violence against children within the school environment." *The Lesson of Lopez: The Political Dynamics of Federalism's Political Safeguards*, 119 HARV. L. REV. 609, 623 (2005) (citing 136 Cong. Rec. 1165 (1990) (statement of Sen. Kohl)). "In his introduction of the bill, Senator Herb Kohl highlighted three school shootings in the preceding two years, followed by several statistics regarding the number of handguns in schools and a short description of the bill." *Id*. Senator Kohl "concluded his remarks by claiming that 'this section will help keep the area around our schools from becoming sanctuaries for armed criminals and drug gangs. Gun-free school zones are not a panacea, to be sure, but they are an important step toward fighting gun violence and keeping our teachers and children safe.'" Robert A. Martinez, *S.O.S. - Saving Our Schools: The Constitutionality of the Gun-Free School Zones Act of 1990*, 22 AM. J. CRIM. L. 491, 494 (1995) (citing statement of Sen. Kohl).

When introducing the Act in the United States House of Representatives, Congressman Edward Feighan of Ohio "informed his colleagues that, 'the National School Safety Center [had] estimate[d] that 135,000 students carried handguns to school daily in 1987 and another 270,000 carried handguns to school at least once.'" *Id*. (citing 135 Cong. Rec. E3988 (1989) (statement of Rep. Feighan)); Gun-Free School Zones Act of 1990: Hearing on H.R. 3757 Before the Subcomm. on Crime of the H. Comm. on the Judiciary, 101st Cong. (1990) [hereinafter Hearing]. "Even at this early stage of the Act's life, observers recognized that Congress's authority to enact

27

such a law was questionable." Martinez, *supra*, at 494. Nevertheless, the Act passed both houses of Congress. *Id*. at 495. President George H.W. Bush, before ultimately signing the bill, posed concerns regarding the federal law's overriding of similar state laws. *Id*.

Such concerns were not addressed until Alfonso Lopez challenged the Act's constitutionality. *Id*. Lopez "arrived at Edison High School in San Antonio, Texas" carrying a .38 caliber handgun, and once school officials learned of Lopez's possession, he "was arrested and charged with violating the Act." *Id*. (citing *United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995)). In the trial court, Lopez "moved to dismiss the indictment," claiming that "the act was an unconstitutional exercise of congressional power." *Id*. The trial court, however, rejected this argument, and Lopez was tried and convicted. *Id*. Lopez then appealed his conviction to the Fifth Circuit, again claiming that the Act was unconstitutional. *Id*. The Fifth Circuit agreed, holding "that section 922(q), in the full reach of its terms, is invalid as beyond the power of Congress under the Commerce Clause."[26] *Lopez*, 2 F.3d at 1367-68.

The Supreme Court affirmed, holding "that the Act exceeds the authority of Congress '[t]o regulate Commerce . . . among the several States.'" *Lopez*, 514 U.S. at 551 (quoting U.S. CONST., art. I, § 8, cl. 3.). "Among other explanations for its decision, the Court noted the lack of congressional findings explaining how the law regulated interstate commerce." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 466 (6th Cir. 2019) (citing *Lopez*, 514 U.S. at 562-63). "Congress amended the statute to include such findings . . . and to include an

---

[26] Lopez focused only on the Commerce Clause and did not mount a challenge based on the Second Amendment; thus, the Fifth Circuit did not consider it. Nonetheless, the court noted that "[i]t is also conceivable that some applications of section 922(q) might raise Second Amendment concerns." *Lopez*, 2 F.3d at 1364 n.46. "[T]his orphan of the Bill of Rights may be something of a brooding omnipresence here." *Id*.

28

interstate-jurisdictional prerequisite for a prosecution." *Id*. (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320904, 108 Stat. 1796, 2125-26 (codified as amended at 18 U.S.C. § 922(q)(1)); *Lopez*, 514 U.S. at 563 n.4; Omnibus Consolidated Appropriations Act of, 1997, Pub. L. No. 104-208, § 657, 110 Stat. 3009, 3009-369-71 (codified as amended at 18 U.S.C. § 922(q)(2)). Since then, courts have upheld the amended statute as a constitutional exercise of congressional power. *Id*.

      b.    The *Why* and *How* of § 922(q)(2)(A)

Determining whether the Government has identified a "relevantly similar" historical analogue requires distilling "'how' and 'why' § 922[(q)(2)(A)] 'burden[s] a law-abiding citizen's right to armed self-defense.'" *Rahimi*, 61 F.4th at 455 (quoting *Bruen*, 142 S. Ct. at 2133).

The text of the statute illuminates "why" it burdens the right to armed self-defense. In relevant part, § 922(q)(1) states:

> The Congress finds and declares that--
> (A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;
> (B) crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;
> (C) firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the House of Representatives and the Committee on the Judiciary of the Senate;
>  . . .
> (F) the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;
>  . . .
> (H) States, localities, and school systems find it almost impossible to handle gun-related crime by themselves--even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and
>  . . . .

Additionally, the hearing before the House of Representatives' Subcommittee on Crime provides insight as to the statute's purpose. Representative William J. Hughes stated that "[t]his bill . . . addresses the increasing problems and tragedies which occur all too regularly when guns are brought onto school property." Hearing, *supra*, at 6. He further noted that "[w]e are bombarded by news reports of yet another student or teacher killing at the hands of either an armed and deranged person, or by an angry armed fellow student." *Id*. "Equally tragic, the shooting is [sic] sometimes accidental, but with the same fatal and tragic result."[27] *Id*. In any event, it appears that, generally speaking, § 922(q)(2)(A) was intended to protect students from gun violence—whether that violence presents itself as a threat from outside or within a campus—and keep firearms off school property.[28]

The statute itself clarifies "how" the right to armed self-defense is burdened. Section 922(q)(2)(A) is not a complete prohibition of the possession of firearms in a school zone—it contains carve-outs, which are found in § 922(q)(2)(B), as well as a few notable omissions.

---

[27] It is of note that, with respect to the 1,000-foot zone around school property, "investigative jurisdiction . . . lies with the Secretary of the Treasury, who has delegated responsibility to [the] [Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")]." Hearing, *supra*, at 14. Thus, upon enactment, the "ATF would have the primary jurisdiction" to enforce its provisions. *Id*. While testifying before the subcommittee, and after recognizing that the ATF maintained jurisdiction within the 1,000-foot zone, Richard Cook ("Cook"), Chief of the ATF's firearms division, stated that "[o]ur firearms enforcement activities are focused on violent criminals and illegal drug traffickers"; thus, in his opinion, the ATF "could not provide direct protection to all the Nation's schools." *Id*. Cook stated that the obligation to protect the Nation's schools "is, and should remain, primarily the responsibility of State and local law enforcement officials." *Id*. Additionally, when questioned as to the Act's "magical zone of a thousand feet," Cook was unable to produce any information, statistics, or justification as to the benefits of such a distance as opposed to any other. *Id*. at 21.

[28] A few states also have laws which prohibit the possession of a firearm within 1,000 feet of school property, ordinarily consistent with § 922(q)(2). *See* Hetzner, *supra*, at 385. Many others do not. For example, Texas has its own laws prohibiting the possession of a firearm on school grounds, but they do not extend the prohibition to the area around school property. TEX. PENAL CODE § 46.03.

Section 922(q)(2)(B) provides a complete exemption[29] to individuals in four contexts. Those individuals who: are "on private property not part of school grounds"; possess a firearm "for use in a program approved by a school in the school zone"; possess a firearm "in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual"; and law enforcement officers acting in their official capacity. 18 U.S.C. § 922(q)(2)(B)(i), (iv)-(vi). Additionally, the statute provides an exclusion "if the individual possessing the firearm[30] is licensed to do so by the State in which the school zone is located[31] or

---

[29] The court uses the term "complete exemption" to indicate that § 922(q)(2)(B) exempts classes of people, based on their status (connected to their occupation or participation in a school program) or location (on private property), from § 922(q)(2)(A)'s prohibition—the exemption applies to these individuals whether they are licensed or unlicensed, or possess a handgun or rifle.

[30] Many states require a permit to carry a handgun in public. *Bruen*, 142 S. Ct. at 2123. States use various terms for their respective concealed-carry licensing regimes. Texas uses the term "License to Carry" to refer to its state-issued permit that authorizes citizens to carry handguns in public. *See* Tyler R. Smotherman, *Troubleshooting the Gun-Free School Zones Act: A Call for Amendment in the Age of Constitutional Carry*, 55 TEX. TECH L. REV. 359, 403 (2023) [hereinafter *Troubleshooting*] ("Texas uses the term 'License to Carry' [ ] to refer to its state-issued permit that authorizes citizens to carry handguns in public. Other states use terms such as 'Concealed Weapons License,' 'Concealed Pistol License,' or 'Concealed Carry Weapons Permit' [ ]." Moreover, "some states' permits also affect citizens' rights to carry handguns openly or to carry weapons other than handguns."). Additionally, some "shall issue" jurisdictions, including Texas and Mississippi, "have so-called 'constitutional carry' protections that allow certain individuals to carry handguns in public within the State without any permit whatsoever." *Bruen*, 142 S. Ct. at 2123 (citing A. Sherman, *More States Remove Permit Requirement to Carry a Concealed Gun*, POLITIFACT (Apr. 12, 2022), https://www.politifact.com/article/2022/apr/12/more-states-remove -permit-requirement-carry-concea/ ("Twenty-five states now have permitless concealed carry laws . . . . The states that have approved permitless carry laws are: Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Iowa, Georgia, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming.")). Accordingly, § 922(q)(2)(B)(ii) does not provide an exclusion for individuals who choose to engage in "constitutional carry." *See* Hetzner, *supra*, at 365 n.29. Additionally, § 922(q)(2)(B)(ii) does not protect those individuals who choose to carry a rifle or a shotgun in one of the many states that does not require a license to carry such a firearm. *See* Hearing, *supra*, at 24 ("[W]hat we see most frequently is that licenses to possess firearms, or carry firearms, are primarily limited to handguns. So that in a particular State there may be no way in which a person could meet the exemption . . . in the case of a long gun."); *id.* at 26 (Representative Chuck Douglas noting that although he would be excluded from § 922(q)(2)(A)'s prohibition for his possession of a handgun because he is licensed in New Hampshire, he would have no protection under § 922(q)(2)(B)(ii) if he were to possess a rifle or a shotgun, as New Hampshire does not require licenses for the possession of such firearms).

a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license." 18 U.S.C. § 922(q)(2)(B)(ii). In other words, the statute effectively excludes only those individuals carrying a handgun and who are licensed to do so by the state in which the school zone is located. Additionally, individuals who keep an *unloaded* firearm "in a locked container, or locked firearms rack that is on a motor vehicle" are excluded. *Id*. § 922(q)(2)(B)(iii). Generally, apart from the narrow, complete exemptions above, unless an individual is carrying a handgun and is licensed to do so in the state in which the school zone is located, unloading and keeping his or her handgun or rifle in a locked container or rack is the only avenue for lawful possession of a firearm within 1,000 feet of a school zone. Unless, of course, an individual possesses a firearm "that is unloaded and is possessed . . . while traversing school premises[32] for the purpose of gaining access to public

---

Therefore, "licensed" firearm possessors, in this context, is far more narrow than "lawful" firearm possessors.

[31] Section 922(q)(2)(B)(ii)'s requirement that the permit be issued by the state in which the school is located has significant implications as well. "The ATF has taken the position that a nonresident who is licensed by a state through reciprocity alone, giving recognition to a permit issued by another state, is not 'licensed to do so by the State in which the school zone is located'--licensure by that state through reciprocity is not, in their view, licensure by a state." Royce de R. Barondes, *Federalism Implications of Non-Recognition of Licensure Reciprocity Under the Gun-Free School Zones Act*, 32 J.L. & POL. 139, 144 (2017). "[E]ven if a state has a formal reciprocity agreement with the permit holder's state to honor her out-of-state permit--just as states do with driver's licenses--the citizen is still subject to prosecution under the [Act]." *Troubleshooting*, *supra*, at 395 ("[T]he ATF has stated that formal reciprocity agreements between states to honor each other's [concealed carry weapons] permits do not satisfy the requirements of the [Act].").

[32] "School Premises" is not defined in 18 U.S.C. § 921.

or private lands open to hunting, if the entry on school premises is authorized by school authorities."[33] *Id.* § 922(q)(2)(B)(vii).

"These characteristics crystallize 'how' and 'why'" § 922(q)(2)(A) "'burden[s] a law-abiding citizen's right to armed self-defense.'" *Rahimi*, 61 F.4th at 455 (quoting *Bruen*, 142 S. Ct. at 2133). Identifying the "how" and "why" requires the court to focus on the key features of the statute, namely, prohibiting some individuals from possessing some firearms—not a total prohibition—in a school, on school property, or within 1,000 feet of school property, in order to protect students from gun violence, whether that violence presents itself as a threat from outside or within, and to keep firearms off school property. Additionally, in this case, identifying "relevantly similar" regulations necessitates that the court take a "more nuanced approach."

### c.    An Unprecedented Societal Concern

To sustain § 922(q)(2)(A)'s intrusion on Allam's "Second Amendment right, the Government bears the burden of proffering 'relevantly similar' historical regulations that imposed 'a comparable burden on the right of armed self-defense' that were also 'comparably justified.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2132-33). Additionally, "when it comes to interpreting the Constitution, not all history is created equal," as "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, 142 S. Ct. at 2136. As indicated above, however, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132. The court is of the

---

[33] The discrepancies noted above defeat the Government's assertion that "[t]aken together, two of [§ 922(q)(2)(B)'s] carveouts [sic] [*i.e.*, § 922(q)(2)(B)(ii)-(iii)] negate Allam's purported concern for law-abiding citizens who travel with firearms." Clearly, there are a number of circumstances in which an individual may run afoul of § 922(q)(2)(A) at the same time they would otherwise be "lawfully" possessing and traveling with a firearm.

24-40065.364

opinion that the prevalence of school shootings—protection from which is one of the aims of § 922(q)(2)(A)'s enactment—in this modern era, is certainly an "unprecedented societal concern." Accordingly, a "more nuanced approach" is required when drawing historical analogies than was utilized in *Heller*, *Bruen*, or *Rahimi*. *See Bruen*, 142 S. Ct. at 2132; *Rahimi*, 61 F.4th at 460.

School shootings have lamentably become a part of this Nation's present-day reality. While school shootings occurred in this country even prior to the Civil War, the current frequency and severity of modern mass school shootings would certainly be incomprehensible to our forefathers.[34] School shootings became particularly worrisome around the mid 1980s, prompting the enactment of § 922(q)(2)(A). School shootings later began to instill fear in parents' hearts and have now become a recurring nightmare. The number of firearm incidents[35] and active shooter

---

[34] The first reported school shooting, the Pontiac's Rebellion school massacre, took place on July 26, 1764—although it is unclear what weaponry was used. Theophanes Avery, *The History of 260 Years of School Shootings in America*, THE CRIME WIRE (Apr. 27, 2023), https://thecrimewire.com/multifarious/The-History-of-Nearly-250-Years-of-School-Shootings-in-America; *History of School Shootings in the United States*, K12 ACADS., https://www.k12academics.com/school-shootings/history-school-shootings-united-states (last visited on May 8, 2023). The shooting occurred in a "Pennsylvanian schoolhouse in what is known today as Greencastle" and "took place during the French and Indian War." Avery, *supra*. "[F]our Lenape warriors stormed in and committed a wholesale slaughter," killing "[t]he schoolmaster Enoch Brown" and 10 children. *Id.* "Only three students survived and of them one had already been partially scalped." *Id.* In 1853, Matthew Ward, a 13-year-old, was the first child to cause a school shooting. *Id.* He was disturbed by Schoolmaster Butler's decision to punish his brother, so he "shot Mr. Butler at point blank range, killing him on school property." *Id.* "The first child-on-child shooting occurred on June 8, 1876[,] when a 13-year-old boy shot another classmate." *Id.* The first school shooting by a female, killing a young boy for spreading rumors about her, occurred in 1886. *Id.* "April 9, 1891[,] marked the first mass school shooting where more than one victim was targeted." *Id.* The perpetrator was a 70-year-old man who injured five male students at St. Mary's Parochial School in Newburgh, New York. *Id.*

[35] The court uses the term "firearm incidents" instead of "all shootings at schools," as this definition, according to the K-12 School Shooting Database, includes even brandishing incidents. The K-12 School Shooting Database defines "all shootings at schools" to include "when a gun is brandished, is fired, or a bullet hits school property for any reason, regardless of the number of victims, time, or day of the week. Unlike other data sources, this information includes gang shootings, domestic violence, shootings at sports games and afterhours school events, suicides, fights that escalate into shootings, and accidents." David Riedman, *All Shootings at Schools From 1970-Present*, K-12 SCH. SHOOTING

situations[36] at schools has increased dramatically since 1970.  *See* Riedman, *All Shootings at Schools From 1970-Present*, *supra*.

The average number of active shooter situations at K-12 schools for the years 1970 to 1979 was 1.6 per year.  *See* Riedman, *Active Shooter Situations*, *supra*.  This same average for the years 2010 to 2019 was 5.5 per year.[37]  *See id*.  The number of active shooter situations was 1 in 2020, 9 in 2021, 3 in 2022, and 2 at this point in 2023.  *Id*.  As for all firearm incidents at K-12 schools, the contrast is even more striking.  The average number of firearm incidents at K-12 schools for the years 1970 to 1979 was 16.6 per year.  *See* Riedman, *All Shootings at Schools from 1970-Present*, *supra*.  The average for the years 2010 to 2019, however, was 51.8 per year.  *See id*.  Moreover, the average number of victims, both fatal and wounded, on K-12 school property due to firearm incidents for the years 1970 to 1979 was 25.8 per year.  *See id*.  This average expanded to 61 per year for the years between 2010 and 2019.  *See id*.  Additionally, the number of firearm incidents was 115 in 2020, 250 in 2021, 304 in 2022, and 178 at this point in 2023.  *Id*.  The increase in firearms incidents, including active shooter situations, on and around school campuses is an aspect of our modern society for which our Nation's Founders could not have accounted.  This is emphasized by the fact that, aside from an incident which occurred in connection with the French and Indian War, the court did not find a school shooting incident prior

---

DATABASE (2023), https://k12ssdb.org/all-shootings [hereinafter Riedman, *All Shootings at Schools from 1970-Present*].

[36] The K-12 School Shooting Database uses the term "active shooter" "when the shooter killed and/or wounded victims, either targeted or random, within the school campus during a continuous episode of violence."  David Riedman, *Active Shooter Situations*, K-12 SCH. SHOOTING DATABASE (2023), https://k12ssdb.org/active-shooter [hereinafter Riedman, *Active Shooter Situations*].

[37] The yearly average number of active shooter situations in K-12 schools for the years 1980-1989 was 3.1, 1990-1999 was 3.3, and 2000-2010 was 4.7.  *See id*.

to the year 1853.  *See* Avery, *supra*.  Accordingly, shootings and firearm incidents on and around school campuses are surely an "unprecedented societal concern" that was unanticipated by our Founders.  *See Bruen*, 142 S. Ct. at 2132.

"Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. (citation omitted).  Accordingly, the court includes data relating to school shootings only for the purpose of illustrating that, in this case, a more nuanced analysis is warranted.  *See id*.  The data are not included for the purpose of engaging in the sort of balancing that *Bruen* prohibited.  Rather, the data clarify that one would not expect to find a clear historical analogue to § 922(q)(2)(A) because the societal issue which it attempts to remedy did not exist until recently.  The question in this case is markedly different from that in *Bruen*, where the question of how to regulate firearms had been apparent since the Founding, or *Rahimi*, where the possession of firearms by individuals accused of domestic violence had been an issue for many years.

A "nuanced approach" requires the court to "broaden its conception of what constitutes an 'analogue' and focus its attention on the justification for, and burden imposed by it." *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700, at *41 (N.D.N.Y. Nov. 7, 2022), *reconsideration denied sub nom. Antonyuk v. Nigrelli*, No. 122CV0986GTSCFH, 2022 WL 19001454 (N.D.N.Y. Dec. 13, 2022); *see* Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, DUKE L. J., (forthcoming) (manuscript at 56-57), https://ssrn.com/abstract=4335545.  Accordingly, the court must look more broadly to historical analogues that contain a "why" or "how" similar to that of § 922(q)(2)(A), even if not directly

24-40065.367

relating to school safety. Thus, the court will consider historical state regulations that illustrate a tradition of protecting particular locations by prohibiting firearms within such locations as well as by prohibiting firearm possession within a buffer zone around such locations.

### d.    The Government's "Historical Analogues"

The Government's proffered historical analogues to § 922(q)(2)(A) fall into two categories: (1) public-university restrictions relating to firearms on campus and (2) state and territorial restrictions relating to schools. The Government contends that "Section 922(q)(2) is 'relevantly similar' to [these] historical precursors . . . both in 'how' and 'why' it burdens 'a law-abiding citizen's right to armed self-defense,' and '[i]t does not matter that the precursors did not ban everyone, always, from possessing firearms near a school, because Section 922(q)(2) does not do that either.'"

### i.    Nineteenth-Century University Restrictions

The Government identifies three university restrictions from Georgia, Virginia, and North Carolina, dating back to the early 1800s. In 1810, the University of Georgia amended its university laws to prohibit students from possessing offensive weapons, including guns. Specifically, it "ordained that no student shall be allowed to keep any gun, pistol, Dagger, Dirk, sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." THE MINUTES OF THE SENATUS ACADEMICUS OF THE STATE OF GEORGIA, Part 1, 1799-1842, at 86 (1810), http://dlg.galileo.usg.edu/do:guan_ua0148_ua0148-002-004-001. At the same time, the University of Georgia adopted additional university laws forbidding "gambling, disorderly

37

24-40065.368

conduct, cursing, fighting, dueling, drunkenness, card games, and billiards."[38]  The university

hoped these laws would further its effort to "cultivate the soul as well as the mind" of its students.

F. N. BONEY, A PICTORIAL HISTORY OF THE UNIVERSITY OF GEORGIA 21 (1984).  The university

built off "Yale's old puritanical rules" which were a "good beginning" for this "long series of

regulations" geared toward "ma[king] the students behave morally and properly."  *Id*.  The

prohibition on firearms also seemed to be related to the fact that "[s]tudent militia units had gotten

out of hand."  *Id*. at 22.  As a result, the militia units were "disbanded and general disarmament

declared."  *Id*.

In 1824, the University of Virginia's Board of Visitors—which included Thomas Jefferson,

the university's founder, as well as James Madison—instituted a ban of its own.  Kopel &

Greenlee, *supra*, at 249.  Specifically, the ban stated:

> No Student shall, within the precincts of the University, introduce, keep or use any
> spirituous or vinous liquors, keep or use weapons or arms of any kind, or
> gunpowder, keep a servant, horse or dog, appear in school with a stick, or any
> weapon, nor, while in school, be covered without permission of the Professor, nor
> use tobacco by smoking or chewing, on pain of any of the minor punishments, at
> the discretion of the Faculty, or of the board of Censors, approved by the Faculty.

---

[38] On the same day that the University of Georgia adopted its prohibition on firearms, it also
amended its regulations to reflect that:

> If any scholar shall be guilty of profane swearing of [sic] fighting or quarreling – if he
> shall open the door of a fellow student – If he shall go more than two miles from Athens
> without leave from the president a professor or tutor. If he shall disturb others by noise
> [sic] loud talking or singing during the time of study – if he shall ring the Bell without
> order or permission – if he shall play at Billiards, Cards, or any unlawful game, if he shall
> associate with vile idle or dissolute persons, or shall admit them into his chamber – if he
> shall instigate or advise any student to a refractory or stubborn behaviour he shall for
> either of those offences be punished by admonition, rustication or expulsion as the nature
> and circumstances of the case may require.

*Id*.

24-40065.369

MEETING MINUTES OF UNIVERSITY OF VIRGINIA BOARD OF VISITORS, at 4-5 (1824), https://rotunda.upress.virginia.edu/founders/default.xqy?keys=FOEA-print-04-02-02-4598. The ban was a product of the students' "spoiled and violent behavior." Kopel & Greenlee, *supra*, at 249. The students "rioted and caroused, fired guns in the air, and shot at each other." *Id.* at 249-50 (citing Carlos Santos, *Bad Boys: Tales of the University's tumultuous early years*, VIRGINIA MAG. (Winter 2013), http://uvamagazine.org/articles/bad_boys)). The ban came as Jefferson was under pressure; his "enemies, and they were legion, were ready to pounce and shutter the school they considered a godless playground of the rich."[39] *Id.* at 250 (quoting Santos, *supra.*). Thus, the ban was instituted to quell the madness.

In 1838, the University of North Carolina adopted its own prohibitions. "No Student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any deadly weapon; nor shall he use fire arms without permission from the President." *Laws for the Government of the University*, ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH CAROLINA, at 15 Chapter V (1838), https://www.google.com/books/edition/

---

[39] Specifically, Jefferson's problems included:

Some students came to the University to learn, but many came to lark and laze. These students of the first two decades, often the spoiled, self-indulgent scions of Southern plantation owners or prosperous merchants, led a life of dissipation. With a sense of honor easily bruised, the wrong word, the wrong look could easily lead to a scuffle, if not a duel. The students brandished guns freely, sometimes shooting in the air, sometimes at each other. They drank, gambled, rioted and vandalized property (even taking a hatchet to the front doors of the Rotunda). The students' behavior was a great humiliation to Thomas Jefferson, the founder of their school and then one of the best known men in America . . . . The students were hostile. His professors were threatening to quit.

Santos, *supra*.

24-40065.370

Acts_of_the_General_Assembly_and_Ordinan/_HVNAAAAYAAJ?hl=en&gbpv=0 (chapter five is entitled "Of the Moral and Religious conduct of the Students, and their conduct towards the Faculty."). This "is an odd construction, which seems to imply that under some circumstances students might be permitted to *use* firearms, but not to *keep* them." Clayton E. Cramer, *Guns on Campus: A History*, ACAD. QUESTIONS 15 (Dec. 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract _id=2998355. Included in the same chapter are laws mandating chapel attendance and prohibiting, among other things, attending horse races, betting, engaging in a game of hazard, and possessing spiritous or fermented liquors. Accordingly, the University of North Carolina's firearms prohibition seems to rely on the same justifications as that of the Virginia and Georgia universities. The prohibition may also be attributable to the fading need for "militia preparedness."[40]  *Id.*  ("In the nineteenth century, as the need for militia preparedness faded,

---

[40] Similar prohibitions were instituted at McKenzie College, located in Clarksville, Texas, in 1860, Kemper College near St. Louis, Missouri, in 1840, the University of Nashville in 1837, and Dickinson College, located in Pennsylvania, in 1830. *Id.* Additionally, the Government cited two private university restrictions; however, it did not include them with the public university restrictions. In 1665, Harvard adopted a "penal law" stating:

> No undergraduate shall buy, sell, barter, or exchange books, apparrell or any thing of considerable value; but by the leave of the President or his Tutor, Guardian or Parent, or If he shall sell or pawne any thing to any scholler, the President shall make the bargaine and admoni[sh] [the] student *noe students shall be suffered to have [a g]un in his or theire chambers or studies*, or *keepeing for theire use any where else in the town*, or *If they be found to have such* by the President or Theire Tutors, *then they shall be admonished by the President or theire Tutors to put it away*:  which If they shall refuse to doe, the President shall have power to take it quite away from them, and If they resist the President herein, they shall upon due proofe be expelled out of the Colledge by the advise of the Colledge overseers:  the same penalty is appointed to any student that shall make resistance against or offer violence unto the President or fellows.

A COPY OF THE LAWS OF HARVARD COLLEGE, 1655, at 10 (1865), https://archive.org/details/acopylawsharvar00unkngoog/page/n14/mode/2up. Yale, in 1745, adopted a prohibition that:

> If any Scholar Shall *keep a Gun or Pistol, or Fire one in the College-Yard or College, or*

24-40065.371

colleges do start to prohibit 'firearms, or any deadly weapon whatever' as Waterville College, Maine did in 1832." (quoting Laws of Waterville College, Maine 11 (1832), https://www.google.com/books/edition/Laws_of_Waterville_College_Maine /n0wMAQAAMAAJ?hl=en&gbpv=1&pg=PA11&printsec=frontcover)).

The Government asserts that these university restrictions are relevant analogues because they were "broad" in that they "applied to all students regardless of age; they prohibited possession everywhere on campus (and 'elsewhere,' in Georgia's case); and they did not confer extensive licensing, storage, and other exemptions." In assessing analogues, courts look to the "how" and "why" of the historic regulation to determine if it is relevantly similar to the challenged prohibition. As for "why" the universities disarmed students, the concerns seem to have been centered around maintaining a safe and distraction-free learning environment. In some instances, (*e.g.*, Georgia and Virginia) armed students posed a threat not only to the learning environment, but also to the faculty and other students. Thus, universities were often protecting against internal threats to safety, as opposed to external threats. As for "how," the university restrictions consistently applied to one group of people—students. The restrictions did not include professors, faculty, or campus visitors. Except for Georgia's prohibition, which applied

---

*Shall Go a Gunning*, Fishing, or Sailing, or Shall Go more than Two Miles from College upon any Occasion whatsoever: or Shall be Present at any Court, Election, Town-Meeting, Wedding or Meeting of young People for Diversion or any Such-like Meeting which may Occasion Mispence of precious Time without Liberty first obtain'd from the President or his Tutor, in any of the cases abovesaid he Shall be *fined* not exceeding Two Shillings.

Franklin Bowditch Dexter, Biographical Sketches of the Graduates of Yale College, May 1745-May 1763, Annals 8 (1896). In any event, these prohibitions carry less severe penalties than expulsion and appear to be similar in their justification to the post-ratification public university restrictions, cited by the Government.

24-40065.372

"elsewhere" as well as on campus, the restrictions also seemed to apply only to possession on school property. In any event, although these enactments occurred close to our Nation's founding, the prohibitions applied to students only, and, thus, the university campus "was not a place where arms were forbidden to responsible adults," much less within 1,000 feet of campus. Kopel & Greenlee, *supra*, at 252. Moreover, three university regulations that applied only to students cannot be said to be representative of our Nation's tradition of firearms regulation.

ii.    <u>Late Nineteenth to Early Twentieth Century State and Territorial Restrictions</u>

The Government next cites seven restrictions from the late 1800s to early 1900s. "In the half-century following the Civil War" some states and territories enacted "broad laws against carrying at public events."[41] *Id.* at 252-53. The Government first cites an 1871 Texas statute, stating:

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational or scientific purposes . . . and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword[-]cane, spear, brass-knuckles, bowie-knife . . . he shall be guilty of a misdemeanor, and on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars . . . and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.[42]

---

[41] In some states, such restrictions were likely alternatives to facially discriminatory regulations. Kopel & Greenlee, *supra*, at 252 ("In the half-century following the Civil War, the former slave states were the center of the gun control movement. Although the Equal Protection Clause of the Fourteenth Amendment forbade gun laws that expressly discriminated on race, the racial subtext of Southern gun control was obvious.").

[42] This statute also prohibited carrying a firearm into a circus, show, public exhibition of any kind, ballroom, social party or gathering, election precinct on the day or days of an election, or any location where people may be assembled to muster or perform any public duty. *Id.*

Act of Apr. 12, 1871, 12th Leg., 1st S. ch. 34, § 3, 1871 TEX. GEN. LAWS 25-26.[43]  "[B]oth

before and after the Civil War," Texas was a "uniquely violent place." Mark Anthony Frassetto,

*The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95,

97 (2016).  Many Texans were "resistant to emancipation and Reconstruction, resulting in

staggering levels of violence against blacks and Unionists." *Id*. at 99.  In 1869, facing significant

resistance, "Radical Republican Edmund Davis was elected Governor of Texas," and his

administration was defined "by its effort to restore order in Texas in the face of Democratic

opposition." *Id*. at 101.  During his inaugural address, Davis "called for the prohibition on

carrying handguns in public." *Id*. at 103.  In the summer of 1870, the state legislature fulfilled

part of Davis's request by passing 1870 TEX. GEN. LAWS 63, a predecessor of the Texas law

stated above, which prohibited carrying firearms in locations such as schools, churches, or social

gatherings.[44]  *Id*. at 104.  "While the prohibition . . . provided an important tool for the state

police to maintain order" in Texas, it fell short of accomplishing Davis's goal of dramatic crime

reduction.  *Id*.  "In response to concerns about the effectiveness of the 1870 Act . . . the Texas

Legislature drafted a bill in 1871 that prohibited" Texans from carrying weapons without

---

[43] At that time, the Texas Constitution provided that "Every person shall have the right to keep and bear arms in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe," and the Texas Supreme Court understood that the Second Amendment did not apply to the states.  *State v. Duke*, 42 Tex. 455, 457-58 (1875).

[44] Although such laws "were technically universal," in reality, "the Texans most vulnerable to arrest for unlawfully carrying arms were those of African American or Mexican descent."  Brennan Gardner Rivas, *When Texas was the national leader in gun control*, THE WASH. POST (Sep. 12, 2019), https://www.washingtonpost.com/outlook/2019/09/12/when-texas-was-national -leader-gun-control/.

24-40065.374

"'reasonable grounds for fearing an unlawful attack on his person.'" *Id.* (quoting Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 TEX. GEN. LAWS 25).[45]

In 1878, Mississippi enacted a statute more similar to the university restrictions listed above. The Mississippi law applied only to "student[s] of any university, college, or school" who carried a pistol or other weapon "concealed or partly concealed," or to "any teacher, instructor, or professor who . . . knowingly" permitted any student to carry such a weapon. 1878 MISS. LAWS 176. Nevertheless, not only did Mississippi's prohibition not ban faculty or staff from carrying concealed firearms, but students could carry arms as long as they did so openly. *Id.*; *see* Kopel & Greenlee, *supra*, at 251-52. The Government next cites two Missouri prohibitions. Missouri's 1883 prohibition stated that:

> If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into . . . any school room or place where people are assembled for educational, literary or social purposes . . . having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon . . . he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

1883 MO. LAWS 76.[46] Missouri did not "go as far as Texas," in that Missouri's prohibition did not restrict open carry. *See* Kopel & Greenlee, *supra*, at 254. "This was consistent with the Missouri Constitution's right to arms provision, which made an express exception for concealed carry." *Id.* The Government also cites an 1879 Missouri statute which prohibited "any person"

---

[45] *Bruen* discussed this Texas law and determined that it, and subsequent decisions of the Texas Supreme Court, provided "little insight into how postbellum courts viewed the right to carry protected arms in public." 142 S. Ct. at 2153.

[46] This statute also applied to carrying a weapon into a church, place where people have assembled for religious worship, court rooms, or any other public assemblage of persons. *Id.* There was, however, an exception for militia drills or meetings. *Id.*

24-40065.375

from discharging "any gun, pistol or fire-arms . . . in the immediate vicinity of any court house, church or building used for school or college purposes." 1879 MO. LAWS 90.

Additionally, Montana, in 1903, prohibited "any person" from entering a "church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purpose" while carrying "concealed or partially concealed" a "pistol or other firearm, dirk, dagger, slung shot, sword cane, knuckles, or bowie knife." 1903 MONT. LAWS 49.[47] This offense carried a punishment of a fine not less than fifty but not more than five hundred dollars. *Id*. Montana's prohibition, like Texas's, covered a broad array of locations, including private social events. *Id*.; *see* Kopel & Greenlee, *supra*, at 257.

During the late 1800s, some territories enacted similar bans on firearms in certain locations. In 1889, Arizona prohibited "any person" from having or carrying "about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife" "into any school room, or other place where persons are assembled for amusement or for educational or scientific purposes." 1889 ARIZ. SESS. LAWS 30-31. Arizona's prohibition, like that of Missouri, applied to other gatherings and locations including churches, circuses, and polling places and, like that of Texas and Montana, applied to social gatherings. *Id*. Oklahoma, in 1890, enacted a statute prohibiting the possession of a firearm in school rooms and other places, similar to Arizona's statute. 1890 OKLA. SESS. LAWS 495-96; *see* Kopel & Greenlee, *supra*, at

---

[47] Montana's prohibition also applied to "any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct or any place of registration, on the day or days of any election or registration, where any portion of the people of the State are collected to register or vote at any election, or to any other place where people may be assembled to perform any public duty, or at any public assembly." *Id*.

45

24-40065.376

258.  Arizona's and Oklahoma's prohibitions, like Montana's and Texas's, applied to wide range of areas, including both public locations and private social gatherings.

The Government asserts that these laws, enacted by states and territories, are relevant analogues to § 922(q)(2)(A)'s prohibition.  It argues that these restrictions are broader than the early nineteenth-century university restrictions because limited exceptions for peace officers were made and they "prohibited *any* person—adult or child—from carrying firearms in schools"—excluding Mississippi.  Furthermore, the Government contends that "they, too, contained few or no carveouts akin to those in Section 922(q)(2)(A)," excluding, for example, Montana's exception for peaceable individuals of good moral character.  1903 MONT. LAWS 50.

The Government concedes that "most of the precursors did not extend [to] a prescribed distance beyond the campus or school."  It claims, however, that one state regulation did.  It argues that Missouri's 1879 regulation that prohibited discharging a firearm within 600 feet of a school is instructive.  1879 MO. LAWS 91.  The Government overlooks the fact that the discharge of a firearm in the vicinity of school property is covered by section 922(q)(3)(A), not section 922(q)(2)(A).  Certainly, Missouri's discharge prohibition would be an apt analogue for section 922(q)(3)(A), but it is not persuasive in this instance.  Additionally, the Government contends that Mississippi's prohibition on students' possession of firearms is relevant because it applied to the possession of "concealed firearms anywhere."  Nonetheless, Mississippi's regulation does not seem highly relevant.  Critically, it applied only to firearms that were concealed, and, like the early university restrictions, it applied only to students.

The Government further asserts that, because many of these late nineteenth-century regulations "extended beyond 'school room[s]' to unspecified 'other place[s]' where children and

others assembled for education, science, worship, or amusement," the regulations provide a strong footing for § 922(q)(2)(A)'s broad application to the area outside school property. These statutes, however, do not lend support for a protected zone around school property. The "unspecified places" language provided for the same protection when school functions took place in an area other than a designated school building. The "unspecified places" were sensitive for the same reasons that a school building is sensitive today, and these laws did not extend such protection to an expansive zone surrounding the site where such school functions took place. The fact that school functions maintained a protected status whether they took place in a school building or an open field does not support the notion that the statute at issue provides for extended protection in a zone around school property.

In any event, it appears that these state and territorial restrictions were intended to keep firearms and other weapons out of schools and other areas where the free flow of information and ideas was to be encouraged. Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 WM. & MARY BILL RTS. J. 459, 471 (2019). As with the earlier university restrictions, states hoped to create a safe and distraction-free learning environment for students. Moreover, the state and territorial restrictions were broader, in that some of these restrictions prohibited all individuals, rather than students only, from possessing firearms in a school. As for "how" these restrictions functioned, they applied only to possession within a school or in an area where school functions were taking place. The regulations did not provide for an expansive area of protection around a school or area where school functions were conducted.

24-40065.378

Laws enacted a century after the Second Amendment's ratification are ordinarily less helpful in shedding light on the public understanding of the Second Amendment at the Founding.[48] Nonetheless, these post-Civil War enactments illustrate a strong state desire to protect schools from firearm violence. Thus, even though these laws were enacted later in the nineteenth century and early twentieth century, the Government has shown, and it was noted in *Bruen*, that in our Nation's history there is a tradition of prohibiting firearms in schools for the purpose of protecting children and creating an environment conducive to learning. *See Bruen*, 142 S. Ct. at 2133; *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 5239895, at *17 n.33 (N.D.N.Y. Oct. 6, 2022).

Doubtless, the Government has failed to provide the court with a "historical twin" for the purpose of reasoning by analogy. Moreover, at first glance, it appears that the Government has also failed to provide the court with a well-established and representative historical analogue. Nevertheless, the court will broaden its scope of review and "will conduct its own historical inquiry in the Government's absence." *Quiroz*, 2022 WL 4352482, at *5.

e. "Buffer Zone" Restrictions

Although the Government does not cite any historical evidence other than the above university, state, and territorial prohibitions, the court understands this analysis to require a more sweeping review of potential historical analogues. Accordingly, while not exclusively within the context of regulations regarding schools, there appears to be historical evidence of laws creating "buffer zones" around other sensitive places. For example, in 1534, King Henry VIII issued a

---

[48] Additionally, although the Fourteenth Amendment is not at issue in this case, laws enacted by territories in the late nineteenth century are less compelling for Second Amendment purposes, as they have a diminished ability to shed light on the public understanding of either the Second or Fourteenth Amendments.

24-40065.379

modernized version of the Statute of Northampton,[49] applicable to Wales.[50] Kopel & Greenlee, *supra*, at 218 (citing 26 HEN. 8, c. 6, § 3 (1534)). Part of his enactment "prohibited not only arms in court, but also arms within two miles of a court." *Id*.

Since this Nation's Founding, polling places have often been viewed as sensitive places.[51] Kopel & Greenlee, *supra*, at 235-36. In fact, the Delaware Constitution of 1776 prohibited any private person from coming armed to an election, and it specifically stated that "Militias could not assemble within one mile of a polling place, starting 24 hours before the opening of the polls, and until 24 hours after the polls closed." *Id*. (quoting DEL. CONST. art. 28 (1776)); Miller, *supra*, at 473. The purpose of the restriction was plainly stated: "To prevent any violence or force being used at the said elections." Miller, *supra*, at 473 (quoting DEL. CONST. art. 28 (1776)).

In the nineteenth century, even more states enacted laws prohibiting guns in polling places. Kopel & Greenlee, *supra*, at 244. In the Reconstruction era, "[a]rmed terrorist organizations, such as the Ku Klux Klan, tried to prevent blacks or white Republicans from voting," thus

---

[49] "In 1328, the Statute of Northampton was propounded (nominally by Edward III)." Kopel & Greenlee, *supra*, at 218. "The preeminent purpose was to prohibit arms carrying around the king's officials." *Id*. In part, the statute provided that "no man great nor small . . . be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace." *Id*.

[50] The court notes King Henry VIII's version of the Statute of Northampton only to illustrate the point that "buffer zones" are not a new phenomenon, not to demonstrate the Founders' understanding of the Second Amendment. *Bruen*, 142 S. Ct. at 2139 (determining that the medieval Statute of Northampton was too old to significantly affect the Founders' understanding of the Second Amendment).

[51] The following discussion relating to "buffer zones" should not be confused with the court's earlier sensitive places analysis. To be sure, in the court's view, a "buffer zone" is not a sensitive place as contemplated in *Heller* and *Bruen*. *See* Kopel & Greenlee, *supra*, at 290 ("Buffer zones are not sensitive places. *Heller* allows for carry bans 'in' sensitive places--not bans 'around' or 'near' sensitive places. Accordingly, buffer zones are not sensitive places."). For a statute prohibiting the possession of a firearm in an area around a sensitive place to be permissible, the prohibition must comport with *Bruen*'s two-step analysis.

24-40065.380

necessitating, in some states, a zone around polling places where weapons were prohibited. *Id*. (citation omitted). Louisiana, in particular, experienced severe campaigns of violence. Over the summer of 1868, in St. Landry Parish, groups "such as the Knights of the White Camelia and the Seymour Guards . . . carried out acts of violence and intimidation against African Americans." Tara Laver, *Civil War Treasures: Party Planning: St. Landry Parish, Radical Republicans, and the Vote for the 1867 Constitutional Convention*, CIVIL WAR BOOK REV. (Summer 2014), at 3-4, https://digitalcommons.lsu.edu/cwbr/wol16/iss3/28. In late September, after such provocation, "freedmen . . . t[ook] up arms and rush[ed] . . . Opelousas," the largest city in St. Landry Parish. *Id*. at 4. "Shots were fired, and a massacre ensued as over three days whites pursued the African Americans across the countryside, killing at least 150 black Republicans." *Id*. In 1870, Louisiana prohibited the carrying of firearms on election day when the polls were open. Kopel & Greenlee, *supra*, at 245 (citing 1870 LA. ACTS 159-60); Miller, *supra*, at 473. Louisiana's ban "apparently had no geographical limit," and, thus, created a vast zone in which firearms could not be carried on election days. Kopel & Greenlee, *supra*, at 244. Moreover, on "any day of registration or revision of registration," individuals were prohibited from carrying firearms and other weapons "within a distance of one-half mile of any place of registration or revision of registration." *Id*.; 1870 LA. ACTS 159-60.[52]

---

[52] In relevant part, 1870 LA. ACTS 159-60 stated:

That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

24-40065.381

Maryland, too, had laws prohibiting the possession and carrying of firearms on election days in two particular counties. "An 1874 law banned arms carrying on election day in Kent County," and "[a]n 1886 statute outlawed bearing arms within 300 yards of the polls on election day in Calvert County." Kopel & Greenlee, *supra*, at 245 (citing 2 PUBLIC LOCAL LAWS OF MARYLAND, ARTICLES 11-24, at 1457 (King Bros. ed. 1888); 1886 MD. LAWS 315). In 1873, Texas also prohibited a person from carrying a firearm "within a half-mile of a polling place during polling hours."[53] *Id*. (citing 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 to 1874, at 1317-18 (4th ed. 1874)). In the years before this enactment, the 1869 Texas Gubernatorial Race—in which Davis was elected—was "marred by violence against blacks seeking access to the polls."[54] Frassetto, *supra*, at 102.

Thus, it is clear from these nineteenth-century enactments that this Nation is no stranger to prohibiting individuals from possessing or carrying firearms, or other weapons for that matter, within a certain proximity of sensitive places. These restrictions were borne out of the states' need to hold safe and fair elections.

---

[53] In relevant part, the 1887 Texas law stated:

Riots and Unlawful Assemblies at Elections Violence Used Towards Electors: (1) It shall be unlawful for any person to carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. (2) Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less than one month . . . .

[54] Although in a context distinct from polling places, it is worth noting that "Minnesota banned guns in state parks and in a zone a half-mile around their edges." Kopel & Greenlee, *supra*, at 262. "Guns could be possessed therein only if they had been 'sealed' by a park employee." *Id*. (citing 1905 MINN. LAWS 620). The seal was presumably some type of wax or other cap indicating that the owner had not fired the gun on park property. *Id*.

51

f.  Section 922(q)(2)(A) is Consistent with this Nation's History of Firearms Regulation

As noted above, there is no historical precursor to § 922(q)(2)(A) that is a "twin" or "dead ringer." Nonetheless, this court is of the opinion that late nineteenth-century prohibitions on possessing firearms in schools and within the vicinity of polling places constitute relevantly similar historical analogues that compel the court to find § 922(q)(2)(A) constitutional.

Today, our Nation's schools face threats that were unfathomable to the Founders. The justification that now exists for prohibiting firearms within the immediate vicinity of a school plainly did not exist in 1791, nor did it exist one hundred years later. It was nearly two hundred years after our Bill of Rights was drafted that this problem became evident and subsequently increased. Therefore, the court is faced with a situation for which *Bruen* contemplates a "more nuanced approach." 142 S. Ct. at 2132. Although courts have significantly diverged with respect to how similar an analogue must be when faced with a problem that has plagued this Nation since its Founding, when faced with a new societal problem, courts do not demand a "distinctly similar" analogue. *See* Charles, *supra*, at 56. In light of recent societal changes, a perfectly analogous historical precursor to § 922(q)(2)(A) would not be expected to exist in this Nation's history.

As previously indicated, § 922(q)(2)(A)'s "why" for its 1,000-foot zone prohibition relates to providing an additional layer of protection around school property in an effort to shield school children and school staff from an increased risk of harm from gun violence—whether that violence presents itself as a threat from outside or within—in an effort to provide safety and promote the students' education. Phrased more generally, the "why" relates to providing an additional layer of protection around a sensitive place, due to an increased risk of harm to the people required to

52

24-40065.383

be in such a location.[55]   Accordingly, because there is no clear historical analogue to § 922(q)(2)(A) and it does not address a general societal problem that has persisted since the eighteenth-century, the court will utilize a "more nuanced approach" and consider both the late nineteenth-century prohibitions on carrying firearms in schools and the prohibitions on carrying firearms around polling places.

The late nineteenth-century prohibitions on carrying firearms in schools reflect a similar purpose as that of § 922(q)(2)(A).  These school-carry prohibitions were ostensibly enacted to keep firearms out of schools—even if in some cases they extended only to concealed firearms—and to protect the children and the teachers therein.  Additionally, the late nineteenth-century prohibitions on carrying firearms around polling places also possess a similar purpose as that of § 922(q)(2)(A).  These polling place restrictions were justified by states' need to protect citizens from firearm violence or the threat of firearm violence in and around polling places.  Once these states recognized that some of their citizens were being threatened and harmed on their way to and at polling places, the states' respective legislatures took action.  These states reacted to a new threat to the political process, just as Congress reacted to a new threat to our Nation's schools.

The "how" related to § 922(q)(2)(A)'s 1,000-foot-zone prohibition involves prohibiting persons from carrying firearms near a school under certain circumstances.  As discussed above, it is not a total prohibition on all persons carrying any firearm in the vicinity of a school under all circumstances.  The late nineteenth-century polling place restrictions prohibited carrying firearms

---

[55] The court phrases § 922(q)(2)(A)'s "why" in this way not only because a school is a sensitive place, but also because of the specific risk that has come to threaten this specific sensitive place over the past few decades.  Accordingly, the court does not view late nineteenth century prohibitions on carrying firearms around polling places to be relevant historical analogues for any prohibition on carrying firearms in a buffer zone around some other sensitive place.

within a certain area around a polling place or registration site on election and registration days. The states' polling place restrictions did not have carve-outs similar to those contained in § 922(q)(2)(B); they were complete prohibitions. Furthermore, even though the states' polling place restrictions were limited in time and § 922(q)(2)(A)'s prohibition is not, that difference is not determinative. In the late nineteenth century, the threats that the polling place restrictions were intended to remedy occurred only on those days that the polls or registration sites were open. The threats that schools face are not so temporally limited. Accordingly, our Nation's history of firearms regulation is not antithetical to prohibiting firearms in a zone around a particular sensitive place.

Although, on first glance, some courts could deem late nineteenth-century analogues "too remote" to inform the Second Amendment analysis, in the context of sensitive places and areas around sensitive places, *Bruen* seems to acknowledge the propriety of applying a different approach under these circumstances, where unprecedented societal concerns have arisen. *See* 142 S. Ct. at 2133. *Bruen*, in discussing "sensitive places," seemed to find the "relatively few 18th- and 19th-century" prohibitions on firearms *in* schools and polling places to be compelling evidence supporting modern prohibitions. *See id*. The court finds those same statutes, as well as statutes prohibiting firearms *around* polling places from the same time period, to be relevant analogues for purposes of a Second Amendment analysis. Furthermore, the lack of numerous precursors prohibiting firearms around sensitive places is not dispositive. *Bruen* noted that, in the context of sensitive place prohibitions, "the historical record yields relatively few" of these historical precursors. *Id*. Nonetheless, *Bruen* seemed to view these few precursors to be compelling. *Id*.

54

24-40065.385

Accordingly, taken together, the late nineteenth-century prohibitions on carrying firearms in schools and in and around polling places have a similar justification and impose "a comparable burden on the right of armed self-defense" as § 922(q)(2)(A), even if they burden the right in slightly different ways. *See id*. at 2133; *Rahimi*, 61 F.4th at 460; *Posada*, 2023 WL 3027877, at *6.

III.  Conclusion

As detailed above, § 922(q)(2)(A)'s prohibition on the possession of firearms within 1,000 feet of school property is not "an 'outlier[ ] that our ancestors would never have accepted.'" *Rahimi*, 61 F.4th at 460 (quoting *Bruen*, 142 S. Ct. at 2133).  Therefore, the statute is constitutional, and both Allam's facial and as-applied challenges fail.  Accordingly, Allam's Motion to Dismiss the Indictment (#22) is DENIED.

SIGNED at Beaumont, Texas, this 14th day of June, 2023.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

24-40065.386

# CERTIFICATE OF SERVICE

The undersigned certifies that on August 8, 2024, the foregoing was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

> Mahogane Reed, mahogane.reed@usdoj.gov,
> > Trial Attorney, Criminal Division, United States Department of Justice;
>
> Stephan Oestreicher, stephan.oestreicher@usdoj.gov,
> Bradley Visosky, bradley.visosky@usdoj.gov, and
> John Ross, john.ross5@usdoj.gov,
> > Assistant United States Attorneys; and
>
> C.D. Michel, cmichellawyers.com,
> > Counsel for Amicus Curiae.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5th Cir. R. 25.2.5.

The undersigned further certifies that (1) all privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses and is free of viruses.


s/ *Elizabeth Emanuel*
ELIZABETH EMANUEL