No. 24-40065

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

AHMED ABDALLA ALLAM,
Defendant–Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

**ANSWERING BRIEF FOR APPELLEE**

DAMIEN M. DIGGS
United States Attorney

BRADLEY VISOSKY
Appellate Chief
United States Attorney's Office
Eastern District of Texas

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney
General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose defendant-appellant Ahmed Abdalla Allam's request for oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ........................................................ iv

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 2

ISSUE PRESENTED ................................................................. 2

STATEMENT OF THE CASE .................................................... 2

    I.    Procedural History ..................................................... 2

    II.   Statement of Facts .................................................... 3

         A.    Allam possesses a semi-automatic rifle, a large-capacity magazine, and 150 rounds of ammunition across the street from an elementary school. ...................................... 3

         B.    A grand jury charges Allam with possessing a firearm in a school zone, and the district court rejects his Second Amendment challenge. ...................................... 6

SUMMARY OF ARGUMENT ................................................... 10

ARGUMENT ........................................................................... 12

Section 922(q)(2)(A) is Constitutional As Applied to Allam ........................ 12

    I.    Standard of Review ................................................... 12

    II.   The Supreme Court's Second Amendment Decisions Support Section 922(q)(2)(A)'s Constitutionality As Applied to Allam. .... 13

    III.  Section 922(q)(2)(A) is Consistent With Our Nation's Historical Tradition of Firearm Regulation. ............................... 19

A.     Legislatures have long prohibited firearm possession in or near schools and universities. ...................................... 20

       1.     Prohibitions on students' possession of arms on university campuses ............................................... 20

       2.     Laws prohibiting firearm possession in schools and other educational settings ................................ 22

B.     Legislatures have long prohibited firearm possession around sensitive places like polling places and schools ...... 24

C.     Section 922(q)(2)(A) is relevantly similar to these historical laws when considered together. ........................ 26

D.     Allam's arguments lack merit. ......................................... 29

E.     Allam's as-applied challenge fails. ................................... 39

CONCLUSION ......................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Crawford v. Washington,*
    541 U.S. 36 (2004) .................................................................. 30

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..............................................13, 14, 29, 30

*Frey v. Nigrelli,*
    661 F. Supp. 3d 176 (S.D.N.Y. 2023) ................................14, 18

*Hill v. State,*
    53 Ga. 472 (Ga. 1874) ........................................................... 15

*Koons v. Platkin,*
    673 F. Supp. 3d 515 (D.N.J. 2023) ........................................ 19

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) ........................................................... 17

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ..................................................... 13, 14, 30

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ............................................................... 33

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024) .................................................. 16

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    597 U.S. 1 (2022)........................9, 14, 15, 16, 23, 25, 29, 31, 32, 33, 34, 36

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020)............................................................ 30

*Roth v. United States,*
    354 U.S. 476 (1957) ............................................................... 30

*Siegel v. Platkin,*
    653 F. Supp. 3d 136 (D.N.J. 2023) ........................................................ 19

*United States v. Alvarez,*
    567 U.S. 709 (2012) ............................................................................... 30

*United States v. Clark,*
    582 F.3d 607 (5th Cir. 2009) ................................................................. 41

*United States v. Class,*
    930 F.3d 460 (D.C. Cir. 2019) ..........................................................17, 18

*United States v. Diaz,*
    116 F.4th 458 (5th Cir. 2024) ............................................................... 16

*United States v. Guzmán-Montañez,*
    756 F.3d 1 (1st Cir. 2014) ...................................................................... 41

*United States v. Haywood,*
    363 F.3d 200 (3d Cir. 2004) ................................................................... 41

*United States v. Lewis,*
    Crim. No. 2008-45, 2008 WL 5412013 (D.V.I. Dec. 24, 2008) ................. 18

*United States v. Lopez,*
    514 U.S. 549 (1995) ...........................................................................15, 27

*United States v. Perez-Macias,*
    335 F.3d 421 (5th Cir. 2003) ................................................................. 12

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024).......... 11, 19, 26, 28, 29, 31, 33, 34, 35, 37, 38, 40, 42

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ...........................................................36, 37

**Federal Statutes**

18 U.S.C. § 921 ........................................................................................6

18 U.S.C. § 922 ................................................................ 1, 2, 3, 6, 26, 27, 41

18 U.S.C. § 3231 ................................................................. 2

28 U.S.C. § 1291 ................................................................. 2

**State Statutes**

Ala. Code § 13A-11-72 ..................................................... 24

Alaska Stat. § 11.61.210 ................................................... 24

Alaska Stat. § 18.65.755 ................................................... 24

Ariz. Admin. Code § 7-4-102 ........................................... 21

Ariz. Rev. Stat. Ann. § 13-3102 ....................................... 24

Ark. Code Ann. § 5-73-119 .............................................. 24

Ark. Code Ann. § 5-73-306 .............................................. 24

Cal. Penal Code § 626.9 ............................................. 21, 24

Colo. Rev. Stat. § 18-12-105.5 ......................................... 24

Colo. Rev. Stat. § 18-12-214 ........................................... 24

Conn. Gen. Stat. § 53a-217b ........................................... 24

D.C. Code § 7-2509.07 .............................................. 21, 24

D.C. Code § 22-4504 ....................................................... 24

Del. Code Ann. tit. 11, § 1457A ....................................... 24

Fla. Stat. § 790.06 .......................................................... 24

Fla. Stat. § 790.115 .................................................... 21, 24

Fla. Stat. § 810.095 ........................................................ 24

Ga. Code Ann. § 16-11-127.1 .......................................... 24

Idaho Code § 18-3302D ................................................................... 24

Idaho Code § 18-3309 ..................................................................... 21

Iowa Admin. Code 681-9.1 .............................................................. 21

Iowa Code § 280.2 .......................................................................... 24

Iowa Code § 724.4B ........................................................................ 24

Ky. Rev. Stat. Ann. § 527.070 ......................................................... 24

La. Stat. Ann. § 14:95.2 .................................................................. 24

La. Stat. Ann. § 40:1379.3 .............................................................. 21

Mass. Gen. Laws ch. 269, § 10 ...................................................21, 24

Md. Code Ann., Crim. Law § 4-102 ................................................ 24

Md. Code Ann., Crim. Law § 4-111 .............................................21, 24

Me. Rev. Stat. Ann. tit. 20-A, § 6552 ............................................. 24

Minn. Stat. § 609.66 Subd.1d .......................................................... 24

Mont. Code Ann. § 45-8-361 ........................................................... 24

N.C. Gen. Stat. § 14-269.2 ..........................................................22, 24

N.D. Cent. Code, § 62.1-02-05 ........................................................ 24

N.J. Stat. Ann. § 2C:39-5 ...........................................................21, 24

N.M. Stat. Ann. § 30-7-2.4 ............................................................. 22

N.Y. Penal Law § 265.01-a ..........................................................22, 24

Neb. Rev. Stat. § 28-1204.04 .......................................................21, 24

Okla. Stat. tit. 21, § 1280.1 ............................................................. 24

S.C. Code Ann. § 16-23-420 .......................................................22, 24

Tenn. Code Ann. § 39-17-1309 ....................................................... 24

Tex. Penal Code § 46.03.................................................................. 24

Va. Code Ann. § 18.2-308.1............................................................ 24

Vt. Stat. Ann. tit. 13, § 4004.......................................................... 24

Wash. Rev. Code Ann. § 9.41.280 ................................................. 24

Wis. Stat. § 948.605 ....................................................................... 24

**Historical Statutes**

2 A Digest of the Laws of Texas, Containing the Laws in Force, and the
    Repealed Laws on Which Rights Rest, From 1754 to 1874 (4th ed.
    1874) ............................................................................................ 25

2 Public Local Laws of Maryland, Articles 11-24, at 1457 (King Bros.,
    ed. 1888) ...................................................................................... 25

26 Hen. 8, c.6, § 6 (1534)............................................................... 25

Act of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws. 25-26 ..................... 22

Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90................................. 26

Act of April 7, 1886, ch. 189, 1886 Md. Laws 315 ....................... 25

Act of Feb. 12, 1927, §§ 1-5, 1927 N.C. Sess. Laws, Public-Local Laws
    68 .................................................................................................. 23

Act of Feb. 27, 1903, ch. 35, § 3, 1903 Mont. Laws 49-50 ........... 23

Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 176 ............... 22

Act of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31 ................... 22

Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76 ................................. 22

Act of March 16, 1870, No. 100, § 73, 1870 La. Acts 159-60 ........................ 25

Del. Const. art. 28 (1776) ............................................................................. 25

The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws
    495-96 ..................................................................................................... 23

**Other Authorities**

"University of Nashville," American Annals of Education and
    Instruction, for the Year 1837 (1938) ...................................................... 21

"Laws of McKenzie College," in University of Texas, The Correlation of
    High School and College Courses in the Sciences (1918) ......................... 21

*Acts of the General Assembly and Ordinances of the Trustees, for the
    Organization and Government of the University of North-Carolina* (Sept.
    1838) ........................................................................................................ 21

Dickinson College, The Statutes of Dickinson College (1830) ..................... 21

Giffords Law Center, *Guns in Schools* ......................................................... 22

Kemper College, The Laws of Kemper College Near Saint Louis,
    Missouri (1840) ...................................................................................... 21

Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev.
    205 (2018) ............................................................................................... 15

Randolph Roth, "Why Guns Are and Are Not the Problem," in Jennifer
    Tucker, *et al.*, *A Right to Bear Arms?: The Contested Role of History in
    Contemporary Debates on the Second Amendment* (2019) .......................... 23, 24

*The Minutes of the Senatus Academicus of the State of Georgia*, 1799-1842
    (Aug. 1810) .............................................................................................. 20

*University of Virginia Board of Visitors Minutes* (Oct. 1824) ...................... 21

Waterville College, Laws of Waterville College, Maine (1832) ..................... 21

# INTRODUCTION

For the better part of a week in January 2023, Ahmed Abdalla Allam lurked across the street from an elementary school. Allam parked his SUV directly across from the school's playground, no more than 40 feet from school grounds, for hours at a time and refused to move his car from near the school. Allam's presence alarmed the community—including school administrators, pupils, and parents—and disrupted the school's activities, forcing the school to relocate or cancel many extracurricular activities. Officers arrested Allam for repeated traffic violations, and they found a semi-automatic rifle, a large-capacity magazine, and 150 rounds of ammunition in his car.

After he was charged with knowingly possessing a firearm in a school zone in violation of 18 U.S.C. § 922(q)(2)(A), a district court rejected his Second Amendment challenge to that statute. The district court's holding was correct for two reasons. First, the Supreme Court has repeatedly suggested that laws prohibiting firearms in schools are lawful. The Court's assurances carry special weight here, where Allam possessed a firearm a stone's throw from school grounds. Second, Section 922(q)(2)(A) comports with the historically derived principles that underpin the Second Amendment. That statute's limited prohibition reflects legislatures' longstanding authority to restrict firearm possession in places where their presence would pose a heightened risk of

1

danger, including in and around schools. Allam cannot show that Section 922(q)(2)(A) is unconstitutional as applied to him, and his claims that the statute may be unconstitutional in some applications are no reason to strike down the statute here. This Court should affirm the district court's judgment.

## JURISDICTIONAL STATEMENT

Defendant-appellant Ahmed Abdalla Allam appeals from a final judgment of conviction in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The court entered its judgment on February 1, 2024. ROA.435-441. Allam timely filed a notice of appeal that same day. ROA.442. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether 18 U.S.C. § 922(q)(2)(A), which prohibits an individual from knowingly "possess[ing] a firearm … at a place that the individual knows, or has reasonable cause to believe, is a school zone," violates the Second Amendment as applied to the defendant, who possessed a semi-automatic rifle, a large-capacity magazine, and 150 rounds of ammunition directly across the street from an elementary school.

## STATEMENT OF THE CASE

### I.    Procedural History

Following a guilty plea in the U.S. District Court for the Eastern District of Texas, Allam was convicted of knowingly possessing a firearm at a place he

knew or had reasonable cause to believe was a school zone, in violation of 18 U.S.C. § 922(q)(2)(A). ROA.435. The district court sentenced Allam to 60 months of imprisonment, to be followed by three years of supervised release. ROA.436-437.

## II. Statement of Facts

### A. Allam possesses a semi-automatic rifle, a large-capacity magazine, and 150 rounds of ammunition across the street from an elementary school.

Until July 2022, Allam lived with his family in New York City. ROA.332. At that time, Allam left New York City in his father's SUV, purchased an AR-15 semi-automatic rifle and ammunition from a gun store in Pennsylvania, and traversed the country, stopping in California for several months before departing for Texas. ROA.332-333.

Allam turned up in Beaumont, Texas, in early January 2023. ROA.333. Between January 5 and 28, officers with the Beaumont Police Department received at least nine reports that Allam had been sitting in his car for extended periods of time next to St. Anthony Cathedral Basilica School, a Christian elementary school. ROA.1415; *see also* ROA.390. Allam regularly parked his car directly across from school grounds along Forsythe Street. ROA.333. From his vantage point, Allam had a clear view of the on-grounds gym and fields, the on-grounds playground, and the off-grounds crosswalk that students used to cross

3

Forsythe Street on their way to the off-grounds basilica. ROA.333. Allam was usually parked a few feet in front of a speed-limit sign that indicated a nearby school:



ROA.214, 242.[1]

Several members of the community asked Allam to move his SUV from in front of the school, but he refused. ROA.214. Because of Allam's behavior, the school "stopped having any type of outside playground activity," moved practice for certain team sports inside, and prohibited "the kids from walking between classes outside." ROA.1108.

---

[1] The photo in this exhibit depicts a vehicle parked in the spot where Allam regularly parked his SUV. *See* ROA.214 n.1.

On the afternoon of January 29, a concerned parent confronted Allam and asked him to move his car from near the school. ROA.1114. Allam responded: "I have a mission. After Monday I will no longer be here and no one will ever see me again." ROA.1114. The parent interpreted Allam's statement as a direct threat to attack people at the school the following day and reported Allam to the Beaumont Police Department. ROA.1115. An officer arrived at the school and parked his patrol car behind Allam's vehicle, which was parked in its usual spot. ROA.1415. Later that evening, the officer observed Allam commit multiple traffic infractions and arrested him for a repeated traffic violation. ROA.391, 1415. During an inventory search of Allam's car, officers found a backpack with marijuana residue, a semi-automatic rifle with a 30-round magazine, and 150 rounds of ammunition. ROA.391-393.

Following his arrest, investigators searched Allam's phone, which contained several images of churches, an empty playground, and federal buildings. ROA.1417. Investigators also found a series of concerning notes on Allam's phone. ROA.1417; *see also* ROA.1417-1422. Many of Allam's notes described violent and torturous acts against others, including women and children. *See, e.g.*, ROA.1417-1418 (a note saying "[k]ill your children" and "[r]ape your women"). Allam's notes also included references to various Islamic

extremists, terrorists, and dictators in the Middle East. *See, e.g.*, ROA.1418-1419 (referencing leaders of terrorist organizations).

      B.    <u>A grand jury charges Allam with possessing a firearm in a school zone, and the district court rejects his Second Amendment challenge.</u>

A federal grand jury charged Allam with knowingly possessing a firearm in a place that he knew or had reasonable cause to believe was a "school zone," in violation of 18 U.S.C. § 922(q)(2)(A). ROA.22. As relevant here, that statute defines the term "school zone" to mean the area "within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 U.S.C. § 921(a)(26)(B). Section 922(q)(2)(A) contains numerous exceptions: it does not prohibit firearm possession "on private property not part of school grounds," 18 U.S.C. § 922(q)(2)(B)(i); where an individual is "licensed" to possess a firearm "by the State in which the school zone is located or a political subdivision of the State" if the state or political subdivision has "verif[ied] that the individual is qualified under law to receive the license," *id.* § 922(q)(2)(B)(ii); or where the firearm is "not loaded" and is "in a locked container, or a locked firearms rack that is on a motor vehicle," *id.* § 922(q)(2)(B)(iii), among other circumstances, *see id.* § 922(q)(2)(B)(iv)-(vii) (listing additional exceptions).

Allam moved to dismiss the indictment, arguing that Section 922(q)(2)(A)'s prohibition on firearm possession within a school zone violates

the Second Amendment on its face and as applied. ROA.45-61. The district court denied Allam's motion. ROA.332-386.

The district court held that the Second Amendment's text covered Allam's conduct, ROA.338-345, and that the Supreme Court's repeated assurances concerning "sensitive places" did not apply to the area surrounding a school, ROA.346-356. However, the court held that Section 922(q)(2)(A)'s limited prohibition on firearm possession is consistent with our Nation's historical tradition of firearm regulation under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). ROA.356-386. The district court observed that "[s]chool shootings have lamentably become a part of this Nation's present-day reality" to an extent "unprecedented" at the founding, thus warranting "a more nuanced [historical] analysis." ROA.365-367.

Turning to the history, the court rejected historical restrictions on the carrying of arms at certain universities because those laws applied only to concealed arms and only to students. ROA.368-373. The court also expressed doubt that "three university regulations that applied only to students" can "be representative of our Nation's tradition of firearms regulation." ROA.373. But the court held that state and territorial restrictions on firearm possession in schools and other educational settings, ROA.373-379, and laws banning guns

around certain sensitive places—so-called "buffer zone" restrictions, ROA.379-382—were sufficiently analogous to Section 922(q)(2)(A).

The court acknowledged that "there is no historical precursor to § 922(q)(2)(A) that is a 'twin' or 'dead ringer.'" ROA.383. But the court reasoned that historical laws prohibiting firearm possession "in schools and within the vicinity of polling places" were relevantly similar to the challenged statute. ROA.383; *see also* ROA.383-386. As to "why" they burden firearm possession, the court explained that historical laws were similar to Section 922(q)(2)(A) because they were "enacted to keep firearms out of schools" and "to protect the children and the teachers therein." ROA.384. Historical laws restricting the carrying of arms around sensitive places similarly "were justified by states' need to protect citizens from firearm violence or the threat of firearm violence in and around polling places." ROA.384. As to "how" they burden firearms rights, the district court recognized that Section 922(q)(2)(A)'s limited prohibition is narrower than the "complete prohibitions" on firearm possession around polling places. ROA.385. And the court explained that any distinction between historical laws' temporal scope—which was generally limited to the days that polls or registration sites were open—and Section 922(q)(2)(A)'s was "not determinative" given Section 922(q)(2)'s distinct purpose of addressing the modern problem of shootings in and near schools. ROA.385.

The district court acknowledged that "some courts" might consider late-19th-century analogues "'too remote' to inform the Second Amendment analysis." ROA.385. But the court reasoned that the Supreme Court's decision in *Bruen* justifies relying on those historical laws "where unprecedented societal concerns have arisen." ROA.385. The court also noted that "the lack of numerous precursors" was "not dispositive." ROA.385. Accordingly, the court concluded that "taken together, the late nineteenth-century prohibitions on carrying firearms in schools and in and around polling places have a similar justification and impose 'a comparable burden on the right of armed self-defense' as § 922(q)(2)(A), even if they burden the right in slightly different ways." ROA.386.

Finally, in a footnote, the district court held that Allam's as-applied challenge to Section 922(q)(2)(A) "must fail." ROA.343 n.15. The court explained that Allam's only argument challenging the statute's validity as applied to him—that the statute violated the Second Amendment because "he 'was arrested on a Sunday evening' when '[n]o children were in school or present,'" ROA.342 n.15—was refuted by the undisputed facts, which showed that Allam possessed a firearm "while school was in session." ROA.342-343 n.15. In light of these uncontested facts, the court reasoned that the statute is constitutional as applied to the facts of Allam's case. ROA.342-343 n.15.

## SUMMARY OF ARGUMENT

The district court correctly upheld Section 922(q)(2)(A) under the Second Amendment. That statute's limited prohibition on firearm possession in a place an individual knows is a school zone comports with the Second Amendment for two independent reasons.

First, the Supreme Court's Second Amendment precedents support Section 922(q)(2)(A)'s constitutionality here. Those decisions strongly suggest that laws prohibiting firearm possession in certain sensitive places, including schools, are consistent with the Second Amendment. The Court's repeated assurances provide a basis for upholding Section 922(q)(2)(A)'s limited ban, particularly as applied in this case, where Allam possessed a semi-automatic weapon just feet away from an elementary school's grounds and directly across from the school's playground. Allam's rigid interpretation of the Supreme Court's description of sensitive places to exclude any area that is not "in" a school improperly reads the Court's opinions like statutes and ignores the undisputed circumstances of his own possession.

Second, Section 922(q)(2)(A) is consistent with our Nation's historical tradition of firearm regulation. That statute's limited prohibition reflects the longstanding principle that legislatures may limit firearm possession in or near places, such as schools, where their presence would pose a heightened risk of

danger. For more than two centuries, legislatures have increasingly prohibited students and others from possessing firearms on school grounds to protect children, faculty, and staff. And shortly after the founding, legislatures began imposing limits on gun possession near sensitive places to protect individuals entering and leaving those places from harm. These historical regulations, when taken together, demonstrate legislatures' authority to restrict gun possession where their presence poses a heightened risk of danger.

Section 922(q)(2)(A) is relevantly similar to these historical prohibitions. Like historical restrictions on gun possession in and around schools, universities, and polling places, Section 922(q)(2)(A) is intended to protect individuals from potential firearm violence. And Section 922(q)(2)(A) is less burdensome than historical firearm restrictions around sensitive areas like polling places, which imposed complete prohibitions on gun possession. Section 922(q)(2)(A) is not identical to these laws, but the district court correctly determined that it is analogous enough to pass constitutional muster.

Allam's piecemeal rejection of the government's historical analogues based on minute distinctions with Section 922(q)(2)(A) mirrors the analytical approach rejected by the Supreme Court in *United States v. Rahimi*, 144 S. Ct. 1889 (2024). His attempt to cast the government's historical analogues as "too late" downplays the unprecedented nature of school shootings and disregards

the Supreme Court's own treatment of post-ratification history in analyzing the contours of constitutional rights. And his substantive disagreements with the historical evidence lack merit. The district court properly determined that the government's proffered historical laws are sufficient to justify Section 922(q)(2)(A)'s constitutionality.

Finally, Allam cannot show that Section 922(q)(2)(A) is unconstitutional as applied to him. Allam undisputedly possessed a semi-automatic rifle, a high-capacity magazine, and 150 rounds of ammunition within a few feet of an elementary school. As the district court determined, Allam's as-applied challenge necessarily fails based on these facts. Allam's general claims hypothesizing the circumstances in which Section 922(q)(2)(A) might be unconstitutional are inapplicable here and in any event provide no basis for holding that the statute violates the Second Amendment.

## ARGUMENT

## SECTION 922(Q)(2)(A) IS CONSTITUTIONAL AS APPLIED TO ALLAM

### I. Standard of Review

This Court reviews constitutional challenges to a statute de novo. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## II.    The Supreme Court's Second Amendment Decisions Support Section 922(q)(2)(A)'s Constitutionality As Applied to Allam.

The Supreme Court's Second Amendment precedents have repeatedly suggested that bans on firearms in sensitive places such as schools comport with the Second Amendment. The Court's assurances provide a sufficient basis for upholding Section 922(q)(2)(A), particularly as applied to the facts of this case.

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). But the Court emphasized that, like most rights, "the right secured by the Second Amendment is not unlimited": it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court thus cautioned that "nothing in [its] opinion should be taken to cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," among other "longstanding prohibitions." *Id.* at 626-27. The Court characterized these laws as "examples" of "presumptively lawful regulatory measures," but emphasized that its list was not "exhaustive." *Id.* at 627 n.26. In *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), a plurality of the Court "repeat[ed *Heller*'s] assurances" about the constitutionality of laws prohibiting firearms in "schools."

In *Bruen*, the Court expounded upon its earlier assurances regarding "laws forbidding the carrying of firearms in sensitive places such as schools and

government buildings." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022). On reviewing the historical record, the Court determined that there were few places—"*e.g.,* legislative assemblies, polling places, and courthouses"—where "weapons were altogether prohibited." *Id.* But the Court discerned "no disputes regarding the lawfulness of such prohibitions" and thus took it as "settled" that "these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* And the Court reasoned that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis omitted).

The Supreme Court's statements provide a sufficient basis for treating schools as "sensitive places" where "arms carrying could be prohibited consistent with the Second Amendment." *Id.* The Supreme Court has repeatedly characterized schools as among the "longstanding" sensitive places where arms-bearing may be limited. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 30. And it suggested in *Bruen* that schools are sufficiently like the non-exhaustive list of "settled" locations where firearm possession may be "altogether prohibited." *Bruen*, 597 U.S. at 30; *see also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 206 (S.D.N.Y. 2023) (reading *Bruen* to have "'assumed it settled

14

that' schools full of children were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment").

That reasoning makes sense. Courthouses and legislative assemblies, two of the "settled" sensitive places, *Bruen*, 597 U.S. at 30, serve an important public function whose purpose would be upended by the pervasive presence of firearms. *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 246 (2018); *see also Hill v. State*, 53 Ga. 472, 478 (Ga. 1874) (upholding a state statute that prohibited carrying weapons into a court of justice and explaining that "[t]he right peaceably to do any … public duty" is "seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for battle"). The same is true for schools. Guns in and around schools make "teachers unable to teach" and "students unable to learn." *United States v. Lopez*, 514 U.S. 549, 619 (1995) (Breyer, J., dissenting). The presence of firearms thus "significantly undermine[s] the quality of education" in schools. *Id.*; *see also id.* (reasoning that "guns and learning are mutually exclusive"). Consequently, legislatures may limit firearm possession in schools to ensure that students "may perform the purpose of their assembling unmolested by terror, or danger, or insult." *Hill*, 53 Ga. at 478; *see also* ROA.355 (explaining that "the justification commonly attributed to schools' classification as 'sensitive places' is based on the concentration of minors therein").

That reasoning is sufficient to reject Allam's as-applied Second Amendment challenge to Section 922(q)(2)(A). And that is particularly so given the facts of this case, where Allam possessed a high-powered semi-automatic firearm and loads of ammunition directly across the street from an elementary school and in an area that students traversed to attend school-related activities. ROA.333, 390, 1108; *cf.* ROA.355 (suggesting that the "justification" for classifying schools as "sensitive places" makes sense in the area near school grounds).

Allam contends that this Court should disregard the Supreme Court's statements altogether and instead engage in *Bruen*'s text-and-history analysis. Br. 36, 42. But this Court generally defers to Supreme Court dictum, especially where the Supreme Court has repeated and expounded upon the dictum across multiple cases. *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024). *Heller*'s repeated assurances about the lawfulness of laws regulating firearms in schools, and *Bruen*'s reasoning expounding upon the basis for those assurances, merit this Court's consideration and deference.[2]

---

[2] In *United States v. Diaz*, 116 F.4th 458, 465-66 (5th Cir. 2024), this Court rejected as non-binding *Heller*'s assurances characterizing laws prohibiting firearm possession by felons as "longstanding" and "presumptively lawful." *Diaz* does not compel a similar outcome here, where *Bruen* reaffirmed *Heller*'s assurances and elaborated upon the basis for the Court's prior statements regarding "sensitive places." *Bruen*, 597 U.S. at 30. *Bruen*'s reasoning is sufficient

16

Allam argues (Br. 19) that the Court's assurances are irrelevant here because the its decisions used the preposition "in" when referring to schools as sensitive places. *See also* ROA.354 (rejecting *Heller*'s and *Bruen*'s assurances because the Supreme Court did not use the words "around" or "near" when referring to schools). According to Allam, the Supreme Court's choice of words necessarily limits its statements to the inside of schools, not school zones. But that rigid interpretation "slices *Heller*[] too thin," *United States v. Class*, 930 F.3d 460, 463-64 (D.C. Cir. 2019), and makes the "mistake" of "read[ing] judicial opinions like statutes," *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2281 (2024) (Gorsuch, J., concurring). Indeed, it would make little sense to read *Heller*'s and *Bruen*'s approval of laws prohibiting firearm possession in schools as casting doubt on laws prohibiting firearm possession mere feet from school grounds. *Accord Class*, 930 F.3d at 464 (explaining that "the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms" on property around the building as well).

That illogic is especially glaring on the facts of this case. Allam did not merely possess a firearm somewhere within the 1,000-foot school zone; he

---

to affirm. But even if this Court disagrees, Section 922(q)(2)(A) is consistent with our nation's historical tradition of firearm regulation, and this Court can affirm the district court's judgment on that basis. *See infra* 19-28.

parked directly across from the school's gym, fields, and playground, ROA.333, "a potential stalking ground for anyone wishing to attack" children across the street, and close enough to school grounds to threaten students' ability "to freely and safely travel to and from" school, *Class*, 930 F.3d at 464.

Nor does it matter that Allam was not *on* school grounds when he possessed a firearm. *Contra* Br. 19; ROA.355. He was within 40 feet of the school, parked on a street that students regularly crossed to attend off-site but school-related activities, and had a clear view of various parts of the school, including its playground. ROA.333, 390, 1415. He could thus be disarmed consistent with the Supreme Court's assurances. *Accord United States v. Lewis*, Crim. No. 2008-45, 2008 WL 5412013, at *2 (D.V.I. Dec. 24, 2008) (holding that "*Heller* unambiguously forecloses a Second Amendment challenge" to Section 922(q)(2) because a school zone "is precisely the type of location of which *Heller* spoke"); *Frey*, 661 F. Supp. 3d 176, 206 (reading *Bruen* to "settle[]" the characterization of schools as "sensitive places").

Finally, Allam cites (Br. 46-47) several cases that he contends undermine reliance on the Supreme Court's assurances to justify Section 922(q)(2)(A). But none of those decisions addressed the constitutionality of schools or the area immediately surrounding schools. And none of those decisions questioned the persuasive effect of *Heller*'s and *Bruen*'s assurances regarding schools. To the

contrary, several courts have explicitly reinforced *Heller* and *Bruen* as "settl[ing]" the constitutionality of laws prohibiting firearms in schools and closely analogous places. *Siegel v. Platkin*, 653 F. Supp. 3d 136, 154 (D.N.J. 2023) (determining that youth sports events "are a 'sensitive place'" because they "fall within the sphere of schools," which "the Supreme Court has recognized" as a sensitive place); *see also, e.g.*, *Koons v. Platkin*, 673 F. Supp. 3d 515, 643 (D.N.J. 2023) (similar). That same reasoning warrants upholding Section 922(q)(2)(A) here.

## III. Section 922(q)(2)(A) is Consistent With Our Nation's Historical Tradition of Firearm Regulation.

Even if the Supreme Court has not definitively settled the question of Section 922(q)(2)(A)'s constitutionality in this case, *Bruen*'s text-and-history framework demonstrates that that provision passes constitutional muster. The Supreme Court has instructed that to assess whether a "challenged regulation is consistent with the principles that underpin our regulatory tradition," courts "must ascertain whether the law is 'relevantly similar' to laws that our tradition is understood to permit," focusing on "[w]hy and how the regulation burdens the right." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (citation omitted). The district court correctly held that, based on those metrics, Section 922(q)(2)(A) is consistent with various longstanding historical prohibitions on gun possession in and around schools and polling places. ROA.356-386. Those

laws, in addition to historical restrictions on gun possession on university campuses, reflect the principle that legislatures may prohibit firearm possession in places where their presence would pose a heightened risk of danger and where individuals need heighted protection from potential firearm violence. Section 922(q)(2)(A) thus comports with the Second Amendment.

A.    Legislatures have long prohibited firearm possession in or near schools and universities.

Since shortly after the founding, legislatures have limited firearm possession in schools, on school grounds, and in the area around schools. And as firearms became more deadly and school-related shootings increased, those restrictions proliferated across the country. Section 922(q)(2)(A) is relevantly similar to those historical and longstanding restrictions.

1.    Prohibitions on students' possession of arms on university campuses

The historical record yields several prohibitions on firearm possession on university campuses. *See* ROA.229. For example, an 1810 regulation at the University of Georgia "ordained" that "no student shall be allowed to keep any gun, pistol, … or any other offensive weapon in College or elsewhere," including "out of the college." *The Minutes of the Senatus Academicus of the State of Georgia*, 1799-1842, at 86 (Aug. 1810). The University of Virginia Board of Visitors, whose members included Thomas Jefferson and James Madison, implemented

a similar restriction, resolving that "[n]o Student shall, within the precincts of the University, … keep or use weapons or arms of any kind, or gunpowder[.]" *University of Virginia Board of Visitors Minutes*, at 71-72 (Oct. 1824). And in 1838, the University of North Carolina established that "[n]o Student shall keep … fire arms, or gunpowder." *Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina*, at 15 (Sept. 1838).

Throughout the 1800s and early 1900s, similar restrictions were instituted at various colleges and universities throughout the country, including Waterville College in Maine, McKenzie College in Texas, Kemper College in Missouri, the University of Nashville, and Dickinson College in Pennsylvania.[3] Today, many states prohibit or strictly limit firearm possession on school grounds subject to certain exceptions.[4] And in the absence of a relevant state statute, several

---

[3] *See* Waterville College, Laws of Waterville College, Maine, at 11 (1832); "Laws of McKenzie College," in University of Texas, The Correlation of High School and College Courses in the Sciences, at 392-93 (1918); Kemper College, The Laws of Kemper College Near Saint Louis, Missouri, at 9 (1840); "University of Nashville," American Annals of Education and Instruction, for the Year 1837, at 7:185 (1938); Dickinson College, The Statutes of Dickinson College, at 22-23 (1830).

[4] *See, e.g.*, Ariz. Admin. Code § 7-4-102(3); Cal. Penal Code § 626.9(h), (i); D.C. Code § 7-2509.07(a)(2); Fla. Stat. § 790.115(2); Idaho Code § 18-3309(1), (2); Iowa Admin. Code 681-9.1(262)(g); La. Stat. Ann. § 40:1379.3; Md. Code Ann., Crim. Law § 4-111(d); Mass. Gen. Laws ch. 269, § 10(j); Neb. Rev. Stat. § 28-1204.04(1); N.J. Stat. Ann. § 2C:39-5(e)(1); N.M. Stat. Ann. § 30-7-2.4;

universities and colleges have implemented policies regulating firearm possession and use on campus.[5]

### 2. Laws prohibiting firearm possession in schools and other educational settings

There is also a sufficiently longstanding tradition of legislatures restricting the carrying of firearms in or around other schools. One of the first restrictions, an 1871 Texas law, prohibited "any person" from carrying "a pistol or other firearm" into (among other places) "any school room, or other place where persons are assembled for … educational or scientific purposes." Act of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws. 25-26. An 1878 Mississippi law prohibited university students from carrying a pistol or other concealed weapon. Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 176. Missouri also prohibited "any person" from carrying "any kind of fire arms" into, among other places, "any school room or place where people are assembled for educational, literary or social purposes." Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76. By the end of the 1800s, Arizona and Oklahoma had passed similar restrictions.[6] And the

---

N.Y. Penal Law § 265.01-a; N.C. Gen. Stat. § 14-269.2; S.C. Code Ann. § 16-23-420.

[5] *See* Giffords Law Center, *Guns in Schools*, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/guns-in-schools/(citing various school policies).

[6] Act of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31 (prohibiting "any person" from having or carrying "about his person a pistol or

legislative trend of restricting firearm possession in schools continued into the early 1900s. In 1903, Montana passed a law prohibiting individuals from carrying firearms into schools or other educational settings. Act of Feb. 27, 1903, ch. 35, § 3, 1903 Mont. Laws 49-50. And in 1927, North Carolina did the same. Act of Feb. 12, 1927, §§ 1-5, 1927 N.C. Sess. Laws, Public-Local Laws 68.

There were understandably few 18th-, 19th-, and early 20th-century laws limiting firearm possession in and near schools. *Bruen*, 597 U.S. at 30. During that period, there were hardly any reports of school-related shootings. *See* ROA.365 n.34. And owing to the cumbersome nature of firearms, there was likely little concern that individuals would use firearms to harm others. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," in Jennifer Tucker, *et al.*, *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019) (explaining that in early America, using a firearm to harm others was rare because muzzle-loading firearms had limitations as weapons). The most commonly used firearms often misfired, and with the exception of a few double-barreled pistols, they could not fire multiple shots. *Id.* at 117. And because firearms usually took at least a minute to load,

---

other firearm" into "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes"); The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws 495-96 (similar).

they could not be used impulsively unless they were already loaded for some other purpose. *Id.*

Beginning in the mid-to-late 1800s, however, firearms became less unwieldy and more accessible. *Id.* at 121. And in the ensuing decades, school shootings became more common. ROA.365-366. In response, states, territories, and municipalities increasingly restricted firearm possession and use in and near schools. Today, nearly every state and territory prohibits firearm possession in schools, on school grounds, or near schools.[7]

> B.  <u>Legislatures have long prohibited firearm possession around sensitive places like polling places and schools</u>

In addition to regulating firearm possession in schools and universities, legislatures have long prohibited individuals from possessing firearms in the area

---

[7] *See, e.g.*, Ala. Code § 13A-11-72; Alaska Stat. §§ 11.61.210, 18.65.755; Ariz. Rev. Stat. Ann. § 13-3102; Ark. Code Ann. §§ 5-73-119, 5-73-306; Cal. Penal Code § 626.9; Colo. Rev. Stat. §§ 18-12-105.5, 18-12-214; Conn. Gen. Stat. § 53a-217b; D.C. Code §§ 7-2509.07, 22-4504; Del. Code Ann. tit. 11, § 1457A; Fla. Stat. §§ 790.115, 810.095, 790.06; Ga. Code Ann. § 16-11-127.1; Idaho Code § 18-3302D(1), (2)(e); Iowa Code §§ 280.2, 724.4B(1); Ky. Rev. Stat. Ann. § 527.070(1); La. Stat. Ann. § 14:95.2(A); Me. Rev. Stat. Ann. tit. 20-A, § 6552(1); Md. Code Ann., Crim. Law §§ 4-102, 4-111(a), (c); Mass. Gen. Laws ch. 269, § 10(j); Minn. Stat. § 609.66 Subd.1d; Mont. Code Ann. § 45-8-361(1); Neb. Rev. Stat. § 28-1204.04; N.J. Stat. Ann. § 2C:39-5(e); N.Y. Penal Law § 265.01-a; N.C. Gen. Stat. § 14-269.2; N.D. Cent. Code, § 62.1-02-05; Okla. Stat. tit. 21, § 1280.1; S.C. Code Ann. § 16-23-420; Tenn. Code Ann. § 39-17-1309; Tex. Penal Code § 46.03(a)(1); Vt. Stat. Ann. tit. 13, § 4004; Va. Code Ann. § 18.2-308.1; Wash. Rev. Code Ann. § 9.41.280; Wis. Stat. § 948.605.

surrounding certain sensitive places. In 1534, King Henry VIII issued a version of the Statute of Northampton, applicable to Wales, which prohibited arms within two miles of a court. 26 Hen. 8, c.6, § 6 (1534); *see Bruen*, 597 U.S. at 30 (characterizing "courthouses" as sensitive places). At the founding, Delaware's constitution prohibited militias from assembling "within one mile of a polling place" during the 24 hours before the polls opened and until 24 hours after the polls closed. Del. Const. art. 28 (1776).

Several states likewise passed laws prohibiting the carrying of arms around sensitive places. In 1870, Louisiana passed a law prohibiting the carrying of firearms on election day and within a half mile of any place of registration or revision of registration. Act of March 16, 1870, No. 100, § 73, 1870 La. Acts 159-60. Texas also had a law that prohibited any person from carrying a firearm within a half mile of a polling place during polling hours. 2 A Digest of the Laws of Texas, Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, From 1754 to 1874, at 1317-18 (4th ed. 1874). In 1874, Maryland banned carrying arms in Kent County on election day, and 12 years later the Maryland legislature passed a law prohibiting the carrying of arms "within 300 yards of the polls on election day in Calvert County." 2 Public Local Laws of Maryland, Articles 11-24, at 1457 (King Bros., ed. 1888); Act of April 7, 1886, ch. 189, 1886 Md. Laws 315.

Those prohibitions sometimes extended to the area surrounding schools. In 1879, Missouri prohibited "any person" from discharging "any gun, pistol or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes." Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90. The statute defined "immediate vicinity" to mean "a distance not exceeding two hundred yards." *Id.* § 3, at 91.

C.   Section 922(q)(2)(A) is relevantly similar to these historical laws when considered together.

Section 922(q)(2)(A) is "relevantly similar" to historical laws and regulations prohibiting the possession and carrying of arms on universities, in schools, and around sensitive places like polling places. *Rahimi*, 144 S. Ct. at 1898.

Start with the justification. Congress passed Section 922(q)(2)(A) as part of the Gun Free School-Zones Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789, 4844. Given the increasing number of then-unprecedented shootings in and around schools, *see* ROA.365-367, Congress recognized that "ordinary citizens" may "fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason." 18 U.S.C. § 922(q)(1)(E). Because of the impact school shootings have on "the quality of education in our country," *id.* § 922(q)(1)(F), and the difficulties that "[s]tates, localities, and school

systems" had "handl[ing] gun-related crime by themselves," *id.* § 922(q)(1)(H), Congress passed Section 922(q)(2)(A) with the primary purpose of "ensur[ing] the integrity and safety of the Nation's schools," *id.* § 922(q)(1)(I). *See also Lopez*, 514 U.S. at 619 (Breyer, J., dissenting) (explaining legislative background of the Gun Free School-Zones Act).

Historical restrictions on possessing arms in and around schools and other sensitive places had similar purposes to Section 922(q)(2)(A). As the district court explained, historical laws prohibiting the carrying of arms in or around schools were "enacted to keep firearms out of schools" and "to protect the children and the teachers therein." ROA.384. Likewise, the historical prohibitions on carrying firearms around schools and polling places "were justified by states' need to protect citizens from firearm violence or the threat of firearm violence in and around polling places." ROA.384. And although the district court disagreed, *see* ROA.368-373, historical restrictions on gun possession by students on university campuses had as at least one purpose the protection of students, faculty, and staff from harm, just like Section 922(q)(2)(A).

Section 922(q)(2)(A) also imposes burdens sufficiently similar to historical restrictions on possessing arms in and around schools and other sensitive places. Like historical laws restricting carrying firearms in or near schools, Section

922(q)(2)(A) is generally applicable to "any" person. And it "is not a total prohibition on all persons carrying any firearm in the vicinity of a school under all circumstances." ROA.384. It is thus less burdensome than historical restrictions on firearm possession near polling places, which "did not have carve-outs similar to those contained in § 922(q)(2)(B)." ROA.385; *see also* ROA.385 (characterizing historical laws restricting firearm possession around sensitive places as "complete prohibitions"). Furthermore, the fact that polling-place restrictions "were limited in time" is "not determinative" for purposes of assessing Section 922(q)(2)(A)'s constitutionality. ROA.385. What matters is that historically, legislatures viewed firearm prohibitions in the limited area around sensitive places as sometimes necessary to protect individuals walking to and from those places from harm with a firearm. "Accordingly, our Nation's history of firearms regulation is not antithetical to prohibiting firearms in a zone around a particular sensitive place." ROA.385.

To be sure, Section 922(q)(2)(A) is not identical to the historical restrictions discussed above. "[B]ut it does not need to be." *Rahimi*, 144 S. Ct. at 1901. Its limited prohibition on firearm possession within a school zone fits comfortably within the regulatory tradition that historical school-related and buffer-zone restrictions "represent." *Id.*

D.  <u>Allam's arguments lack merit.</u>

Allam's arguments that the government's historical analogues are insufficient lack merit.

1.     Allam first contends that laws from the late 19th century cannot provide insight into the meaning of the Second Amendment at all, particularly where "a federal statute is challenged." Br. 49-50, 59. But the Supreme Court has explained that 19th-century evidence constitutes a "critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20, 36 (quoting *Heller*, 554 U.S. at 650, 614); *see also Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring) (emphasizing that "post-ratification history" represents "a proper tool to discern constitutional meaning"); *id.* at 1924 (Barrett, J., concurring) (recognizing that "postenactment history can be an important tool"). The Court's extensive review of 19th-century evidence in both *Heller* and *Bruen* confirms that such evidence plays an important role in the Second Amendment analysis. *See Heller*, 554 U.S. at 605-19; *Bruen*, 597 U.S. at 30, 35-36, 50-56.

As Justice Kavanaugh emphasized in his *Rahimi* concurrence, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." 144 S. Ct. at 1917. "Reliance on post-ratification history" has thus "shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every

stripe." *Id.* at 1918 (quotation marks omitted). In analyzing the First Amendment, for example, the Court has reviewed 19th-century sources in discussing "historic and traditional" exceptions to the free speech right. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (quotation marks omitted); *see, e.g.*, *Roth v. United States*, 354 U.S. 476, 483-85, 483 n.13, 485 n.17 (1957) (citing 19th-century laws in determining whether obscenity is protected by the First Amendment). In Sixth Amendment cases, the Court has likewise consulted 19th-century evidence. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1396 (2020) (citing evidence from "throughout the 19th century" in addressing right to a jury trial); *Crawford v. Washington*, 541 U.S. 36, 49-50 (2004) (citing mid-19th-century materials in defining the Confrontation Clause's scope). There is no basis for adopting a more circumscribed view of the relevant historical evidence in Second Amendment cases.

Moreover, the Supreme Court has recognized that the Second Amendment codified a "pre-existing right" regarded as "venerable" when the Amendment was ratified in 1791, *Heller*, 554 U.S. at 570, 603, 605, and "still recognized to be fundamental" in the mid-to-late 19th century, *McDonald*, 561 U.S. at 773. Sources from both before and after 1791 thus provide insight into what the right to bear arms entails. Nineteenth-century history warrants particular weight because the Supreme Court has determined that the firearms

rights protected by the Second Amendment and the Fourteenth Amendment "have the same scope." *Bruen*, 597 U.S. at 37. Tracing the meaning of a right codified in 1791 and renewed in 1868 requires a review of sources from both periods. Indeed, *Bruen* recognizes that "a regular course of practice" arising after those periods "can liquidate [and] settle the meaning of disputed or indeterminate terms" in the Constitution. *Id.* at 35-36 (citation and quotation marks omitted).[8] The district court thus properly determined that "late nineteenth-century analogues" are not "'too remote' to inform the Second Amendment analysis." ROA.385.

More than that, disregarding relevant post-founding historical evidence would make little sense in this context, where the uniquely modern scourge of school-related shootings is an "unprecedented societal concern[]" that was unimaginable to founding-era legislatures. *Bruen*, 597 U.S. at 27; ROA.364-368. Virtually unheard of at the founding, school shootings are "lamentably" commonplace today. *See* ROA.364-366. And the technological advancements in

---

[8] The Supreme Court has not resolved the "ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right" in 1791, when the Second Amendment was ratified, or in 1868, when the Fourteenth Amendment was ratified. *Rahimi*, 144 S. Ct. at 1898 n.1 (quoting *Bruen*, 597 U.S. at 37) (emphasis added). But the answer to that question does not affect the important role of post-ratification history in the interpretation of constitutional text, including the Second Amendment. *See Bruen*, 597 U.S. at 38; *Rahimi*, 144 S. Ct. at 1912 (Kavanaugh, J., concurring).

firearm technology render school shootings even more deadly. *See supra* 23-24. Because the "regulatory challenges posed by firearms today are not … the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," *Bruen*, 597 U.S. at 27-28, it is necessary to analyze relevant post-founding evidence to properly conduct the historical inquiry.

2.    Allam's amicus contends that when a challenged law regulates conduct that already existed at the Founding, the absence of widespread historical laws restricting that same conduct suggests that the Founders understood the Second Amendment to preclude such regulation. Amicus Br. 5. But there is little indication that mass school shootings of the sort that are commonplace today existed at the founding. ROA.364-368. And it certainly was not a "societal concern" that might have warranted similar regulation at the founding. *See* ROA.364-368. Nor is there any evidence that the founders refrained from enacting similar regulations because of constitutional concerns.

Even assuming the amicus' premise (that school shootings were a problem at the founding) is correct, its contention that the absence of founding-era regulations is constitutionally dispositive is flawed. That logic echoes the dissent in *Rahimi*, which asserted that Section 922(g)(8) violates the Second Amendment because "interpersonal violence" has existed since the founding, yet the founders addressed the problem "'through the materially different means'

of surety laws." *Rahimi*, 144 S. Ct. at 1933 (Thomas, J., dissenting) (quoting *Bruen*, 597 U.S. at 26). The *Rahimi* majority rightly rejected that reasoning. *Id.* at 1903. As Justice Barrett explained in concurrence, the *Rahimi* dissent's approach carries "serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber,'" and "assum[ing] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). The *Rahimi* majority's approach instructs courts not to mistakenly equate historical inaction with unconstitutionality. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional …").

    3.    Allam's attempts to distinguish the "how" and "why" of historical laws from Section 922(q)(2)(A) are also irreconcilable with *Rahimi*. Br. 56-64; *see also* ROA.368-373 (district court distinguishing the "how" and "why" of historical university restrictions). *Rahimi* indicates that in consulting historical regulations to discern why and how they burdened the right to bear arms, the goal is not to nitpick by isolating each historical precursor and asking if it differs from the challenged regulation in some way. Such a divide-and-conquer approach to the historical evidence is inconsistent with the Court's assurances

that "a 'historical twin' is not required." *Rahimi*, 144 S. Ct. at 1903 (quoting *Bruen*, 597 U.S. at 30). In *Rahimi* itself, the Court derived the relevant historical principle from "two distinct legal regimes" (surety laws and going armed laws), "[t]aken together." *Id.* at 1899-1901. The dissent criticized the Court for "cobbl[ing] together" multiple historical laws to discern a general principle rather than demanding a closer match to the how and why of "a single historical law," *id.* at 1944 (Thomas, J., dissenting), but the majority's principles-focused approach is not so onerous. The relevant question is whether Congress's determination to prohibit firearm possession within school zones is consistent with the enduring principles that follow from the historical evidence as a whole and "[t]aken together." *Id.* at 1901. Thus, the fact that some historical laws applied specifically to students (Br. 57), or only prohibited carrying concealed firearms on school campuses but seemingly permitted open carry (Br. 60), does not make them improper analogues.

In any event, Allam's qualms with individual historical laws are without merit. Allam claims (Br. 57) that historical laws prohibiting students from possessing firearms on university campuses are not analogous because they were not generally applicable and were focused on restricting students' behavior and moral conduct. Allam's reliance on these distinctions again echoes the dissent's approach in *Rahimi*—which eight justices rejected. The *Rahimi* dissent reasoned

that "affray" (or "going armed") laws had a different purpose than Section 922(g)(8) because they "captured only conduct affecting the broader public" instead of seeking to prevent "interpersonal violence in the home." *Rahimi*, 144 S. Ct. at 1942 (Thomas, J. dissenting). And it argued that laws targeting "dangerous" persons "were driven by a justification distinct from that of § 922(g)(8)" because the historical laws were concerned with "quashing treason and rebellion" whereas Section 922(g)(8) is "concerned with preventing interpersonal violence." *Id.* at 1934-35. The *Rahimi* majority rejected the dissent's conclusion that "the historical analogues for Section 922(g)(8) are not sufficiently similar to place that provision in our historical tradition." *Id.* at 1902-03. The Court said the dissent improperly "read *Bruen* to require a 'historical twin' rather than a 'historical analogue.'" *Id.* at 1903. Allam commits the same error. As explained above, because historical university rules restricted firearm possession on campus, they are one piece of the regulatory tradition that justifies Section 922(q)(2)(A).

Allam likewise claims that "the policies that applied to the student body of just three universities" cannot establish a historical tradition. Br. 57; *see also* ROA.373 (district court using the same reasoning). But the Supreme Court's Second Amendment precedents do not establish a threshold number of historical analogues the government must provide to justify a modern regulation. That is

especially so where, as here, the historical record lacks contrary evidence suggesting that a challenged statute is inconsistent with our nation's historical tradition. *See Bruen*, 597 U.S. at 30 (relying on the "relatively few 18th- and 19th-century 'sensitive places'" laws because the Court was "aware of no disputes regarding the lawfulness of such prohibitions"); *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024) (explaining that when examining whether a modern sensitive-place regulation is lawful, "a small number of laws, even localized laws, can suffice" to establish a tradition "if those laws were viewed as non-controversial") (emphasis omitted). In any event, more than three colleges and universities imposed restrictions similar to those Allam specifically discusses. *See supra* 20-22. There is thus a sufficiently widespread tradition of prohibiting firearms in and near university campuses.

Allam incorrectly contends (Br. 58-59) that Section 922(q)(2)(A) is like the historical territorial restrictions the Supreme Court denounced in *Bruen*. Those laws generally prohibited, with some limited exceptions, "the carry of pistols in towns, cities, and villages." *Bruen*, 597 U.S. at 66. Section 922(q)(2)(A) is much more limited than those broad prohibitions on firearm restrictions and is consistent with the enduring principle that legislatures may impose limited restrictions on firearm possession in and around sensitive places such as schools. *See* ROA.384-385.

Nor does *Bruen*'s rejection of Texas' 1871 "reasonable grounds" law to support New York's public-carry regime suggest that the provision invoked here is insufficient to justify Section 922(q)(2)(A). Br. 58-59. In *Rahimi*, the defendant argued that *Bruen*'s rejection of surety laws rendered them unsuitable for assessing the constitutionality of Section 922(g)(8). *Rahimi*, 144 S. Ct. at 1902. The Supreme Court rejected that argument, explaining that *Bruen*'s rejection of surety laws to justify New York's "broad prohibitory regime" did not mean that those laws could not "be an appropriate analogue for a narrow one." *Id.* Likewise, *Bruen*'s rejection of Texas' broad reasonable-grounds law to justify New York's broad regime does not suggest that a different, narrower subsection of that law cannot justify Section 922(q)(2)(A)'s limited prohibition. That is especially so where at least four other states imposed similar firearm restrictions in schools and other educational settings, *see supra* 22-23, and where there was no historical record suggesting that such restrictions were inconsistent with the Second Amendment, *see Wolford*, 116 F.4th at 980.

Allam next contends (Br. 62-63) that historical restrictions around sensitive places like polling places and schools are not analogous enough to Section 922(q)(2)(A), primarily because they "were limited in time and addressed the unique threats of voter intimidation which do not occur just *in* polling places, but on the sidewalks and streets outside elections." Br. 63.

Allam's argument again flouts *Rahimi*'s principles-based analytical approach, which does not disregard historical analogues based on such minute distinctions. *Rahimi*, 144 S. Ct. at 1899, 1902. Under the proper approach, what matters is that both Section 922(q)(2)(A) and historical laws restricting firearm possession around polling places are aimed at protecting individuals from "firearm violence or the threat of firearm violence" around schools. ROA.384. And as the district court determined, Section 922(q)(2)(A)'s multiple exceptions render it even less burdensome than those historical laws, which imposed a "complete prohibition[]" on firearm possession. ROA.385.

Allam also contends (Br. 62-63) that Delaware's constitutional provision "contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms." But Allam does not identify that other evidence. As explained above, the historical record demonstrates that legislatures viewed restrictions on firearm possession in and around schools and other sensitive places as consistent with the right to keep and bear arms. And to the extent the purported "overwhelming weight" comes from the absence of regulation, as explained above, this Court should not assign constitutional significance to legislative silence. *See Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring).

Finally, Allam's claim (Br. 64) that the district court "strayed … into the type of means-end approach *Bruen* and *Rahimi* rejected" is incorrect. The district

court merely engaged in the analogical reasoning that *Bruen* and *Rahimi* require and correctly determined that Section 922(q)(2)(A) is "relevantly similar" to historical laws. That provision thus comports with the Second Amendment.

    E.    <u>Allam's as-applied challenge fails.</u>

Allam cannot show that Section 922(q)(2)(A) is unconstitutional as applied to him based on his particular circumstances. Indeed, as he did below (*see* ROA.342 n.15), Allam largely ignores the facts of his own case. *See also* Amicus Br. 2 n.2, 15 (encouraging this Court to overlook the admittedly "unsympathetic facts" of Allam's case). But as the district court determined, those facts—that Allam possessed a semi-automatic weapon and more than 100 rounds of ammunition within 40 feet of an elementary school's grounds and directly across from the school playground, after watching the school for days and making concerning statements—demonstrate that Section 922(q)(2)(A) is constitutional as applied to him. ROA.342-343 n.15.

Allam suggests (Br. 12, 14, 16, 54) that the law is unconstitutional as applied to him because he was arrested on a Sunday evening when no children were in school or present. But as the district court determined, Allam undoubtedly "possessed the rifle within the school zone while school was in session." ROA.342-343 n.15. And he repeatedly refused to leave when asked,

prompting the school to move several extracurricular activities indoors or cancel them. *See* ROA.1108.

Allam otherwise makes the unsupported contention (Br. 53) that Section 922(q)(2)(A) violates the Second Amendment because the combined effect of school-zone restrictions is to cover "almost the entirety of every urban location in the United States." But any theoretical effect of the law's outer bounds is irrelevant here, where Allam possessed a semi-automatic rifle across the street from the school's playground and a mere 40 feet from the school's grounds. ROA.333, 390, 1415. Furthermore, the hypothetical outer limits of the law's effect would be no basis for holding that the statute is unconstitutional in this case. As *Rahimi* explained, courts should refrain from "focus[ing] on hypothetical scenarios" where a challenged statute "might raise constitutional concerns." *Rahimi*, 144 S. Ct. at 1903. Applications of the statute that might theoretically raise constitutional questions thus present no basis for striking down Section 922(q)(2)(A) here.

Allam's amicus expresses concern (Amicus Br. 16) that Section 922(q)(2)(A) might "lead to accidental violations" of the law, exposing individuals who "stop for coffee, get gas, or even just drive near a school while otherwise lawfully carrying" to criminal prosecution. *See also* Allam Br. 54. But several aspects of the Section 922(q)(2)(A) protect against that.

First, the statute criminalizes only firearm possession "at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). Thus, an individual's mere proximity to the school with a firearm would not subject them to prosecution under Section 922(q)(2)(A). *See United States v. Guzmán-Montañez*, 756 F.3d 1, 10-12 (1st Cir. 2014) (reversed conviction for insufficient evidence where the government's only proof of *mens rea* was the defendant's proximity to the school); *United States v. Haywood*, 363 F.3d 200, 207-09 (3d Cir. 2004) (similar).

Second, the statute contains various exceptions, including one that permits individuals with qualifying licenses to possess firearms within a school zone, 18 U.S.C. § 922(q)(2)(B)(ii), and one that permits unlicensed individuals to carry an unloaded firearm that is "in a locked container, or a locked firearms rack that is on a motor vehicle," *id*. § 922(q)(2)(B)(iii). These two carveouts, combined with Section 922(q)(2)'s *mens rea* requirement, protect an unwitting but otherwise well-intentioned armed citizen from prosecution.

At bottom, Allam's and his amicus' concerns sound in due process rather than the Second Amendment. *See United States v. Clark*, 582 F.3d 607, 612-13 (5th Cir. 2009) (explaining that "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice"). But Allam does not raise a due process claim. Nor would any such claim succeed: Allam regularly parked his

car mere feet from a school and within eyeshot of a sign indicating that he was in a school zone. *See supra* 3-4. For these reasons, this Court should decline to entertain Allam's arguments. *Accord Rahimi*, 144 S. Ct. at 1903 n.2 (declining to entertain due process challenge although purported concerns with federal gun statute "sound[ed] in due process").

## CONCLUSION

This Court should affirm the district court's judgment.

DAMIEN M. DIGGS
United States Attorney

BRADLEY VISOSKY
Appellate Chief
United States Attorney's Office
Eastern District of Texas

NICOLE M. ARGENTIERI
Principal Deputy Assistant
Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

/s/ Mahogane D. Reed
MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

## CERTIFICATE OF SERVICE

Under Federal Rule of Appellate Procedure 25(d), undersigned counsel certifies that the foregoing Answering Brief for the United States was this day served on counsel for appellants by notice of electronic filing with the Fifth Circuit CM/ECF system.

/s/ Mahogane D. Reed
MAHOGANE D. REED

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,105 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point type Calisto MT font.

/s/ Mahogane D. Reed
MAHOGANE D. REED