No. 24-40065

IN THE

# United States Court of Appeals
# for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee.*

v.

AHMED ABDALLA ALLAM,

*Defendant-Appellant,*

On Appeal from the United States District Court
for the Eastern District of Texas, No. 1:23-CR-10
Before the Honorable Marcia A. Crone

**BRIEF FOR *AMICI CURIAE* MARCH FOR OUR LIVES, BRADY CENTER
TO PREVENT GUN VIOLENCE, TEAM ENOUGH, AND
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
IN SUPPORT OF PLAINTIFF-APPELLEE.**

ELIZABETH A. OCH
HOGAN LOVELLS US LLP
1601 WEWATTA ST. STE. 900
DENVER, CO 80202
(303) 899-7300

Rachel M. Bayer
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

November 13, 2024

JESSICA L. ELLSWORTH
  *Counsel of Record*
JONATHAN L. DIESENHAUS
HANNAH GRAAE
GIL MCDONALD
EVAN GUIMOND
MARIANNA CORTES DEL RIO
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

1. Number and style of case:  *United States v. Allam*, 1:23-CR-10.

2. The undersigned counsel of record certifies that the following listed persons
   and entities as described in the fourth sentence of Rule 28.2.1 have an interest
   in the outcome of this case.  These representations are made in order that the
   judges of this Court may evaluate possible disqualification or recusal.

### *Plaintiff-Appellee*
United States of America

### *Current and Former Attorneys for Plaintiff-Appellee*
Stephan Edward Oestreicher, Jr.
Mahogane Denea Reed
John B. Ross
Bradley Elliot Visosky
Damien M. Diggs
Nicole M. Argentieri
Lissa H. Miller
Joseph Robert Batte

### *Defendant-Appellant*
Ahmed Abdalla Allam

### *Current and Former Attorneys for Defendant-Appellant*
Elizabeth Emanuel
Ryan Withington Gertz
Gary R Bonneaux
John T Floyd, III
Kevin Blake Ross
Thomas William Kelley

### *Amici Curiae*
March for Our Lives
Brady Center to Prevent Gun Violence
Giffords Law Center to Prevent Gun Violence
California Rifle & Pistol Association, Incorporated

Second Amendment Law Center, Inc.
Second Amendment Foundation

***Attorneys for Amici Curiae***
Hogan Lovells US LLP
Michel & Associates, P.C.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF CONTENTS ...................................................................................... iii

INTERESTS OF *AMICI CURIAE* ........................................................................1

INTRODUCTION .................................................................................................3

ARGUMENT .........................................................................................................5

I.    EXPERIENCES OF GUN VIOLENCE SURVIVORS
DEMONSTRATE THE NECESSITY OF RESTRICTING
FIREARMS NEAR SCHOOLS ...........................................................5

    A.    Caitlyne Gonzales and Jazmin Cazares (Uvalde, Texas) ...........7

    B.    Kylie Ossege (Oxford, Michigan) ...............................................9

    C.    Zach Martin and Tom Mauser (Columbine, Colorado)............13

    D.    Kennedy Rodriguez (Santa Fe, Texas) .....................................17

    E.    Camille Paradis and Nicole Melchionno (Newtown,
Connecticut) ..............................................................................19

II.    SECOND AMENDMENT JURISPRUDENCE REQUIRES
CONSIDERATION OF SOCIETAL CONDITIONS AND
EMPIRICAL RESEARCH .................................................................21

    A.    The Modern U.S. Schooling System Is a Recent
Development That Did Not Exist at the Founding or
Reconstruction .........................................................................23

    B.    School Shootings In America Are an Unprecedented
Societal Problem .......................................................................25

    C.    Gun Violence Affects the Physical and Mental Health of
Young People .............................................................................27

CONCLUSION ...................................................................................................29

**TABLE OF CONTENTS—Continued**

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)..................................................................3

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)......................................................3, 4, 21, 22

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024)...................................................4, 22

**STATUTES:**

18 U.S.C. § 922(q)(2)(A) ..................................................*passim*

35 Pa. Stat. and Const. Stat. § 10231.802 ..................................25

Alaska Stat. Ann. § 04.11.410 ..................................................24

Ariz. Rev. Stat. Ann. § 13-3411..................................................25

D.C. Code Ann. § 50-2201.03c..................................................25

Del. Code Ann. tit. 4, § 543 ......................................................24

Fla. Stat. Ann. § 316.306 .........................................................24

Ga. Code Ann. § 16-13-32.4 .....................................................25

La. Rev. Stat. Ann. § 300.8 .......................................................24

Mass. Gen. Laws Ann. Ch. 138, § 16C ......................................24

Md. Code Ann., Transp. § 21-803.1 ...........................................24

Mich. Comp. Laws Ann. § 257.627a...........................................24

Minn. Stat. Ann. § 340A.412 .....................................................24

N.C. Gen. Stat. Ann. § 20-141.1.................................................24

## TABLE OF AUTHORITIES—Continued

N.H. Rev. Stat. Ann. § 126-X:8 ...................................................................25

Okla. Stat. Ann. tit. 47, § 11-806.1 ..........................................................24

Tenn. Code Ann. § 39-17-432 ...................................................................25

Tex. Health & Safety Code Ann. § 481.134(c)(1)....................................25

Tex. Transp. Code Ann. § 545.425 ...........................................................24

Wash. Rev. Code Ann. § 69.50.435 ...........................................................25

Wis. Stat. Ann. § 939.632 ..........................................................................25

**OTHER AUTHORITIES:**

Am. Lung Ass'n, The Ctr. for Tobacco Pol'y & Organizing, *Matrix of Local Ordinances Restricting Tobacco Retailers Near Schools* (2016), https://healthcollaborative.org/wp-content/uploads/2022/10/Matrix-of-Ordinances-Restricting-Retailers-Near-Schools-Sept-2016.pdf ...............................................24

*America After 3PM: Demand Grows, Opportunity Shrinks*, Afterschool All. (2020), https://afterschoolalliance.org/documents/AA3PM-2020/AA3PM-National-Report.pdf ...................................................23

Pilar Bancalari et al., *Youth Exposure to Endemic Community Gun Violence: A Systematic Review*, 7 Adolescent Rsch. Rev. 383 (2022), https://www.tc.columbia.edu/media/microsites/gun-violence-prevention/Youth-Exposure-to-Endemic-Community-Gun-Violence.pdf ...............................................................28

Dessa Bergen-Cico et al., *Community Gun Violence as a Social Determinant of Elementary School Achievement*, 33 Social Work in Pub. Health 439 (2018), https://static1.squarespace.com/static/5c803e91840b1612f58d7053/t/5cdb225ab208fcc2650c261e/1557865051036/Bergen-Cico+School+Performance+and+Gun+Violence--draft+for++distribution.pdf.....................................................6

## TABLE OF AUTHORITIES—Continued

Marika Cabral, Bokyung Kim et al., *Trauma at School: The Impacts of Shootings on Students' Human Capital and Economic Outcomes*, NBER (2020), https://www.nber.org/papers/w28311 ........................6

Valentina Cimolai, *Effects of Mass Shootings on the Mental Health of Children and Adolescents*, 23 Curr Psychiatry Rep. 23 (2021), https://www.proquest.com/openview/97bb06ccb3c0194cfb7bc4cb 79ae1336/1?pq-origsite=gscholar&cbl=4402920 .............................................29

Cnty. of Sonoma, Dep't of Health Servs, *Marijuana: Smoking and Vaping*, https://sonomacounty.ca.gov/health-and-human-services/health-services/marijuana-public-health-and-safety/marijuana-smoking-and-vaping (last visited Nov. 8, 2024) ....................24

Colleen Connolly, *Nearly 90% of Public Schools Now Offer Afterschool Programs*, Youth Today (Nov. 27, 2023), https://youthtoday.org/2023/11/afterschool-programs-nearly-90-of-public-schools-now-offer-afterschool-programs/.................................................23

John Woodrow Cox et al., *More Than 383,000 Students Have Experienced Gun Violence at School Since Columbine*, Wash. Post, https://wapo.st/40MK3TI (last visited Nov. 11, 2024).............................26

Ctr. for Homeland Def. & Sec., *Shooting Incidents at K-12 Schools (Jan 1970-June 2022)*, https://www.chds.us/sssc/charts-graphs/ (last visited Nov. 8, 2024)...................................................................................27

Dep't of Health & Human Servs., *U.S. Surgeon General Issues Advisory on the Public Health Crisis of Firearm Violence In the United States* (June 25, 2024), https://www.hhs.gov/about/news/2024/06/25/us-surgeon-general-issues-advisory-public-health-crisis-firearm-violence-united-states.html ..............................................................................................25

*EWG: Schools Near Pesticide Spray Zones Could Lose Health Protections*, EWG (2023), https://www.ewg.org/news-insights/news/2023/11/ewg-schools-near-pesticide-spray-zones-could-lose-health-protections.................................................................25

## TABLE OF AUTHORITIES—Continued

Jodi L. Ford & Christopher R. Browning, *Effects of Exposure to Violence with a Weapon During Adolescence on Adult Hypertension*, 24 Annals of Epidemiology 193 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4221585/pdf/nihms560504.pdf ....................................................................................28

Giffords Law Ctr., *The Truth About School Shootings* (2019), https://files.giffords.org/wp-content/uploads/2019/02/The-Truth-About-School-Shootings-Report.pdf ......................................................29

Claudia Goldin et al., *Why the United States Led In Education Lessons from Secondary School Expansion, 1910 to 1940* (2008), https://scholar.harvard.edu/files/lkatz/files/why_the_united_states_led_in_education_lessons_from_secondary_school_expansion_1910_to_1940_1.pdf .................................................................................23

Chip Grabow & Lisa Rose, *The US Has Had 57 Times as Many School Shootings as the Other Major Industrialized Nations Combined*, CNN (May 21, 2018), https://www.cnn.com/2018/05/21/us/school-shooting-us-versus-world-trnd/index.html .......................................................................27

*K-12 School Shooting Database*, https://k12ssdb.org/methodology-1 (last visited Nov. 8, 2024)...............................................................26

Nat'l Ctr. for Educ. Stat., *Status Dropout Rates*, https://nces.ed.gov/programs/coe/indicator/coj/status-dropout-rates (last visited Nov. 8, 2024)...............................................................23

Nat'l Ctr. for Educ. Stat., *Table 201.10 Historical Summary of Public Elementary and Secondary School Statistics: Selected Years, 1869-70 through 2015-16*, https://nces.ed.gov/programs/digest/d18/tables/dt18_201.10.asp (last visited Nov. 8, 2024)...............................................................23

## TABLE OF AUTHORITIES—Continued

Nat'l Ctr. for Educ. Stat., *Table 228.14. Number of School Shootings at Public and Private Elementary and Secondary Schools, By Location and Time Period: School Years 2000-01 through 2021-22*, https://nces.ed.gov/programs/digest/d22/tables/dt22_228.14.asp (last visited Nov. 8, 2024).................................................................................27

David Riedman, *K-12 School Shooting Database*, https://k12ssdb.org/data-visualizations (last visited Nov. 8, 2024)...................26

San Francisco Travel Ass'n, *What you Need to Know about Legal Marijuana In California*, https://www.sftravel.com/info/what-you-need-to-know-about-legal-marijuana-california (last visited Nov. 8, 2024) ......................................................................................................................24

Sarah R. Lowe & Sandro Galea, *The Mental Health Consequences of Mass Shootings*, 18 Trauma, Violence & Abuse 62 (2017), https://www.cmhnetwork.org/wp-content/uploads/2018/09/The-Mental-Health-Consequences-of-Mass-Shootings.pdf.......................................28

## INTERESTS OF *AMICI CURIAE*[1]

This brief is filed by *amici* March For Our Lives ("MFOL"), Brady Center to Prevent Gun Violence ("Brady"), Team ENOUGH, and Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"). These organizations are committed to reducing the gun violence that pervades the United States.

MFOL is a non-profit organization of young people across the country fighting for sensible gun violence prevention policies to save lives. Formed after the 2018 mass shooting in Parkland, Florida, MFOL immediately organized the largest single day of protests against gun violence in U.S. history. Hundreds of thousands of people joined its March 24, 2018 march in Washington, D.C. and sibling marches all over the world, and again on June 11, 2022. Students have formed hundreds of MFOL chapters at middle schools, high schools, and college campuses across the country.

Founded in 1974, Brady is the nation's most longstanding nonpartisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to act to prevent gun violence.

---

[1] The parties to this appeal have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part, and that no party or person other than *amici* or their counsel contributed money toward the preparation or filing of this brief.

Team ENOUGH is a youth-led, Brady-sponsored program that educates and mobilizes young people in the fight to end gun violence in the United States. A nationwide coalition of young people and students impacted by gun violence, Team ENOUGH has a substantial interest in defending common sense gun policies that affect the daily lives of young people.

Giffords Law Center is a nonprofit organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others seeking to reduce gun violence and improve community safety. It was formed in 1993 by a group of attorneys after a shooting at a San Francisco law firm and renamed in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Through partnerships with gun violence researchers, public health experts, community organizations, gun owners, and law enforcement officials, Giffords Law Center researches, drafts, and defends laws, policies, and programs proven to reduce gun violence.

*Amici* have a shared interest in reducing gun violence to protect the lives of all Americans and bring extensive expertise regarding firearm regulations and gun violence in the United States. They have a substantial interest in ensuring the Constitution is correctly interpreted to allow for effective, common-sense gun violence prevention measures fully consistent with the Second Amendment. In this brief, *amici* show that 18 U.S.C. § 922(q)(2)(A), which limits firearms within 1,000 feet

of a school, is consistent with the principles underpinning the history and tradition of the nation—a history and tradition that preserves and protects the free exercise of civic engagement, among other core American values.

## INTRODUCTION

This case is about protecting young people in America from the horrors of gun violence in one of their most frequented places: school. Defendant challenges the constitutionality of a statute limiting carrying firearms within 1,000 feet of a school. This statute affords critical protections to students as they go about their business attending school. Young people spend the majority of their waking hours in and around schools, from formal education to extracurricular activities to socializing in the school yard. For schools to achieve their purpose, they must be a safe space free from gun violence.

The trial court correctly held that schools and their immediate surroundings are sensitive and protectable places where Congress can restrict guns. *Amici* agree with the Government that Section 922(q)(2)(A)'s limited prohibition on firearm possession in a school zone comports with the Second Amendment. Gov't Br. at 10. The Supreme Court has made this sensitive nature of schools quite clear. *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). That alone can and should end this Court's inquiry. *Amici* write to underscore additional ways that firearm regulations in and

around schools are consistent with the Supreme Court's decisions in *Bruen* and *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

*Bruen* and *Rahimi* teach that the critical question when analyzing a Second Amendment challenge to a statute implicating the Second Amendment's plain text is "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26-31). In identifying those principles, courts must inquire into "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29 (emphases added).

Congress's enactment of 18 U.S.C. § 922(q)(2)(A) in 1990 and amendment in 1995 recognized the urgent need to keep guns away from schools and their surrounding areas. School shootings are a modern epidemic. They are not "a general societal problem that has persisted since the 18th century." *Bruen*, 597 U.S. at 26. When considering this kind of "unprecedented societal concern," courts must distill the *principles* underpinning the regulatory tradition. *Bruen*, 597 U.S. at 27; *see Rahimi*, 144 S. Ct. at 1925 ("[I]mposing a test that demands overly specific analogues has serious problems . . . it forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.'" (citation omitted) (Barrett, J., concurring)).

Schools and the immediately surrounding areas are critical sites of education, physical and social development, democratic participation and civic engagement, and community life for today's young people. Students who have been exposed to gun violence at school face considerable negative consequences that interfere with schools' ability to do what they are designed to do: provide a safe space to educate children. Witnessing gun violence reduces academic performance, impairs concentration, disrupts learning, hinders brain development, and can have longer term bad mental health and educational outcomes for students.

This brief gives voice to students who have experienced gun violence in and around schools. Gun violence forever altered the course of those individuals' lives. They tell their stories to underscore the tremendous physical and psychological devastation caused by those shootings and the dangers of permitting firearms in school zones, which inform the principles underpinning the law.

This Court should affirm the lower court's decision and uphold the constitutionality of Section 922(q)(2)(A).

## ARGUMENT

### I. EXPERIENCES OF GUN VIOLENCE SURVIVORS DEMONSTRATE THE NECESSITY OF RESTRICTING FIREARMS NEAR SCHOOLS

The terror students feel from the experience or threat of gun violence in and around schools directly impacts their well-being. School gun violence causes trauma that disrupts brain development, impairs concentration, and reduces academic

performance.[2]  Studies show the concrete consequences of gun violence in schools on students, including declining test scores, repeating grades, and reducing high school graduation numbers.[3]  It causes myriad psychological and physical consequences that undermine the ability of schools to serve their essential purpose as places of education and socialization of our youth.

Numerous individuals affiliated with *amici* have been horribly and permanently affected by gun violence in and around schools.  The personal accounts shared here demonstrate the extreme pain and trauma that gun violence has inflicted on young people in the United States, both in school buildings and in the buffer zone around schools that Congress protected by enacting Section 922(q)(2)(A).  Their voices are just some of the millions of young people who, weighed down by the daily threat of gun violence, demand that Congress continue to act, consistent with its constitutional authority and responsibility, to make this country safer for them.

---

[2] Marika Cabral, Bokyung Kim et al., *Trauma at School: The Impacts of Shootings on Students' Human Capital and Economic Outcomes*, NBER (2020), https://www.nber.org/papers/w28311.

[3] *See id.*; Dessa Bergen-Cico et al., *Community Gun Violence as a Social Determinant of Elementary School Achievement*, 33 Social Work in Pub. Health 439 (2018), https://static1.squarespace.com/static/5c803e91840b1612f58d7053/t/5cdb225ab20 8fcc2650c261e/1557865051036/Bergen-Cico+School+Performance+and+Gun+Violence--draft+for++distribution.pdf.

### A.    Caitlyne Gonzales and Jazmin Cazares (Uvalde, Texas)

Ten-year-old Caitlyne Gonzales was excited to go to school on May 24, 2022. It was the last day before summer break, and she was looking forward to the academic honors awards she would receive with her friends at Robb Elementary in Uvalde, Texas.

That same morning, seventeen-year-old Jazmin Cazares overslept, waking up after her nine-year-old sister Jackie Cazares had left for her last day of school at Robb Elementary.

Around 11:30 a.m., Caitlyne and her fourth-grade classmates heard two loud bangs. Then three more. Mrs. Salas, their teacher, went into the hallway to assess the situation. The door locked behind her. The students saw the look on her face, sensed something was wrong and rushed to let her back in, hiding in the corner of the room. Caitlyne pieced together what was happening as she heard the cries and screams of children down the hall.

The gunman relentlessly made his way to Caitlyne's classroom. As he struggled to open the door, Caitlyne and her friend held their hands over the mouths of their classmates, muffling their screams to avoid attention. Caitlyne waited in agony, listening to gunshots ringing in the classroom across the hall, followed by screams from children she knew and grew up with. She still remembers the smell of smoke, like something was burning. Then silence. Mrs. Salas hugged the children

and reminded them to be quiet.  Caitlyne's legs ached; one of her classmates was crouched on top of her as they hid behind desks.

After what felt like hours, police shattered the classroom window, leading Caitlyne and her classmates to safety.  The students ran toward a nearby funeral home to reunite with their families.

Across town, the shooting at Robb sent Jazmin's high school into lockdown. Jazmin immediately texted her little sister Jackie.  The minutes ticked by without a response.  As Jazmin and her classmates tried frantically to gather information, Jazmin's teacher received a call—Jackie had been rushed to the hospital.

When she was allowed to leave Uvalde High, Jazmin went straight to Jackie. But she was too late.  Jackie had died.

The hours and days that followed were a blur, though Jazmin remembers gathering at her grandmother's house that evening.  Around midnight, the family learned that Jazmin's cousin, ten-year-old Annabell Rodriguez, had also been murdered.

Caitlyne stayed up watching the news that evening.  As the media began to identify the victims, Caitlyne texted her best friend, Jackie Cazares, to let her know that their mutual friend, Ellie was missing.  But Caitlyne would never receive a reply text—Jackie and Ellie were both among the 21 victims who were killed that day.

Caitlyne, now twelve, still startles fiercely at the sounds of sirens or loud bangs, and at the smell of smoke.  She has frequent flashbacks to the shooting, often

multiple times per day.  Her mother, Gladys, started sleeping in Caitlyne's bedroom because Caitlyne was plagued by nightmares.  Her feeling of safety has been broken forever.

Caitlyne remains in Uvalde.  Outside of school, she spends her time on and around school campuses in the area, leading her fellow classmates as student body president, playing volleyball, running track, and cheerleading.  Safety in and around school is essential for Caitlyne.  The gun-free buffer zone around schools helps protect her from her ongoing and acute anxiety.

Jazmin will never fully recover from the loss of her sister.  She is constantly reminded of that day's immense loss.  She is angry that the children at Robb Elementary were not protected and frustrated that she still needs to fight for change.  Jazmin is terrified of guns, especially the thought of firearms being permitted in areas around schools.

Jazmin channels her emotion into action, advocating for stronger gun safety laws and connecting with survivors of gun violence.  She wishes to tell this Court: "It could be you who loses someone; it could be you who passes," and, "change starts with you."

**B.    Kylie Ossege (Oxford, Michigan)**

Kylie Ossege, 20, was born and raised in Oxford Township, Michigan.  She has lived in the same house her entire life, just a five-minute drive from her

elementary school, 15 minutes from her middle school, and 10 minutes from her high school. Oxford is in many ways like other small towns in America. You cannot go grocery shopping without seeing someone you know, and everybody loves the high school football team. Kylie never thought about the possibility of gun violence, especially not in Oxford.

On November 30, 2021, Kylie, a high school senior, was with friends in the hallway outside the cafeteria after lunch when she heard a loud popping noise. Kylie had never heard gunshots before; she turned to look and next thing she knew, she was lying on the floor. Not until the principal announced an active shooter over the loudspeaker did Kylie realize she had been shot.

As Kylie lay on the floor, one of her friends—who Kylie would later learn had been grazed by a bullet—grabbed Kylie by her backpack straps, begging her to run to safety. Kylie lay paralyzed, shell-shocked and in excruciating pain, unable to even respond.

Kylie remembers the warmth of blood on her face. Behind and slightly on top of her lay a freshman whom she only somewhat knew. Still paralyzed, Kylie could not turn to look, but she could hear the girl groaning in pain. Kylie reached back to try to comfort her.

Everything below Kylie's waist was numb.  She tried to push herself up to drag herself to a nearby classroom, but searing pain caused her to drop to the floor.  The blood-soaked carpet squished beneath her.

The assistant superintendent lay with Kylie on the floor as they waited for paramedics.  Until that point, adrenaline and fear kept Kylie alert.  With someone there to care for her, her eyes drifted shut.  The assistant superintendent tried to keep her awake, begging her to stay with him.  When paramedics finally arrived, they wheeled Kylie outside on a gurney.  Every little bump sent jolts of searing pain through Kylie's back.  But she was alive, and that fact outweighed the agony.

At the hospital, Kylie learned that the bullet had shattered her right clavicle and exited through the left side of her back, causing a hematoma in her spine.  During emergency surgery, doctors removed fragments of shattered bone, scraps of clothing, and Kylie's first two thoracic vertebrae, saving her life.

Kylie awoke to more scorching pain; her back felt like it was on fire, and every movement burned.  Even the hospital gown brushing against her skin caused near-intolerable discomfort.  Kylie also learned upon waking up that the freshman from the hallway, and three other classmates, had been killed.

After a week in the ICU in critical condition, Kylie moved to the rehabilitation unit.  She had to learn how to do every day tasks like walking, showering, and getting dressed without having sensation in her legs.

Before the shooting, Kylie planned to go away to college. Her doctors recommended that Kylie go to community college closer to home for her recovery, but Kylie did not want the shooter to take that goal from her too. She enrolled in Michigan State University. Inspired by her therapists, she is majoring in kinesiology and plans to become an occupational therapist.

Kylie's daily life is vastly different from that of her classmates. Each time other students in her dorm slam a door, run down the hallways, or scream, it triggers Kylie's post-traumatic stress disorder, causing her immense and overwhelming anxiety.

A month into Kylie's second semester, an active shooter came to campus. Kylie immediately shut the blinds, barricaded her dorm room door, and hid in the bathroom for hours, listening to the police radio and responding to countless messages from concerned friends and family. On her bathroom floor, Kylie heard over the police radio that the officers had found an injured student paralyzed in a stairwell. Heartbroken, Kylie relived vividly how it felt to lie there waiting for help, unable to move. In Oxford, Kylie was shot so quickly that she had no time to be afraid. Now at Michigan State, the fear of being shot consumes her.

The substantial mental and physical effects of the shootings still linger. Almost three years later, Kylie remains in outpatient rehabilitation; only around 70 percent of sensation has returned to her legs. When applying to jobs, Kylie is limited

to positions that do not require standing for extended periods, and her extreme anxiety prevents her from working behind a front desk and being the first person a shooter would see.

Kylie never feels safe in public. She senses a bolt of fear upon seeing someone wearing a hood or carrying a duffle bag; in lecture halls and movie theaters, she anxiously identifies an escape route, ready to flee at the smallest disturbance. This fear interferes with her ability to engage in the most routine of activities.

Kylie will feel immense fear around schools if the law establishing a gun-free buffer zone around schools is struck down. To Kylie, gun violence is not a political issue; it is a central part of her being, from which she can never escape. She desperately does not want other children to be terror stricken—as she is—by the presence of firearms in and around schools.

### C.    Zach Martin and Tom Mauser (Columbine, Colorado)

Zach Martin always envisioned himself at Columbine High School. He could see the school from his childhood backyard, atop a nearby hill. Zach sprinted up that hill for class on the morning of April 20, 1999, during his freshman year.

Tom Mauser's son, Daniel, was also a student at Columbine. Daniel was introverted and reserved. He enjoyed reading, playing piano, and video games. Daniel also ran cross country and was on the debate team, where he became a skilled debater despite his reserved nature.

Zach was in art class when the fire alarm began blaring. He was certain it was a drill or a prank until a panicked student ran into his classroom and cried out that it was a real emergency. Zach saw students fleeing through the front doors of the school, bleeding from debris and shattered glass and realized just how serious the situation was. Rumors of gunfire spread as policemen started flooding in.

Zach fled to his house with 30 of his fellow students. Zach's sister Sarah, a senior at Columbine, was not among those sheltering there. That was the worst part of the day for Zach—not knowing where Sarah was, whether she was safe, or if she would return home.

Sarah was in choir class when the first gunshots were fired. She tried to escape, but was forced back into the classroom by gunfire down the hall. Her classmates barricaded themselves into their teacher's office and hid for roughly six hours, unable to communicate with their loved ones. She was one of the last groups of students evacuated from the school.

Around noon that day, as Tom prepared to leave his office in Columbine for a conference, a colleague came in and asked him three questions: whether he had children, whether he lived in south Jefferson County, and whether he had any kids at Columbine High School. The answer to each was yes. Tom joined his colleagues in a conference room to watch the news. It was clear that something was seriously wrong at Columbine.

Tom assured himself that whatever was happening could not involve his sweet, introverted Daniel.  Even when his wife, Linda, said she could not find Daniel at the reunification site, he was sure that Daniel was okay.  He joined Linda and they waited for Daniel together.  Tom was told that there was one last school bus arriving with evacuated students.  Daniel must be on that bus.  No bus arrived.  Finally, the parents who remained were ushered into a room with counselors.  There, Tom learned that about 20 children were shot.  He froze, realizing for the first time that there were victims.  There were deaths.

Still in shock, Tom and Linda went home, awaiting news about Daniel.  The police called to ask what Daniel had been wearing.  They called again to ask for Daniel's dental records.  Tom felt hope slipping away with each question, but part of him still believed Daniel was safe and waiting to come home.  At noon the next day, the police called and confirmed that Daniel was one of the victims.  It had been difficult to identify Daniel's corpse because of the extreme damage caused by the shotgun blasts.

It was the worst day of Tom's life.  He drifted through the next few days in a state of shock.  He reflects today that, "You just don't expect to have your child murdered in their school."  At Daniel's funeral, Tom was torn between wanting to reflect on Daniel's life with his family and sitting in disbelief, thinking, "My God. My son has been murdered."

In the aftermath of the shooting, Zach struggled to process his anger, confusion, and guilt.  He grappled with survivor's guilt and yearned to be a "normal" fifteen-year-old again.  Yet, despite the trauma, Columbine always felt like home.  As a student, Zach's life revolved around school, playing soccer, singing in the choir, and spending time in the school parking lot listening to music or eating lunch with friends.  Twenty-four years later Zach remains at Columbine, teaching social studies to students who also center their lives around the school.  He sees kids on the same campus, participating in athletics and extracurriculars.  As a father to two young children—his six-year-old daughter has already experienced three lockdowns and expressed fears of a school shooting—Zach dreams of a day without lockdown drills, when schools are beacons of safety and security, not targets.  If guns are not kept from the area around Columbine, Zach will be debilitated by memories of that devastating day in 1999.

Daniel's death continues to haunt Tom and his family.  Holidays and family activities feel particularly empty without Daniel.  But Tom focuses his energy on making sure that other families do not have to experience that awful grief.  He speaks out in favor of common-sense gun safety measures like Section 922(q)(2)(A).  He feels strongly that schools are not a place for anybody to carry a firearm.  If the law were struck down, it would be "gut-wrenching" for Tom; he would fear when passing a school that a gunman could kill children there, as happened to his Daniel.

16

### D.    Kennedy Rodriguez (Santa Fe, Texas)

Just two weeks after the tragic shooting that killed 17 and injured another 17 at Marjory Stoneman Douglas High School in Parkland, Florida, Kennedy Rodriguez's Texas high school went into lockdown following reports of an active shooter. For nearly six hours, Kennedy and her classmates at Santa Fe High School crouched in the corner of their classrooms, holding up textbooks for protection. As she and her friend held hands, Kennedy feared that those would be her last moments. When the lockdown finally lifted, Kennedy learned that there was no active shooter; the lockdown was prompted by what sounded like gunshots outside the school. Kennedy, relieved that no one was harmed, was nonetheless deeply shaken.

Two months later, on May 18, 2018, real gun violence reached Santa Fe High School. Kennedy took morning classes through the community college, so she had not yet arrived when her classmates began first period. Her morning routine was interrupted by a friend's frantic call: "Don't come to school today – we think there's an active shooter – we're running across the street." Kennedy could hear chaos in the background—screams of horror and confusion, people crying, and students trying to locate their friends. A 17-year-old student had brought a shotgun and revolver to school and killed 10 people, wounded 10 others, and traumatized an entire community in the span of 30 minutes.

Kennedy felt guilty that she had not been at school with her classmates and sensed a deep fear in the pit of her stomach, worried that something had happened to her friends.  She tried to reach them, and recalls today, "There were so many people who weren't answering their phones, and I didn't know if their phones were dead or if they were dead."  The rest of the day was a blur.  Kennedy remained glued to the television and her phone, anxiously awaiting updates.

Eight students were killed that day—the youngest only fourteen and the oldest seventeen.  Two teachers were killed too, one of whom would often sub for Kennedy's theater class.  The emotional pain and trauma of that day still lingers for Kennedy: "It's an indescribable amount of fear and pain—just the highest level of terror that I can't even put it into words."

After graduating high school, Kennedy attended the University of Texas at Austin, where guns are permitted on campus.  The presence of guns exacerbated Kennedy's continuing deep mental and emotional trauma and weighed on her daily.  The possibility of an active shooter was constantly on Kennedy's mind.  A routine fire drill in her freshman year sent Kennedy into a panic attack.  She also avoided many typical college activities, greatly fearing the potential presence of guns at social events and large gatherings.

Kennedy strongly believes that feeling safe in and around school is essential for learning and development.  Keeping guns from schools and surrounding areas is

an important way for students to feel safe and secure so they can "be good students—to pay attention—and truly learn."

### E.    Camille Paradis and Nicole Melchionno (Newtown, Connecticut)

On December 14, 2012, eight-year-old Camille Paradis woke up early to watch television while her mother made waffles.  She carried her favorite white purse, filled with toys and animal erasers, as she headed off to school at Sandy Hook Elementary, just down the road from her house.

That morning also began as usual for seven-year-old Nicole Melchionno, whose second-grade class at Sandy Hook was planning to make paper snowflakes.  As Nicole and her classmates sat on the floor awaiting instructions, a 20-year-old man armed with a rifle, handgun, and bolt-action rifle entered her school and began shooting.

Gunshots rang out in the hallways and over the intercom.  As their teacher called 911, Nicole could feel panic in the classroom.  Their teacher sang songs and read books to attempt to calm the students down, but she was also violently shaking.  Nicole felt hot and shaky, like she was going to be sick.  She thought to herself: "I'm going to die, I'm going to die."

Camille's third-grade classroom went into lockdown, too.  She was confused until she saw the adults' faces—they were terrified.  Camille had never seen a teacher scared before, and quickly realized this was serious.  The class huddled in the reading

corner, trying to keep quiet.  A boy near Camille whispered, "We're going to die, we're going to die."

Eventually, police evacuated the school.  Camille recalls being led single-file out of her classroom and ordered not to look around, so as not to be frightened by the bullets, blood, and bodies all around them.

The students were taken to a local firehouse.  Camille witnessed her classmates searching for their siblings, some without success; the boy who had whispered, "We're going to die," lost his sister.

Nicole recalls a "free-for-all" sprint toward the firehouse.  Not yet understanding the magnitude of the devastation, Nicole was confused by her mom's tears of relief as they reunited.

Camille's and Nicole's lives were irreparably and fundamentally altered by the shooting.

Because of Nicole's experiences, the thought of guns at and around her school makes her horribly anxious.  As a child, she spent time in the areas immediately surrounding her school playing softball, running cross country, and attending football games.  Once Nicole started driving, she and her friends spent time in the school parking lot before and after school, sporting events, plays, and charity events.  She knows that firearm-free school zones, after countless mass murders at schools, are

essential to students' safety, and allow students to focus on learning and success in the classroom.

The shooting at her school taught Camille not only about guns and gun violence, but about death itself—about devastation, loss, and true grief. Despite over a decade of therapy, Camille, now 20, still does not feel safe in public. Each time Camille hears about other mass shootings, she feels the all-consuming grief, devastation, and loss all over again.

For Camille, it is critical to keep schools and their surrounding areas safe for use as places of learning, community, and recreation. Keeping firearms away from schools is essential to students' safety—just as basic and essential as a reduced speed limit sign in a school zone. Camille knows that prohibiting guns from school campuses is a crucial part of keeping students safe and diminishing the risk of others experiencing what she lived through and continues to live with today.

## II.    SECOND AMENDMENT JURISPRUDENCE REQUIRES CONSIDERATION OF SOCIETAL CONDITIONS AND EMPIRICAL RESEARCH

Under *Bruen*, as clarified by *Rahimi*, this Court must analyze the constitutionality of Section 922(q)(2)(A) in light of prevailing societal conditions. *Bruen* directed courts to compare regulations addressing conduct covered by "the Second Amendment's plain text" with our Nation's "historical tradition" of firearms regulation. *Bruen*, 597 U.S. at 33-34. *Rahimi* clarified what this means: the law is not

"trapped in amber" and "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. at 1897-98. The critical question in addressing a prohibition's constitutionality is "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added) (citing *Bruen*, 597 U.S. at 26-31).

As a part of this inquiry, courts must inquire into "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Comparing the motivations (the "whys") and the mechanisms (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in modern and historical American society. *Rahimi*, 144 S. Ct. at 1898; *see also id.* at 1904 (Sotomayor, J., concurring) ("[T]he Court's interpretation [of *Bruen*] permits a historical inquiry calibrated to reveal something useful and transferable to the present day."). This is particularly important in cases—such as this one—that implicate "unprecedented societal concerns" or "dramatic technological changes" different from those in the eighteenth and nineteenth centuries. *Bruen*, 597 U.S. at 27. And in conducting this analysis, empirical research provides indispensable evidence of these conditions. To hold otherwise would "force[] 21st-century regulations to follow late-18th-century policy choices." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring).

### A.    The Modern U.S. Schooling System Is a Recent Development That Did Not Exist at the Founding or Reconstruction

Today's students spend more time at school than prior generations.  Since Reconstruction, the average number of school days attended each year has more than doubled,[4] and the number of pre-college school years has skyrocketed.[5]  Additionally, millions of students stay on campus after the formal school day concludes,[6] with about 87% of public schools offering afterschool programming to students as of 2023.[7]

As children in the United States spend significantly more time at and around

---

[4] In 1869, students attended 78 days on average each term, compared to 167 days in 2015.  *See* Nat'l Ctr. for Educ. Stat., *Table 201.10 Historical Summary of Public Elementary and Secondary School Statistics: Selected Years, 1869-70 through 2015-16*, https://nces.ed.gov/programs/digest/d18/tables/dt18_201.10.asp  (last  visited Nov. 8, 2024).

[5] Most Americans did not attend high school before the 20th century; in 1910, only 9% of 18-year-olds held high school degrees.  Claudia Goldin et al., *Why the United States Led In Education Lessons from Secondary School Expansion, 1910 to 1940* 1 (2008), https://scholar.harvard.edu/files/lkatz/files/why_the_united_states_led_ in_education_lessons_from_secondary_school_expansion_1910_to_1940_1.pdf. By 1970, that number had increased to nearly 80%.  As of 2022, the high school dropout rate was only 5%.  Nat'l Ctr. for Educ. Stat., *Status Dropout Rates*, https://nces.ed.gov/programs/coe/indicator/coj/status-dropout-rates  (last  visited Nov. 8, 2024).

[6] *America After 3PM: Demand Grows, Opportunity Shrinks*, Afterschool All. 10 (2020), https://afterschoolalliance.org/documents/AA3PM-2020/AA3PM-National-Report.pdf.

[7] Colleen Connolly, *Nearly 90% of Public Schools Now Offer Afterschool Programs*, Youth  Today  (Nov.  27,  2023),  https://youthtoday.org/2023/11/afterschool-pro-grams-nearly-90-of-public-schools-now-offer-afterschool-programs/.

school, the need for school-zone protections has increased. Numerous "buffer zones" have been implemented to protect students near schools. Like Section 922(q)(2)(A)'s firearm regulation, these "buffer zones" protect students and facilitate safe educational environments. States across the country have enacted "buffer zones" laws that include lower speed limits,[8] prohibitions on cell phone use by drivers,[9] prohibitions on tobacco sales,[10] restrictions on liquor licenses,[11] prohibitions on cultivating and consuming otherwise-legal marijuana,[12] prohibitions on operating

---

[8] *See, e.g.*, Okla. Stat. Ann. tit. 47, § 11-806.1; Md. Code Ann., Transp. § 21-803.1; Mich. Comp. Laws Ann. § 257.627a; N.C. Gen. Stat. Ann. § 20-141.1.

[9] *See, e.g.*, Tex. Transp. Code Ann. § 545.425; La. Rev. Stat. Ann. § 300.8; Fla. Stat. § 316.306.

[10] Am. Lung Ass'n, The Ctr. for Tobacco Pol'y & Organizing, *Matrix of Local Ordinances Restricting Tobacco Retailers Near Schools* (2016), https://healthcollaborative.org/wp-content/uploads/2022/10/Matrix-of-Ordinances-Restricting-Retailers-Near-Schools-Sept-2016.pdf.

[11] *See, e.g.*, Alaska Stat. Ann. § 04.11.410; Mass. Gen. Laws Ann. ch. 138, § 16C, Minn. Stat. Ann. § 340A.412; Del. Code Ann. tit. 4, § 543.

[12] *See, e.g.*, San Francisco Travel Ass'n, *What you Need to Know about Legal Marijuana In California*, https://www.sftravel.com/info/what-you-need-to-know-about-legal-marijuana-california (last visited Nov. 8, 2024); Cnty. of Sonoma, Dep't of Health Servs, *Marijuana: Smoking and Vaping*, https://sonoma-county.ca.gov/health-and-human-services/health-services/marijuana-public-health-and-safety/marijuana-smoking-and-vaping (last visited Nov. 8, 2024).

legal cannabis facilities,[13] restrictions on spraying pesticides,[14] prohibitions on e-scooters,[15] and enhanced penalties for drug crimes[16] and violent crimes[17]. These restrictions are all designed to help ensure the safety of students while they are in or just outside of their schools, reflecting a widespread consensus about the heightened vulnerability of modern American schools and students, and the various additional safeguards required to protect them.

### B.     School Shootings In America Are an Unprecedented Societal Problem

School shootings occur in the United States today at a rate that is conscience shocking.  In 2024, the U.S. Surgeon General declared gun violence a public health crisis based partly on the impact of school shootings on American children.[18]

---

[13] *See, e.g.*, 35 Pa. Stat. and Const. Stat. § 10231.802; N.H. Rev. Stat. Ann. § 126-X:8.

[14] *See, e.g.*, *EWG: Schools Near Pesticide Spray Zones Could Lose Health Protections*, EWG (2023), https://www.ewg.org/news-insights/news/2023/11/ewg-schools-near-pesticide-spray-zones-could-lose-health-protections.

[15] *See, e.g.*, D.C. Code § 50-2201.03c.

[16] *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-3411; Ga. Code Ann. § 16-13-32.4; Tenn. Code Ann. § 39-17-432; Tex. Health & Safety Code Ann. § 481.134(c)(1); Wash. Rev. Code Ann. § 69.50.435.

[17] *See, e.g.*, Wis. Stat. Ann. § 939.632.

[18] Dep't of Health & Human Servs., *U.S. Surgeon General Issues Advisory on the Public Health Crisis of Firearm Violence In the United States* (June 25, 2024), https://www.hhs.gov/about/news/2024/06/25/us-surgeon-general-issues-advisory-public-health-crisis-firearm-violence-united-states.html.

The number of recorded school shootings[19] in the 2021-2022 school year was nearly 39 times the number of incidents in 1966:[20]



The scale of this problem is staggering. Since the Columbine massacre in 1999, over 383,000 primary and secondary students have experienced school shootings.[21] This unprecedented surge is unique to America. Between 2009 and 2018, the United

---

[19] The K-12 School Shooting Database defines a "school shooting" to be any instance "when a gun is fired, brandished (pointed at a person with intent), or [when a] bullet hits school property, regardless of the number of victims, time, day, or reason." *K-12 School Shooting Database*, https://k12ssdb.org/methodology-1 (last visited Nov. 8, 2024).

[20] David Riedman, *K-12 School Shooting Database*, https://k12ssdb.org/data-visualizations (last visited Nov. 8, 2024).

[21] *See* John Woodrow Cox et al., *More Than 383,000 Students Have Experienced Gun Violence at School Since Columbine*, Wash. Post, https://wapo.st/40MK3TI (last visited Nov. 11, 2024).

States recorded more than 57 times as many school shootings as all other major industrialized nations *combined*.[22]

Notably, more than half of shootings at U.S. schools take place not in school buildings, but in outdoor areas surrounding the school.[23]  Over the last two decades, the number of shootings in areas surrounding schools (including outside entrances, fields, playgrounds, and school parking lots) increased nearly 16-fold, while the number of shootings inside school buildings tripled.[24]

### C.    Gun Violence Affects the Physical and Mental Health of Young People

The negative effects of school shootings extend far beyond the immediate traumas inflicted by gunshot wounds.  Even indirect exposure to gun violence can have negative impacts on the physical and mental health of American youth in ways both seen and unseen.

---

[22] Chip Grabow & Lisa Rose, *The US Has Had 57 Times as Many School Shootings as the Other Major Industrialized Nations Combined*, CNN (May 21, 2018), https://www.cnn.com/2018/05/21/us/school-shooting-us-versus-world-trnd/index.html.

[23] *See* Ctr. for Homeland Def. & Sec., *Shooting Incidents at K-12 Schools (Jan 1970-June 2022)*, https://www.chds.us/sssc/charts-graphs/ (last visited Nov. 8, 2024).

[24] This analysis uses the same definition of "school shooting" as the K-12 School Shooting Database.  *See* Nat'l Ctr. for Educ. Stat., *Table 228.14. Number of School Shootings at Public and Private Elementary and Secondary Schools, By Location and Time Period: School Years 2000-01 through 2021-22*, https://nces.ed.gov/programs/digest/d22/tables/dt22_228.14.asp (last visited Nov. 8, 2024) (comparing the 2000-2001 school year to the 2021-2022 school year).

Childhood exposure to community violence, like a school shooting, can have direct adverse physical health consequences for children, including physical PTSD symptoms[25] and even asthma.[26] Some of these consequences may not become apparent until adulthood, with one study finding that children who witnessed violence with a weapon were more likely to develop hypertension in adulthood.[27] Though physical symptoms like these may be common in the aftermath of school shootings, they must not be normalized.

Gun violence also has significant mental health impacts. Mass shootings are associated with higher levels of post-traumatic stress symptoms.[28] In the immediate aftermath of a mass shooting, children and adolescents can experience recurring intrusive thoughts, social withdrawal, hyperarousal, sleep disturbance and

---

[25] *See* Pilar Bancalari et al., *Youth Exposure to Endemic Community Gun Violence: A Systematic Review*, 7 Adolescent Rsch. Rev. 383, 384 (2022), https://www.tc.columbia.edu/media/microsites/gun-violence-prevention/Youth-Exposure-to-Endemic-Community-Gun-Violence.pdf.

[26] *See id.* at 394.

[27] *See* Jodi L. Ford & Christopher R. Browning, *Effects of Exposure to Violence with a Weapon During Adolescence on Adult Hypertension*, 24 Annals of Epidemiology 193 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4221585/pdf/nihms560504.pdf.

[28] *See* Sarah R. Lowe & Sandro Galea, *The Mental Health Consequences of Mass Shootings*, 18 Trauma, Violence & Abuse 62, 78 (2017), https://www.cmhnetwork.org/wp-content/uploads/2018/09/The-Mental-Health-Consequences-of-Mass-Shootings.pdf.

nightmares.[29]  Children who experience school shootings can suffer severe anxiety and debilitating trauma, with consequences persisting into adulthood.[30]

## CONCLUSION

For the foregoing reasons and those offered by Plaintiff-Appellee, *amici* respectfully request this Court affirm the judgment below.

Dated: November 13, 2024

Respectfully submitted,

*/s/ Jessica L. Ellsworth*
Jessica L. Ellsworth
*Counsel of Record*
Jonathan L. Diesenhaus
Hannah Graae
Gil McDonald
Evan Guimond
Marianna Cortes Del Rio
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

Elizabeth A. Och
HOGAN LOVELLS US LLP
1601 Wewatta St. Ste. 900
Denver, CO 80202
(303) 899-7300

---

[29] Valentina Cimolai, *Effects of Mass Shootings on the Mental Health of Children and Adolescents*, 23 Curr Psychiatry Rep. 23, 12 (2021), https://www.proquest.com/openview/97bb06ccb3c0194cfb7bc4cb79ae1336/1?pq-origsite=gscholar&cbl=4402920.

[30] Giffords Law Ctr., *The Truth About School Shootings* 6 (2019), https://files.giffords.org/wp-content/uploads/2019/02/The-Truth-About-School-Shootings-Report.pdf.

Rachel M. Bayer
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

*Counsel for Amici Curiae March for Our Lives Foundation, Brady Center to Prevent Gun Violence, Team ENOUGH, and Giffords Law Center to Prevent Gun Violence*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,409 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman.

*/s/ Jessica L. Ellsworth*
Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Clerk using the Court's CM/ECF system on November 13, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Jessica L. Ellsworth*
Jessica L. Ellsworth
