No. 24-40065

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

────────────────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AHMED ABDALLA ALLAM,

*Defendant-Appellant.*

────────────────────────────

On Appeal from the United States District Court
for the Eastern District of Texas (No. 1:23-cr-00010)

────────────────────────────

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF-APPELLEE AND AFFIRMANCE**

────────────────────────────

Janet Carter
William J. Taylor, Jr.
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8198
efredericksen@everytown.org

November 13, 2024

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*United States v. Allam*, No. 24-40065

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those previously listed in briefs filed in this case, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Amicus curiae
   a. Everytown for Gun Safety[1]

2. Counsel for amicus curiae
   a. Janet Carter, Everytown Law
   b. William J. Taylor, Jr., Everytown Law
   c. Erik P. Fredericksen, Everytown Law

Dated: November 13, 2024          By:  /s/ Erik Fredericksen
                                  Attorney of record for Everytown for
                                  Gun Safety

---

[1] Everytown for Gun Safety's formal name is Everytown for Gun Safety Action Fund. It has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

    I.    *Rahimi* Clarifies that Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases................................3

    II.    The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Post-Ratification Evidence ..................................................8

        a.    The proper originalist analysis centers on the Reconstruction era ...9

        b.    Regardless of the proper temporal focus, Reconstruction-era and later evidence remains crucial.......................................................16

    III.    This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers".........................................................................21

    IV.    Sensitive Places Are Not Defined By Government-Provided Security...25

CONCLUSION.................................................................................................27

# TABLE OF AUTHORITIES

## *CASES*

*Antonyuk v. James,*
  --- F.4th ----, 2023 WL 11963034 (2d Cir. Oct. 24, 2024) ........................... *passim*

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..................................................................9, 16, 21, 22

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) .............................................................10

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) .............................................................23

*Goldstein v. Hochul,*
  680 F. Supp. 3d 370 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023) ..............................................................................................19

*Gould v. Morgan,*
  907 F.3d 659 (1st Cir. 2018) .............................................................10

*Kipke v. Moore,*
  695 F. Supp. 3d 638 (D. Md. 2023) .................................................25

*LaFave v. County of Fairfax,*
  No. 1:23-cv-1605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024) ...................................................11, 18, 25

*Lara v. Comm'r Pennsylvania State Police,*
  91 F.4th 122 (3d Cir. 2024), *vacated sub nom. Paris v. Lara*, No. 23-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) ....................................................................11, 12

*McCullen v. Coakley,*
  573 U.S. 464 (2014) .........................................................................23

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ....................................................................10, 23

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024) ............................................................24

*Md. Shall Issue, Inc. v. Montgomery Cnty.,*
    680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed,* No. 23-1719 (4th Cir. July 10, 2023) ............................................................................................7, 11

*Nat'l Rifle Ass'n v. Bondi,*
    61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc,* 72 F.4th 1346 (11th Cir. 2023) ..............................................................11, 12, 20

*Nev. Comm'n on Ethics v. Carrigan,*
    564 U.S. 117 (2011) ......................................................................20

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ...............................................................*passim*

*Rupp v. Bonta,*
    No. 8:17-cv-00746, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024), *appeal docketed,* No. 24-2583 (9th Cir. Apr. 24, 2024) ...............................................11, 12

*United States v. Class,*
    930 F.3d 460 (D.C. Cir. 2019) .....................................................25, 26

*United States v. Connelly,*
    117 F.4th 269 (5th Cir. 2024) ................................................*passim*

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023), *vacated,* 144 S. Ct. 2707 (2024) .......................15, 25

*United States v. Diaz,*
    116 F.4th 458 (5th Cir. 2024) ........................................................7, 8

*United States v. Dorosan,*
    350 F. App'x 874 (5th Cir. 2009) (unpublished) (per curiam) ............................26

*United States v. Greeno,*
    679 F.3d 510 (6th Cir. 2012) .............................................................10

*United States v. Medina-Cantu,*
    113 F.4th 537 (5th Cir. 2024) ............................................................5

iv

*United States v. Metcalf*,
　No. 1:23-cr-00103, 2024 WL 358154 (D. Mont. Jan. 31, 2024), *appeal docketed*,
　No. 24-4818 (9th Cir. Aug. 6, 2024) ..................................................................5

*United States v. Meyer*,
　No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023) .........................14

*United States v. Rahimi*,
　144 S. Ct. 1889 (2024) .................................................................... *passim*

*United States v. Rahimi*,
　61 F.4th 443 (5th Cir. 2023) ............................................................................3

*We the Patriots, Inc. v. Lujan Grisham*,
　697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed*, No. 23-2166, 2024 WL
　4586921 (10th Cir. Oct. 28, 2024) .................................................................11

*Wolford v. Lopez*,
　116 F.4th 959 (9th Cir. 2024) ...........................................................11, 22, 25, 26

*Worth v. Jacobson*,
　108 F.4th 677 (8th Cir. 2024) .........................................................................12

## **STATUTES**

18 U.S.C. § 922(q)(1)(E) ......................................................................................6

18 U.S.C. § 922(q)(2) ...........................................................................................1

## **OTHER AUTHORITIES**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............14, 15

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n
　v. Bruen*, No. 20-843 (U.S.) .................................................................................19

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
　Charleston L. Rev. 205 (2018) ...........................................................................18

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....12

Joseph Blocher & Eric Ruben, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99 (2023)....................................................................5

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ......................................................................12

Kurt T. Lash,
*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022)
.......................................................................................................................13

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .....14, 15

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008)....................................................................12

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ...............................................................................13

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ...................................12

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ...........................................................................................12

United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission (last visited Nov. 13, 2024) ..........................................26

White House Historical Ass'n, *Guarding the White House*, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house (last visited Nov. 13, 2024) .............................................................26

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Gun Free School Zones Act (the "Act") restricts the carry of loaded, unsecured firearms without a permit in school zones. *See* 18 U.S.C. § 922(q)(2). That regulation is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), for the reasons stated in the government's

---

[2] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

brief, Dkt. 89 ("U.S. Br."). As the government explains, the Second Amendment unquestionably allows Congress to restrict the carry of firearms not just inside a school, but—as in this case—also across the street from one.

Everytown agrees that this Court may affirm based solely on the settled law that schools are sensitive places. *See* U.S. Br. 13-19. Should this Court proceed to a full historical analysis under *Bruen* and *Rahimi*, however, Everytown submits this amicus brief to expand on four methodological points. *First*, *Rahimi* clarifies that Second Amendment analysis requires in all cases a flexible, principles-based approach to history. That is even more true here, given that, as the district court correctly found below, "shootings and firearm incidents on and around school campuses are surely an 'unprecedented societal concern.'" ROA.367 (citing *Bruen*, 597 U.S. at 27). *Second*, in conducting this historical inquiry, whether for a federal or a state gun law, the Court should center its analysis on 1868, not 1791. And even if the Court were to focus on the founding, *Bruen* and *Rahimi* make clear that it should still give significant weight to Reconstruction-era and later evidence. *Third*, the Court should reject the misguided argument that the government's historical analogues are "outliers" or insufficiently numerous. Although not directly implicated here, given the robust historical record, *Bruen*'s analysis reveals that a small number of laws can establish a tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the

2

contrary. *Fourth*, this Court should reject the baseless and historically inaccurate theory that sensitive places are defined by comprehensive, government-provided security.

## ARGUMENT

### I. *Rahimi* Clarifies that Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases

*Rahimi* involved a Second Amendment challenge to the federal law that prohibits individuals subject to certain domestic violence restraining orders from possessing firearms. *See* 144 S. Ct. at 1895-96. This Court concluded that the law was an "outlier that our ancestors would never have accepted" and held it unconstitutional. 61 F.4th 443, 461 (5th Cir. 2023) (cleaned up). The Supreme Court reversed, by a vote of eight to one, explaining that this Court had misapplied *Bruen*. *See* 144 S. Ct. at 1902-03. In so doing, it relied on two regulatory traditions from the eighteenth and nineteenth centuries: affray laws (which prohibited "arming oneself to the Terror of the People," *id.* at 1901 (cleaned up)) and surety laws (which required "individuals suspected of future misbehavior" to post a bond or else be incarcerated, *id.* at 1899-1900). Although neither of those traditions closely mirrored the modern domestic violence prohibitor, together they established a principle of disarming "individual[s] [who] pose[] a clear threat of

physical violence to another," a principle also reflected in the modern law. *Id.* at 1901-02.

*Rahimi* provides guidance to courts applying *Bruen*'s historical analysis. It emphasized that "some courts"—including this Court—"have misunderstood the methodology of [its] recent Second Amendment cases" to require overly specific historical analogues to a challenged statute. *Id.* at 1897. The Supreme Court stressed that the Second Amendment "was never thought to sweep indiscriminately," and that its precedents "were not meant to suggest a law trapped in amber." *Id.* To the contrary, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. "Holding otherwise," the Court explained, "would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* at 1898.

Against that backdrop, the Supreme Court clarified in *Rahimi* that "the appropriate analysis" in Second Amendment cases is not to look for a "dead ringer" or "historical twin," *id.*, as the Fifth Circuit panel had done, *see id.* at 1903. Rather, courts should "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898 (emphasis added); *see also id.* at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). Moreover, *Rahimi* confirms that different strands of historical laws may be "[t]aken

4

together" to identify the principles against which modern laws should be judged. *See id.* at 1901 (majority opinion).

This Court has affirmed this more flexible, principles-based approach in multiple recent Second Amendment cases, underscoring that *Rahimi* "clarified the analytical framework articulated in *Bruen*." *United States v. Medina-Cantu*, 113 F.4th 537, 541 (5th Cir. 2024); *see, e.g.*, *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) (observing that, after *Rahimi*, a modern gun law need be "consistent with the *principles* that underpin our regulatory tradition" (quoting *Rahimi*, 144 S. Ct. at 1898) (emphasis added)). Moreover, as the district court correctly determined, "shootings and firearm incidents on and around school campuses are surely an 'unprecedented societal concern.'" ROA.367 (citing *Bruen*, 597 U.S. at 27); *see id.* at 364-68; *United States v. Metcalf*, No. 1:23-cr-00103, 2024 WL 358154, at *7 (D. Mont. Jan. 31, 2024) (reaching same conclusion), *appeal docketed*, No. 24-4818 (9th Cir. Aug. 6, 2024); *see also* Joseph Blocher & Eric Ruben, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 156 (2023) ("At the Founding, there was no comparable problem of gun violence at schools."). That further calls for a "more nuanced" approach to historical analogy in this case. *See* ROA.364-68.

Appellant Allam and his amici nevertheless encourage this Court to apply a divide-and-conquer method to the Second Amendment historical analysis. *See* Allam Br. 56-64; Brief of California Rifle & Pistol Ass'n, Inc. et al. ("CRPA Br.")

5

12-15. They are mistaken. Allam, for example, asserts that historical laws prohibiting guns in the areas around polling places are not analogous here because, he states, those laws "were limited in time and addressed the unique threats of voter intimidation." Allam Br. 63. But that is precisely the kind of "twins"-based analysis that caused the Supreme Court to reverse in *Rahimi*. Instead, the government's laws "reveal a principle, not a mold," *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring)—specifically, a principle that the sensitivity of a location may warrant firearms prohibitions in the surrounding area, not just in the location itself. Just as the presence of guns around a polling place might intimidate citizens on their way to vote, so might the presence of guns across the street from a school terrify children and families arriving at or leaving school, as Congress found in passing the Act. *See* 18 U.S.C. § 922(q)(1)(E). Accordingly, and as the government demonstrates, U.S. Br. 19-39, the historical record—including the polling-place laws relied upon by the district court, *see* ROA.379-86—shows that the Act is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.[3]

The approach Allam's amici take is even more wrong. They assert that the government must demonstrate the existence of "'distinctly similar' historical laws"

---

[3] As both the district court and the government note, historical laws prohibiting guns in the areas surrounding sensitive places also included laws concerning schools, parks, courthouses, and other locations. *See* ROA.379-80, 382

to support the challenged prohibition, which (in their view) addresses the "social concern of criminals committing crimes with weapons they carry in public." CRPA Br. 10 (quoting *Bruen*, 597 U.S. at 26). When a societal condition has existed since the 18th century, they contend, "[a]nalogical reasoning is … not appropriate." *Id.* at 22.

This argument is doubly incorrect. To begin with, they have failed to match the societal concern to the law's prohibition, which is carrying guns *in and around schools*, not everywhere "in public." As already discussed, gun violence in and around schools is an "unprecedented societal concern." *See supra* p. 5. And, even if it were not, a flexible, principles-based approach to history would still apply here. This Court recently left no doubt on this point, expressly rejecting the very same contentions that Allam's amici raise here. Specifically, *United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024), held that a "bifurcated approach"—*i.e.*, reasoning by analogy when considering unprecedented societal concerns or technological changes, but otherwise insisting on "directly similar" historical laws—"has been

---

n.54; U.S. Br. 24-26; *see also, e.g.*, *Md. Shall Issue, Inc. v. Montgomery Cnty.*, 680 F. Supp. 3d 567, 589 (D. Md. 2023) (citing historical laws prohibiting guns in areas around polling places, schools, and parks), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023).

rejected by the Supreme Court." That approach has no place in this or any Second Amendment case. *See id.*

Instead, as the government explains, under the proper historical analysis, the Act is consistent with historical tradition—both with the overarching "'sensitive places' principle that limits the right to public carry," *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring), and with the more granular principles that "locations where vulnerable populations congregate," including "places heavily trafficked by children," are sensitive, *Antonyuk v. James*, --- F.4th ----, 2023 WL 11963034, at *49, 62 (2d Cir. Oct. 24, 2024), and that sensitive places may include the zones surrounding them. It is thus constitutional, and the district court's judgment should be affirmed.

## II.     The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Post-Ratification Evidence

Allam seeks to undermine the government's historical evidence by claiming that the 19th-century polling place laws relied on by the district court are "too late" to inform the meaning of the Second Amendment right. Allam Br. 63; *see also* CRPA Br. 6-7, 13. That argument seriously misunderstands *Bruen*, *Rahimi*, and their historical approach to the Second Amendment.

*First*, the proper originalist analysis of the Second Amendment right centers on the Reconstruction era rather than the founding, given the transformative effect of the Fourteenth Amendment on the Bill of Rights. *Second*, even if this Court

disagrees with that conclusion or chooses (like the Supreme Court) not to settle the issue, late 19th-century (and even 20th-century) evidence remains highly relevant to understanding the scope of the Second Amendment. Either way, the contention that this Court can dismiss such evidence as "too late" is mistaken.

### a. The proper originalist analysis centers on the Reconstruction era

It is an open question whether the Second Amendment analysis should primarily focus on the founding or Reconstruction era. The Supreme Court has expressly declined to decide the issue. *See Rahimi*, 144 S. Ct. at 1898 n.1; *Bruen*, 597 U.S. at 37-38. This Court need not resolve that question here, because the Act is consistent with both founding- and Reconstruction-era tradition. *See* U.S. Br. 20-28. But if the Court wishes to resolve it, the correct originalist answer is to focus on the Reconstruction era.

To see why, it is first necessary to understand why that is correct in cases challenging state laws. Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008)), focusing on 1868 in a case concerning a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? Since the people chose to extend the Bill of Rights to the states in 1868, it is their

understanding of the scope of each right at that time that should control the originalist analysis today.

Indeed, holding otherwise would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 2023 WL 11963034, at *18.

That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018).[4]

---

[4] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

In fact, since *Bruen*, courts have seen a notable "trend … of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era," in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-1605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024); *see Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023) ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[5] *Rupp v. Bonta*, No. 8:17-cv-00746, 2024 WL 1142061, at *9, 31-32 (C.D. Cal. Mar. 15, 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc.*, 680 F. Supp. 3d at 582-83 (agreeing with *Bondi*); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi* and *Maryland Shall Issue*), *appeal dismissed*, No. 23-2166, 2024 WL 4586921 (10th Cir. Oct. 28, 2024). Still more courts have concluded that Reconstruction-era evidence is at least as important as founding-era evidence. *See, e.g.*, *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024); *Antonyuk*, 2023 WL 11963034, at *28 n.36.[6]

---

[5] Despite being vacated for rehearing en banc, *Bondi*'s robust reasoning and authorities remain persuasive.

[6] The Court should give no weight to the Third Circuit's focus on 1791 in its now-vacated decision in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *vacated sub nom. Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024). Instead of engaging with originalist principles, the court in *Lara* based its conclusion on a "general assumption" in several Supreme Court cases cited by

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[7] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo).[8] Simply put, a faithful originalist analysis compels

---

*Bruen*. 91 F.4th at 133 (citing *Bruen*, 597 U.S. at 37). In *Worth v. Jacobson*, 108 F.4th 677, 697 (8th Cir. 2024), the Eighth Circuit pointed to this same assumption to similarly conclude that Reconstruction-era laws "carry less weight than Founding-era evidence." But the cases *Bruen* cited did not address the significance of the Fourteenth Amendment's ratification for this issue and cannot have resolved the question that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 144 S. Ct. at 1898 n.1. Because *Lara* and *Worth* relied on an assumption and cannot be squared with originalist principles, they are not persuasive. *See Antonyuk*, 2023 WL 11963034, at *18-19 (rejecting the reasoning in *Lara*); *Rupp*, 2024 WL 1142061, at *32 (declining to follow *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles").

[7] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[8] *See* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008); *see also* Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the*

applying the 1868 understanding of the right to keep and bear arms in a case
challenging a state law.[9]

The pertinent question in this case, of course, is whether the 1868
understanding should also control in challenges to *federal* gun laws. If the Court
decides to resolve the issue, it should conclude that 1868 is the correct focus in
evaluating both federal and state laws.

To be sure, the choice between 1791 and 1868 is a less straightforward one
for federal laws. "Originalists seem," at first glance, to be "forced to either abandon
originalism or accept a world in which we have two Bills of Rights, one applicable
against the federal government and invested with 1791 meanings and one
incorporated against the states and invested with 1868 meanings." Kurt T. Lash,
*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441
(2022). But *Bruen* seemed to reject the possibility of different standards for the state
and federal governments, requiring incorporated rights to "have the same scope"
against each. 597 U.S. at 37. Accordingly, it appears that originalists must justify

---

*Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel,
*Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655,
662 n.32 (2008).

[9] To be clear, we do not suggest that each of these scholars also believe that
1868 is the correct focus for analyzing the meaning of the right in cases against the
federal government. But, as explained below, the weight of authority and analysis
favors 1868. *See infra* pp. 13-16.

applying either the 1868 understanding or the 1791 understanding (if they conflict) to all levels of government.

Existing doctrine does not resolve this choice. In *Rahimi*, the Supreme Court specifically declined to resolve it—in a case concerning a federal law. *See Rahimi*, 144 S. Ct. at 1898 n.1. And in *Bruen*, the Court noted only that prior decisions had "*assumed*" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." 597 U.S. at 37 (emphasis added). If the majority believed those decisions controlled the issue, it would have said so.

Instead, the Court expressly left the question open, pointing to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing

14

for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning as to not only the states, but also the federal government. *See* Amar, *The Bill of Rights*, *supra*, at xiv, 223, 243 (referring to this as a doctrinal "feedback effect"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866."). More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, … invest[ing] those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

The vacated panel decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *vacated*, 144 S. Ct. 2707 (2024), does not support a different conclusion. *First*, even before the opinion was vacated for reconsideration in light of *Rahimi*, its time-period discussion was dictum. *See id.* at 347-48 (discussing time period only after rejecting the proffered 19th-century laws as insufficiently analogous). Thus, its discussion of this issue is non-binding on two separate grounds. *Second*, that discussion is not persuasive, because it did not engage with the problems it would create for a faithful originalist, discussed above, nor with the originalist case for the

15

Fourteenth Amendment's "feedback effect."[10] This Court should reason from originalist first principles and conclude that the Reconstruction era is the central focus in Second Amendment historical analysis.

### b. Regardless of the proper temporal focus, Reconstruction-era and later evidence remains crucial

Even if this Court concludes that 1791 is the appropriate focus for historical analysis, it should still consider evidence from Reconstruction and beyond. The Supreme Court has instructed that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (second emphasis added). As *Bruen* explained, *Heller* relied on "'19th-century cases that interpreted the Second Amendment,'" "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "'how post-Civil War commentators understood the right." *Id.* at 21 (quoting *Heller*, 554 U.S. at 610, 614). *Rahimi* then rested its decision *upholding* a challenged law in significant part on laws that were passed between 1836 and 1868. *See* 144 S. Ct. at 1900 (relying on Massachusetts

---

[10] Nor did this Court resolve this issue in *Connelly*, 117 F.4th 269. There, the Court simply noted that post-enactment history may be less illuminating than history contemporaneous with a right's adoption. *See id.* at 280-81. While the Court seemingly assumed that this time was 1791 for the Second Amendment, it did not resolve the time-period question that the Supreme Court has repeatedly left open.

surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws). As Justice Kavanaugh explained, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. *Rahimi*, 144 S. Ct. at 1917 (Kavanaugh, J., concurring); *see also id.* at 1918 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding, showing that such analysis "has shaped scores of Court cases spanning all domains of constitutional law, every era of the nation's history, and Justices of every stripe." (quoting Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. Rev. 1477, 1480 (2023))); *id.* at 1919-20.

Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool" not only to "liquidate ambiguous constitutional provisions" but also to "provide persuasive evidence of the original meaning." *Id.* at 1924 (Barrett, J., concurring) (cleaned up). And that is consistent with the Court's guidance in *Bruen* that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up) (quoting decision quoting James Madison). In short,

"*Bruen* and *Rahimi* both make clear that the analysis need not be restricted to the Founding Era," and instead "favor[] a more flexible approach" that considers 19th-century evidence. *LaFave*, 2024 WL 3928883, at *7.

*Bruen* did clarify that, under *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text would not change that meaning. *See* 597 U.S. at 36, 66 & n.28. And as this Court has echoed, evidence roughly contemporaneous with a right's adoption may carry greater weight than significantly later evidence. *Connelly*, 117 F.4th at 281; *see supra* note 10. But there is no support in Second Amendment doctrine for simply rejecting 19th-century evidence out of hand.

Moreover, the Supreme Court has pointed to 19th-century evidence in discussing sensitive places, in particular. In *Bruen*, the Court indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis, 597 U.S. at 30 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in the locations the Court listed were from the *late* 19th century.[11]

---

[11] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia

Appreciating the relevance of 19th-century history accords not only with Supreme Court caselaw, but also with common sense. If a regulation passed in the decades around Reconstruction did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later tradition also reflects the founding-era understanding. And here, Allam has provided no founding-era evidence that contradicts later tradition, so there is no reason to think that there was some drastic shift in the understanding of the Second Amendment from 1791 to 1868.[12]

Nor is 1868 a cutoff. It is "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another." *Antonyuk*, 2023 WL

---

law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

[12] The attempted reliance by Allam's amici on colonial-era laws requiring some men to carry guns to church, *see* CRPA Br. 11-12, is misplaced. Those laws "were not rooted in the Second Amendment's tradition," but rather were passed so that "militiamen or free white men" could "defend against potential attacks by Native Americans and Blacks during slave uprisings." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6,

11963034, at *17. After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011). When uncontradicted by earlier evidence, a wide range of post-ratification history can both liquidate unsettled constitutional meaning and evidence original public understanding. Indeed, the actions of state legislatures in the decades around Reconstruction—starting *within the lifetimes* of individuals alive at the founding—are robust evidence of how the founding generation understood the right to keep and bear arms.

Accordingly, the suggestions from Allam that late 19th-century laws are too late or from his amici that the Supreme Court is "moving" toward "definitively rul[ing] out Reconstruction Era laws that had no Founding Era counterparts," CRPA Br. 7, are profoundly mistaken—*even if* the meaning of the right is keyed to the public understanding in 1791. In short, a proper originalist analysis of the Second Amendment right should focus on the public understanding around Reconstruction. But even if this Court disagrees, laws from the Reconstruction era and later remain crucial to that historical analysis.

---

2023). And in any case, reliance on such laws "mistakes a legal obligation for a right." *Bondi*, 61 F.4th at 1331.

Ultimately, however, this Court need not resolve these time-period questions to decide this case. The Supreme Court has already identified the principle that the government may prohibit guns in sensitive places. *See Heller*, 554 U.S. at 626-27; *Bruen*, 597 U.S. at 30-31; *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring). It has specified that those sensitive places include schools, *see Heller*, 554 U.S. at 626, and history from the founding through Reconstruction and beyond also establishes the principle that a location's sensitivity may allow guns to be prohibited around, and not just in, that location. *See* U.S. Br. 24-26. Taken together, these principles confirm that the Act, particularly as applied to the facts in this case "fits comfortably within" our Nation's tradition of firearms regulation. *Rahimi*, 144 S. Ct. at 1897.

## III.  This Court Should Reject Any Effort To Dismiss the State's Historical Analogues as "Outliers"

This Court should reject any invitation to disregard the government's historical analogues as "outliers." *See* CRPA Br. 5-6, 13-14. To begin, that argument is untenable here, as the government has presented a robust historical record. And regardless, neither *Bruen* nor *Rahimi* nor any Fifth Circuit precedent justifies using the term "outlier" as a license to ignore valid historical evidence. To the contrary, *Bruen* demonstrates that even a small number of laws can establish a tradition sufficient to support a modern regulation—particularly when it comes to sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See Wolford*, 116 F.4th at 979 (reviewing laws cited in article and brief on which *Bruen* relied). Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony (Maryland) and were enacted three years apart, in 1647 and 1650. *See id*. As the district court here observed, "*Bruen* seemed to view these few precursors to be compelling." ROA.385. The lesson is clear: "[C]omparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 2023 WL 11963034, at *17.

Under *Bruen*, a small number of laws can establish a tradition of firearms regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary. That makes sense, because governments "past and present have not generally legislated to their constitutional limits." *Id*. at *15; *see Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (rejecting as "flawed" the

assumption that past "legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"); *cf.*, *e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (recognizing that the Constitution "does not require States to regulate for problems that do not exist" in their jurisdiction).

This conclusion also respects bedrock federalism principles that entitle a state to effectuate its citizens' policy choices within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain conduct, not because the public understood the Second Amendment to prevent such regulations, but because of democratically supported policy choices.

As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. Accordingly, while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.

To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 597 U.S. at 46. But that tentative statement cannot establish a rule, given the Supreme Court's own discussion of sensitive-place laws. *See supra* pp. 21-22. Moreover, the comment must be read in context, in light of the Court's statement that it found an "overwhelming weight of other evidence" that contradicted historical analogues to New York's proper-cause law. *Id.* at 66-68 (quoting *Heller*, 554 U.S. at 632); *cf. McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024) ("[B]y reading one passage of *Bruen* out of context, [plaintiffs] ask us to invert it. … But we do not read that language in a vacuum."). What *Bruen* rejected as outliers were laws that "contradict[ed] the overwhelming weight of other evidence." 597 U.S. at 65-66 (quoting *Heller*, 554 U.S. at 632). *Bruen* does not support disregarding valid, uncontradicted historical analogues for failing some nebulous numerosity requirement.

Nor does Fifth Circuit caselaw. In *Connelly*, this Court questioned whether three Reconstruction-era laws and one later law might be insufficient to establish a tradition. *See Connelly*, 117 F.4th at 281. But the Court's holding was that the laws were insufficiently similar to the challenged law in that case. It concluded that the four laws *do* support a tradition of banning firearms carrying while intoxicated, but that the challenged law was materially dissimilar as applied to the defendant. *See id*

24

at 281-82.[13] And in rejecting a facial challenge to the law, the Court relied on that same handful of laws to find a tradition sufficient to uphold the challenged law in some circumstances. *See id.* at 282. The Court thus held that four laws were sufficient to establish a tradition.

Simply put, the moniker "outlier" is not a license to disregard valid, uncontradicted historical analogues. *Bruen* does not support that approach, which would reject, rather than adhere to, our Nation's tradition of firearms regulation. Properly applying *Rahimi* and *Bruen*, the historical record here amply demonstrates the Act's constitutionality.[14]

## IV.    Sensitive Places Are Not Defined By Government-Provided Security

Finally, this Court should resist the suggestion of Allam's amici that the Second Amendment forbids prohibiting guns in the absence of comprehensive, government-provided security. *See* CRPA Br. 3, 8. Several courts have rejected that

---

[13] Similarly, the now-vacated opinion in *Daniels* briefly emphasized that the proffered historical analogues in that case were few, but based its holding on the conclusion that the challenged law was "substantially broader" than those laws. *Daniels*, 77 F.4th at 347.

[14] Nor should this Court dismiss any of those laws merely for originating in territories. *See* Allam Br. 59; CRPA Br. 22. That approach misunderstands *Bruen* and cannot survive *Rahimi*, which relied on territorial surety laws from Wisconsin (1838), Minnesota (1851), and Oregon (1854) to uphold a federal law. *See* 144 S. Ct. at 1900 (citing *Bruen*, 597 U.S. at 56 & n.23, which included those territorial laws).

argument, before and after *Bruen*. *See Wolford*, 116 F.4th at 981; *United States v. Class*, 930 F.3d 460, 464-65 (D.C. Cir. 2019); *LaFave*, 2024 WL 3928883, at *13; *Kipke v. Moore*, 695 F. Supp. 3d 638, 649-50 (D. Md. 2023). This Court should do the same, because the argument cannot account for the locations the Supreme Court has already identified as sensitive. "Many schools and polling places have few security measures—now or in the past—yet the Supreme Court listed those place as conclusively sensitive." *Wolford*, 116 F.4th at 981; *see also Class*, 930 F.3d at 465 ("Many schools and government buildings—the paradigmatic sensitive places identified in *Heller I*—are open to the public, without any form of special security or screening.") (cleaned up); *see also United States v. Dorosan*, 350 F. App'x 874, 875-76 (5th Cir. 2009) (unpublished) (per curiam) (holding that post office parking lot qualified as a sensitive place). Even such indisputably sensitive locations as the U.S. Capitol and the White House lacked serious security for decades.[15] This Court should reject amici's ahistorical suggestion and should look instead to Supreme

---

[15] *See* United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission (explaining that Capitol watch was initially one person and expanded to four in 1828); White House Historical Ass'n, *Guarding the White House*, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house (timeline describing no guards at White House before 1830, other than militia presence on grounds during War of 1812, and no permanent security force until four-man guard was established in 1842).

Court precedent and this Nation's established tradition of sensitive-place restrictions, which demonstrate that the Act is constitutional.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: November 13, 2024          Respectfully submitted,

/s/ Erik Fredericksen
Janet Carter
William J. Taylor, Jr.
Erik Fredericksen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8198
efredericksen@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,494 words, excluding the portions exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

November 13, 2024                    /s/Erik Fredericksen
                                     Erik Fredericksen

                                     *Counsel for Amicus Curiae*
                                     *Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

On November 13, 2024, I electronically filed this brief with the Clerk of the

Court for the United States Court of Appeals for the Fifth Circuit using the

CM/ECF system. All parties in the case are registered CM/ECF users.


November 13, 2024                    /s/Erik Fredericksen
                                     Erik Fredericksen

                                     *Counsel for Amicus Curiae*
                                     *Everytown for Gun Safety*