# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
June 16, 2025
Lyle W. Cayce
Clerk

No. 24-40065

United States of America,

*Plaintiff—Appellee,*

versus

Ahmed Abdalla Allam,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:23-CR-10-1

_____

Before Graves, Higginson, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

Ahmed Abdalla Allam was charged with possession of a firearm within 1,000 feet from school grounds, in violation of 18 U.S.C. § 922(q)(2)(A). Invoking the Second Amendment, Allam challenged the constitutionality of the statute, both on its face and as applied to him. The district court rejected his challenges, and Allam thereafter pled guilty.

Allam now appeals the denial of his as-applied challenge. We affirm.

No. 24-40065

# I.

In August 2022, Allam embarked on a road trip in his father's SUV from his home in Brooklyn, New York. By early January 2023, he pulled into Beaumont, Texas, via a circuitous, cross-country route. By the time he arrived in Texas, he possessed an AR-15-style rifle that he had purchased along the way in Pennsylvania. Since leaving New York, he had also been living in the SUV; he continued to do so while he was in Texas.

In Beaumont, Allam began parking his SUV for extended periods next to St. Anthony Cathedral Basilica School, a private school for students from pre-kindergarten through 8th grade. The Beaumont Police Department (BPD) was first alerted to his presence near the school on January 5. When approached by a BPD officer and asked if he had any guns or weapons, Allam replied that he did not. After being advised to park elsewhere, Allam was sighted in the following days near the Beaumont Civic Center and in front of a nearby Jewish synagogue for extended periods, prompting synagogue members to call BPD repeatedly.

Allam returned to the vicinity of St. Anthony around January 22 and remained parked next to the school almost continually, causing "fear and concern" among the school community. Attempts by teachers, BPD, and members of the public to get Allam to leave were unsuccessful. Due to Allam's presence, the school "stopped having any type of outside . . . activity," including "softball[,] . . . cheerlead[ing,] . . . [and] recess," and the school prohibited students from "walking between classes outside."[1]

---

[1] During Allam's detention hearing, a witness testified that there had been a 5-kilometer run organized by the school on a Saturday in late January. Allam's car was parked near the starting/finish line of the race, and BPD was concerned that Allam could use a firearm or his vehicle to harm participants. During the run, BPD "blocked [Allam]

2

No. 24-40065

On Sunday afternoon, January 29, a school parent confronted Allam, who was sitting in his SUV parked adjacent to the school, and asked him to leave the area. Allam responded that he had a "mission" and that no one would ever see him again after Monday. Alarmed by Allam's ominous statement and based on a strong suspicion that Allam possessed a gun, the parent immediately prompted BPD to post an officer near Allam's SUV. Later that Sunday, when Allam began to drive the SUV from its parked location, the officer stopped him for various alleged traffic violations.[2] When Allam refused to comply with the officer's instructions, he was arrested. In Allam's car, the police discovered the rifle, 150 rounds of ammunition, and a loaded thirty-round magazine.[3]

The Government's exhibits demonstrate where Allam was arrested in relation to St. Anthony. The rectangular school campus is surrounded by public streets:

---

in on three sides" so that "there was no way Allam could either move his car or even get out of his car."

[2] On January 25, an officer had warned Allam that the frame around his rear license plate was obscuring the state of registration, in violation of Texas law. When the officers stopped Allam on January 29 for failing to signal a turn, they also explained that he was being arrested for failing to correct the license plate violation.

[3] In addition, the police found "a series of random notes in Allam's phones, several of which contained . . . descriptions of violent acts, including murder, torture, maiming, hate crimes, and rape . . . pointed seemingly towards the President of the United States[,] . . . the United States Government, and its citizens (including women and children)." The notes referenced "various Islamic extremists, terrorists, and dictators in the Middle East." Allam's phone also contained videos and images that showed "dead and dismembered cats," "Allam gutting cats and pulling out their entrails with his hands," and Allam "lighting [a] cat on fire." Also in the car were "children's clothing," marijuana residue, and cocaine.

3

No. 24-40065



When Allam was arrested, he was parked on Forsythe Street (the long side on the right in the above photo) between St. Anthony and its affiliated church, St. Anthony Cathedral Basilica. The second photo depicts a different vehicle parked where Allam had regularly parked his SUV, "under a school-zone sign approximately 40 feet across from the school's property line, adjacent to the school's playground":



From that vantage point, Allam had a "clear view of the . . . crosswalk that students use[d] to cross Forsythe Street on their way to the off-grounds basilica."

In February 2023, Allam was indicted and charged with possession of a firearm in a school zone, in violation of 18 U.S.C. § 922(q)(2)(A):

> It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

A "school zone" is defined elsewhere as: "(A) in, or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 U.S.C. § 921(a)(26). So the statute prohibits both possession of a firearm on school grounds and within a 1,000-foot "buffer zone" around school grounds.[4]

Allam moved to dismiss the indictment under Rule 12(b)(3)(B) of Federal Rules of Criminal Procedure, arguing that § 922(q)(2)(A), paired with § 921(a)(26)(B)'s definition of "school zone," violates the Second Amendment. In a thorough order, the district court upheld the statute as

---

[4] But Section 922(q)(2)(A) is not a categorical prohibition. In addition to the scienter requirement in § 922(q)(2)(A), the next subparagraph enumerates several exemptions, including allowing possession of a firearm:

> (i) on private property not part of school grounds;
>
> (ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license; [or]
>
> (iii) that is—
>
>> (I) not loaded; and
>>
>> (II) in a locked container, or a locked firearms rack that is on a motor vehicle[.]

18 U.S.C. § 922(q)(2)(B)(i)–(iii).

constitutional, both facially and as applied to Allam, and denied the motion. *United States v. Allam*, 677 F. Supp. 3d 545, 579–80 (E.D. Tex. 2023).[5] Applying the framework the Supreme Court articulated in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 24–30 (2022), the district court found "no historical precursor to § 922(q)(2)(A) that is a 'twin' or 'dead ringer,'" but nonetheless concluded that "late nineteenth-century prohibitions on possessing firearms in schools and within the vicinity of polling places constitute[d] relevantly similar historical analogues that compel[led] the court to find § 922(q)(2)(A) constitutional." *Allam*, 677 F. Supp. 3d at 578. The district court also emphasized the "unprecedented societal concern" of school shootings and underscored that § 922(q)(2)(A) is not a total prohibition on firearm possession given its carveouts, including one for "individuals licensed . . . by the State in which the school zone is located." *Id.* at 565–66 (citing § 922(q)(2)(B)(ii)).

Following the denial of his motion to dismiss, Allam pled guilty. The district court sentenced him to 60 months in prison followed by three years of supervised release. On appeal, Allam challenges only the district court's rejection of his as-applied constitutional challenge.

## II.

The district court's analysis focused on Allam's facial challenge to § 922(q)(2)(A) rather than his as-applied claim. *Cf. United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (discussing general rule that courts should address as-applied challenges before considering facial ones). But on appeal, Allam abandons his facial attack, so we cabin our analysis to the application

---

[5] The district court rendered its decision more than a year before the Supreme Court handed down *United States v. Rahimi*, 602 U.S. 680 (2024), in which the Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(8) and clarified the standard it fashioned in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022).

of the statute to Allam's specific circumstances. *See Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019).

We review constitutional questions *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003). In considering Allam's as-applied Second Amendment challenge, we (A) outline the Supreme Court's *Bruen* framework; and then (B) survey, through *Bruen*'s lens, the potentially analogous historical firearm regulations proffered by the Government and consider whether § 922(q)(2)(A)'s application to Allam is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17.

### A.

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the Supreme Court formulated a two-part framework "centered on constitutional text and history" for courts to employ in assessing Second Amendment claims. 597 U.S. at 22. First, we must determine whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct." *Id.* at 24. We then proceed to the second part of the analysis, in which the Government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

At this second step, we consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 26–31). To do that, we "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing]

faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29).[6]

Importantly, even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (citing *Bruen*, 597 U.S. at 30). "Why and how the regulation burdens the right are central to this inquiry." *Id.*[7]

With some significant exceptions, § 922(q)(2)(A) broadly disarms individuals "in, or on the grounds of, a public, parochial or private school" or "within a distance of 1,000 feet from the grounds" of a school. 18 U.S.C. § 921(a)(26). But in evaluating Allam's as-applied challenge, which is "a narrower consideration" than weighing a facial attack, *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019), we "go beyond the language of the [statute]"

---

[6] There is continuing debate over whether "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," or to "when the Fourteenth Amendment was ratified in 1868." *Bruen*, 597 U.S. at 37. But we need not join that debate for today's case, because "the public understanding of the right to bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

[7] Potentially muddling the application of the *Bruen* framework is the concept of "sensitive places," which the district court addressed at length and the Government heavily references in its brief. The Supreme Court has labeled certain locations—including schools—as "sensitive places" when discussing location-based firearm regulations. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 30. But how this concept meshes with *Bruen*'s framework is an open question. *See McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("[S]ensitive-place laws are likely captured by the plain text of the Second Amendment—they directly impact the right to bear. Therefore, they are likely subject to *Bruen*'s historical analysis."). However, because we need not do so to resolve Allam's appeal, we decline to delve further into this question today.

and analyze its "application to the particular circumstances of an individual." *Freedom Path, Inc.*, 913 F.3d at 508. At essence, "the [G]overnment must demonstrate that [§ 922(q)(2)(A)] is consistent with this Nation's historical tradition of firearm regulation," as the statute is applied to Allam. *Bruen*, 597 U.S. at 17.

**B.**

Our analysis of Allam's Second Amendment challenge to § 922(q)(2)(A) is driven by the "concrete facts that properly underlie an as-applied challenge to a statute." *Justice v. Hosemann*, 771 F.3d 285, 295 (5th Cir. 2014). To recap: For many days leading up to his arrest, Allam exhibited disturbing behavior in several locations around Beaumont—in particular, alarming the members of the St. Anthony school community, who suspected (correctly) that he possessed a gun. His presence was conspicuous enough that people affiliated with the school repeatedly called the police—as did members of the local synagogue when he parked nearby. Despite repeated admonishments from BPD, parents, and community members, Allam's behavior disrupted the school's day-to-day routine over the course of at least several days. His threatening deportment was capped by his cryptic Sunday-afternoon statement about a "mission" the following Monday, in response to being confronted yet again by a school parent. And just before Allam was arrested—with a rifle, 150 rounds of ammunition, and a loaded thirty-round magazine—he was parked across the street, about 40 feet away, from the school campus. Mindful that our inquiry is bounded by these "concrete facts," *id.*, we turn to applying *Bruen*'s framework.

At a threshold level, Allam clears the first step of *Bruen*'s two-part test because the Second Amendment's plain text covers his conduct, keeping a rifle in his car ostensibly for self-defense. *Bruen*, 597 U.S. at 24; *see United States v. Diaz*, 116 F.4th 458, 462, 467 (5th Cir. 2024) (concluding that "[t]he

plain text of the Second Amendment covers the conduct" of a prior felon who was found with a gun in his car during a traffic stop). Weighed against the second part of *Bruen*'s standard, however, Allam's claim comes up wanting.

To ascertain whether § 922(q)(2)(A), as applied to Allam, is "relevantly similar to laws that our tradition is understood to permit," *Rahimi*, 602 U.S. at 692 (internal quotation marks omitted), this court must survey the historical exemplars proffered by the Government: King Henry VIII's version of the Statute of Northampton, post-ratification regulations in school settings, and "buffer-zone" restrictions around polling places. We consider each in turn.

The Statute of Northampton, first enacted in 1328 in England,

> provided that, with some exceptions, Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure."

*Bruen*, 597 U.S. at 40 (quoting 2 Edw. 3 c. 3 (1328)). The Government offers King Henry VIII's version of the Statute of Northampton, applicable to Wales and which additionally prohibited arms within two miles of a court, as an analogous historical example of a "buffer zone" law. 26 Hen. 8, c.6, § 3 (1534). But to assess whether the Statute of Northampton, as a location-based restriction, is "relevantly similar" to § 922(q)(2)(A), we must look beyond the law's text because, in practice, the Statute was not strictly enforced as written. According to scholarship cited by the Supreme Court in *Bruen*, 597 U.S. at 30, "[a]n indictment or presentment for violation of the

No. 24-40065

Statute of Northampton had to specify that the arms carrying was *[i]n quorandam de populo terror*—to the terror of the people." David B. Kopel & Joseph Greenlee, *The 'Sensitive Places' Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 217 (2018) [hereinafter Kopel & Greenlee]; *see also Bruen*, 597 U.S. at 5 ("[N]o wearing of Arms is within the meaning of [the Statute], unless it be accompanied with such Circumstances as are apt to terrify the People." (quoting 1 PLEAS OF THE CROWN 136)). "[B]y the time of American independence[,] . . . the old Statute of Northampton . . . was only applicable to carrying for the purpose of terrorizing other people, and not to carrying for legitimate self-defense." Kopel & Greenlee at 227. Thus, "the Statute . . . was no obstacle to public carry for self-defense in the decades leading to the founding." *Bruen*, 597 U.S. at 45.

Even so, though perhaps not a "dead ringer" or "historical twin" of modern "buffer zone" restrictions on firearm possession, the Statute of Northampton is nonetheless of a type of historical location-based regulation relevantly similar to § 922(q)(2)(A)'s application to Allam: the so-called "going armed laws," which the Supreme Court has addressed at length. *See Rahimi*, 602 U.S. at 697; *Bruen*, 597 U.S. at 40–54. These laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land," and were "incorporated into American jurisprudence through the common law." *Rahimi*, 602 U.S. at 697 (citing 4 BLACKSTONE 149). "As during the colonial and founding periods, the common-law offenses of 'affray' or going armed 'to the terror of the people' continued to impose some limits on firearm carry in the antebellum period." *Bruen*, 597 U.S. at 50.

"Why and how" the Statute of Northampton and going-armed laws "burden[ed] the right" to carry firearms, *Rahimi*, 602 U.S. at 692, mirror the operation of § 922(q)(2)(A) here, suggesting that "applying [§ 922(q)(2)(A)]

to [Allam] is consistent with this Nation's historical tradition of firearm regulation," *Diaz*, 116 F.4th at 472. First, why: Section 922(q) was enacted in response to "concern about violent crime and gun violence," the possibility of "parents . . . declin[ing] to send their children to school for the same reason," and the "occurrence of violent crime in school zones." 18 U.S.C. § 922(q)(1)(E) & (F). These aims are consistent with a longstanding tradition of restricting those who carry firearms "to the terror of people" and those who pose a "clear threat of physical violence to another." *See Rahimi*, 602 U.S. at 697–98. Next, how: Section 922(q)(2)(A) delimits schools and buffer zones around them as areas in which firearms may not be carried, subject to significant enumerated exceptions that materially ameliorate the restriction of the right. This roughly maps with how the Statute of Northampton's various location-based restrictions generally operated in practice, as well as the behavior the going-armed laws proscribed. As applied to Allam, then, § 922(q)(2)(A) is relevantly similar to the Statute of Northampton and, more broadly, the going-armed laws of which the Statute is one example.

The other historical evidence proffered by the Government as consistent with modern location-based firearm restrictions is more attenuated. An initial caveat is that "[p]roceeding past the bounds of founding-era analogues . . . is risky under *Bruen*, and courts must 'guard against giving postenactment history more weight than it can rightly bear.'" *Reese v. ATF*, 127 F.4th 583, 599 (5th Cir. 2025) (quoting *Bruen*, 597 U.S. at 35). Another is that sporadic regulations, in only a few jurisdictions, likely are insufficient to substantiate a "regulatory tradition." *See Bruen*, 597 U.S. at 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."); *see also* Kopel & Greenlee at 262 ("Bans on guns in schools are, in most places, of similarly recent vintage."). Yet the forerunners the Government adduces are at least aligned with the

conclusion that § 922(q)(2)(A)'s application to Allam is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 26–31).

For example, the Government points to early firearm regulations in educational settings as a category of "relevantly similar" firearm restrictions. In the decades following the ratification of the Second Amendment, several colleges banned students from possessing weapons on campus, including the University of Georgia (1810),[8] the University of Virginia (1824),[9] and the University of North Carolina (1838).[10] However, these rules were only limited prohibitions, specifically disarming students but not the public at large. And none of these regulations applied off campus. So they were not really "buffer zone" laws at all, such that, even if campus or student safety was "why" these restrictions constrained firearm possession, "how" they did so is somewhat distinct from § 922(q)(2)(A)'s reach.

---

[8] The Minutes of the Senatus Academicus, 1799–1842, at 86 (Aug. 1810) ("[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere.").

[9] University of Virginia Board of Visitors Minutes, at 68–69 (Oct. 1824) (prohibiting students, but not faculty or other employees, from keeping "weapons" on school premises).

[10] Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina, at 15 (Raleigh, NC: Raleigh Register, 1838) ("No Student shall keep a dog, or fire arms, or gunpowder. . . . [N]or shall he use fire arms without permission from the President.").

No. 24-40065

The Government also offers later 19th-century statutes from Texas (1871)[11] and Missouri (1883)[12] that more broadly prohibited carrying firearms in educational settings. But like the earlier college restrictions, these statutes restricted firearm carry inside—rather than around—schools. The closest analogue to our case, at least of those proffered by the Government, of this genre of laws is an 1879 Missouri statute that prohibited people from *discharging* any gun near a school.[13]

Taken together, and discounting for *Bruen*'s caveats about over-weighing scattered or postenactment regulations (here, both limitations apply), these historical firearm restrictions in educational settings perhaps hint at "a tradition of public-carry regulation." *Bruen*, 597 U.S. at 46. They at least buttress our conclusion that § 922(q)(2)(A) hurdles *Bruen*'s test as applied here, i.e., that carrying firearms in a manner that poses a "clear threat of physical violence to another," *Rahimi*, 602 U.S. at 698, specifically to school children, could constitutionally be restricted around schools.

Finally, the Government provides several examples of laws demarking buffer zones restricting firearms around polling places. At the time of the founding, to "prevent any violence or force being used at the said elections," Delaware's constitution prohibited any individual from "com[ing] armed" to any polling place on election day or "any battalion or company" from remaining "within one mile" of a polling place during the 24 hours before

---

[11] Act of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws 25–26 (prohibiting "any person" from carrying "a pistol or other firearm" into "any school room, or other place where persons are assembled for . . . educational or scientific purposes").

[12] Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76 (similar).

[13] Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90–91 (prohibiting people from discharging "any gun, pistol or fire-arms of any description, in the immediate vicinity [200 yards] of any court house, church or building used for school or college purposes").

the polls opened and until 24 hours after the polls closed. DEL. CONST. art. 28 (1776). And in the late-19th century, as a reaction to efforts by "[a]rmed terrorist organizations . . . to prevent blacks or white Republicans from voting," Kopel & Greenlee at 262, a few states prohibited the carrying of firearms on election day around polling places: e.g., Louisiana (1870),[14] Texas (1874),[15] and Maryland (1886).[16] However, these buffer zones were time-restricted to certain election-related days. And only Delaware's polling buffer zone dates to the founding era. So even assuming the "why" of these laws mirror the purposes behind § 922(q)(2)(A), "how" they operated is materially more limited than how § 922(q)(2)(A) applied to Allam—he was arrested on a Sunday, presumably when no school-related activities were taking place. Moreover, these regulations suffer from the same limitations as the 19th century school regulations discussed *supra*: regulations from only four states at best present weak evidence of "a tradition of public-carry regulation." *Bruen*, 597 U.S. at 46; *see id.* at 36 ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" (quoting *Heller*, 554 U.S. at 614)). Still, like the educational restrictions, and at least one version of the Statute of Northampton, these laws offer some evidence of the permissibility

---

[14] Act of Mar. 16, 1870, § 73, 1870 La. Acts 159–60 ("[I]t shall be unlawful for any person to carry any gun, pistol, . . . concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration . . . .").

[15] 2 A DIGEST OF THE LAWS OF TEXAS, CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST, FROM 1754 TO 1874, CAREFULLY ANNOTATED 1317–18 (4th ed. 1874) (similar).

[16] Act of Apr. 7, 1886, ch. 189, § 1, 1886 Md. Laws 315–16 (banning bearing arms within 300 yards of the polls on election day in Calvert County).

of limited buffer zones for the purpose of preventing threats of physical violence.

By contrast, Allam focuses heavily on the lack of a conclusive historical analogue to § 922(q)(2)(A)'s 1,000-foot buffer zone. But this focus misses the mark. We need not—and do not—fix how far a buffer zone may stretch before it runs afoul of the Second Amendment to decide Allam's as-applied claim. Section 922(q)(2)(A)'s buffer zone needed to do very little work here, if any. Allam had camped out only 40 feet from school grounds. His SUV was parked on a street bordering campus—adjacent to school zone lighting and signage—at a location where students crossed routinely to get to the off-campus basilica. He was also behaving erratically and menacingly, so much so that people repeatedly called the police, and St. Anthony changed its students' routines and traffic patterns. As applied here, § 922(q)(2)(A) is "relevantly similar" to the Statute of Northampton and going-armed laws and the (limited) historical examples of firearm restrictions in educational settings and buffer zones around polling places, which corroborate the constitutionality of disarming a visibly threatening individual as near a school as Allam was.[17]

---

[17] The district court reasoned that analyzing Allam's claims against the *Bruen* framework required "a more nuanced approach" given that "[s]chool shootings have lamentably become a part of this Nation's present-day reality." *Allam*, 677 F. Supp. 3d at 567; *see Bruen*, 597 U.S. at 27 ("[O]ther cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). As with the concept of "sensitive places," *see supra* note 7, we hesitate to follow the district court down that path without guidance from the Supreme Court about what such a "nuanced approach" might entail. On substance, though, our crediting for the most part the Government's proffered historical analogues—even the ones that are somewhat attenuated through *Bruen*'s lens—is consistent with the district court's focus on school shootings as an "unprecedented societal concern[]" that the founders did not face. Under either rubric, it is clear that Allam's as-applied challenge fails.

No. 24-40065

## III.

The "why and how" of 18 U.S.C. § 922(q)(2)(A), as applied to Allam, are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Put differently, "taken together," the historical analogues offered by the Government "establish that our tradition of firearm regulation supports the application of [§ 922(q)(2)(A)] to [Allam]." *Diaz*, 116 F.4th at 471. We offer no opinion regarding the constitutionality of § 922(q)(2)(A) in any other context.

For the foregoing reasons, the district court properly rejected Allam's as-applied challenge to the statute. Accordingly, the ruling of the district court, as well as Allam's guilty-plea conviction, are

AFFIRMED.